# EXHIBIT 1

## IN THE COURT OF COMMON PLEAS
## LAKE COUNTY, OHIO

**LITTLE MOUNTAIN PRECISION, LLC**       )
8687 Tyler Blvd                          )       CASE NO. _____
Mentor, Ohio  44060                      )
                                         )       JUDGE _____
       Plaintiff,                     )
                                         )
                                         )
vs.                                      )
                                         )
**DR GUNS LLC, dba DRG Manufacturing**   )
**and dba White Label Armory**           )
c/o Roger T. Stelle                      )
1515 E. Woodfield Rd., Suite 250         )
Schaumburg, IL 60173                     )
                                         )       **COMPLAINT**
*ALSO SERVE AT:*                         )
                                         )
**DR GUNS LLC, dba DRG Manufacturing**   )
**and dba White Label Armory**           )
551 Telser Rd.,                          )
Lake Zurich, IL 60047                    )
                                         )
and                                      )
                                         )
**RYBACKI MANAGEMENT INC.**              )
c/o Roger T. Stelle                      )
1515 E. Woodfield Rd., Suite 250         )
Schaumburg, IL 60173                     )
                                         )
and                                      )
                                         )
**SRW INDUSTRIES, LLC**                  )
c/o Roger T. Stelle                      )
1515 E. Woodfield Rd., Suite 250         )
Schaumburg, IL 60173                     )
                                         )
*ALSO SERVE AT:*                         )
                                         )
SRW INDUSTRIES, LLC                      )
500 Capital Dr.,                         )
Lake Zurich, IL 60047                    )
                                         )
and                                      )
                                         )

**500 CAPITAL DRIVE LLC**     )
c/o Roger T. Stelle       )
1515 E. Woodfield Rd., Suite 250  )
Schaumburg, IL 60173     )
              )
*ALSO SERVE AT:*      )
              )
500 CAPITAL DRIVE LLC   )
500 Capital Dr.,       )
Lake Zurich, IL 60047     )
              )
and           )
              )
**SLD REAL ESTATE HOLDINGS LLC** )
c/o Roger T. Stelle       )
1515 E. Woodfield Rd., Suite 250  )
Schaumburg, IL 60173     )
              )
*ALSO SERVE AT:*      )
              )
SLD REAL ESTATE HOLDINGS  )
500 Capital Dr.,       )
Lake Zurich, IL 60047     )
              )
and           )
              )
**EQUIPMUNK LEASING LLC**   )
c/o Roger T. Stelle       )
1515 E. Woodfield Rd., Suite 250  )
Schaumburg, IL 60173     )
              )
*ALSO SERVE AT:*      )
              )
EQUIPMUNK LEASING LLC   )
500 Capital Dr.,       )
Lake Zurich, IL 60047     )
              )
and           )
              )
**551 TELSER ROAD LLC**    )
c/o Roger T. Stelle       )
1515 E. Woodfield Rd., Suite 250  )
Schaumburg, IL 60173     )
              )
*ALSO SERVE AT:*      )
              )

551 TELSER ROAD LLC                          )
500 Capital Dr.,                             )
Lake Zurich, IL 60047                        )
                                             )
and                                          )
                                             )
**HOBBIT HOLDINGS INC.**                     )
c/o Roger T. Stelle                          )
1515 E. Woodfield Rd., Suite 250             )
Schaumburg, IL 60173                         )
                                             )
and                                          )
                                             )
                                             )
                                             )
            Defendants.                      )

Plaintiff, Little Mountain Precision, LLC ("Little Mountain"), by and through undersigned counsel, for its *Complaint* against Defendants DR Guns LLC, dba DRG Manufacturing and dba White Label Armory ("DRG"), Rybacki Management Inc. ("RMI"), SRW Industries, LLC ("SRW"), 500 Capital Drive LLC ("500 Capital Drive"), SLD Real Estate Holdings LLC ("SLD"), Equipmunk Leasing LLC ("Equipmunk"), 550 Telser Road LLC ("550 Telser Road"), and Hobbit Holdings Inc. ("Hobbit Holdings") (DRG, RMI, SRW, 500 Capital Drive, SLD, Equipmunk, 550 Telser Road, and Hobbit Holdings are collectively referred to herein as the "Related Rybacki Family Companies"), states as follows:

## PARTIES

1.      Little Mountain is an Ohio limited liability company with a statutorily registered place of business at 60 South Park Place, Painesville, OH 44077 and a principal office at 8687 Tyler Blvd., Mentor, Ohio 44060.

2.      DRG is an Illinois limited liability company doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173 and a principal office at 551 Telser Rd., Lake Zurich, IL 60047.

3.      RMI is an Illinois corporation doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173.

4.      SRW is an Illinois limited liability company doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173 and a principal office at 500 Capital Dr., Lake Zurich, IL 60047.

5.     500 Capital Drive is an Illinois limited liability company doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173 and a principal office at 500 Capital Dr., Lake Zurich, IL 60047.

6.     SLD is an Illinois limited liability company doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173 and a principal office at 500 Capital Dr., Lake Zurich, IL 60047.

7.     Equipmunk is an Illinois limited liability company doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173 and a principal office at 500 Capital Dr., Lake Zurich, IL 60047.

8.     551 Telser Road is an Illinois limited liability company doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173 and a principal office at 500 Capital Dr., Lake Zurich, IL 60047.

9.     Hobbit Holdings is an Illinois corporation doing business in Ohio, with a statutorily registered place of business at 1515 E. Woodfield Rd., Suite 250, Schaumburg, IL 60173.

10.    David Rybacki is an individual doing business in Ohio, and residing at 1132 Galena Dr., Volo, IL  60073-8188.

11.    David Rybacki is a principal of the Related Rybacki Family Companies, with the actual and/or apparent authority to bind the Related Rybacki Family Companies.

12.    Stacy Rybacki a/k/a Stacy Paras is an individual doing business in Ohio, and residing at 21847 N. Tall Oaks Dr., Kildeer, IL  60047-7960.

13.    Stacy Rybacki a/k/a Stacy Paras is a principal of the Related Rybacki Family Companies, with the actual and/or apparent authority to bind the Related Rybacki Family Companies.

## JURISDICTION AND VENUE

14.    This Court possesses personal jurisdiction over Defendants because the subject business was transacted within the territorial jurisdiction of this Court.

15.    This Court possesses subject matter jurisdiction over the subject matter of this action pursuant to O.R.C. § 2305.01.

16.    The amount in controversy in this action exceeds Twenty-Five Thousand Dollars ($25,000).

4

17.     Venue is proper in this forum under Civ.R. 3(C)(3) and/or (5), as it is the county in which the Defendants conducted activity that gave rise to the claims for relief set forth herein, and the tangible personal property at issue in this suit is further situated in this county.

## GENERAL BACKGROUND

### (The Gas Key Agreement)

18.     Little Mountain is a precision manufacturing company.

19.     DRG is a manufacturing company, with a focus in the firearms industry.

20.     On January 29, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed a Purchase and Supply Agreement ("Gas Key Agreement").[1] (*See* Exhibit 1.)

21.     The Gas Key Agreement was signed by David Rybacki. (*Id.*)

22.     The Gas Key Agreement concerned DRG's purchase of several products from Little Mountain, including gas keys, triggers, hammers, and gas blocks. (*See id.*, and Ex. A thereto.)

23.     The Gas Key Agreement provided that DRG would purchase weekly quantities of: 7,000 gas keys; 4,600 triggers; 4,600 hammers; and 4,000 gas blocks. (*Id.*)

24.     The Gas Key Agreement provided for an initial delivery lead time of 52 weeks, and a production lead time of 20 weeks. (*Id.*)

25.     The Gas Key Agreement provided for an initial term of five (5) years, with the possibility of one year renewals thereafter. (*Id.*, at Sect. 3.)

26.     The Gas Key Agreement's Default, Termination, and Remedies provision provided, in pertinent part:

> Default. Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement. In the event of an uncured event of Default, either non-defaulting Party

---

[1] As discussed *infra*, the term Gas Key Agreement includes the First Gas Key Amendment and Second Gas Key Amendment as defined and discussed below.

may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

\*\*\*

In the event of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

(*Id.*, at Sect. 9(A) and (E).)

27.     In June 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed an amendment to the Gas Key Agreement ("First Gas Key Amendment"). (*See* Exhibit 2.)

28.     The First Gas Key Amendment was signed by David Rybacki.

29.     In pertinent part, the First Gas Key Amendment provided:

a.      DRG would no longer purchase the trigger or hammer, and instead only purchase the gas key and gas block. (*Id.*, at Sect. 2-3.)

b.      The respective weekly quantities for the gas key and gas block would be considered a total purchase quantity irrespective of the particular part (e.g., a weekly order could be 100% gas keys and 0% gas block so long as the total weekly part total was met). (*Id.*, at Sect. 4.) Further, each part had a "Minimum Run Quantity" that had to be met within six months. (*Id.*; *see also* Exhibit A thereto.)

c.      The lead time was changed from 20 weeks to 30 weeks. (*Id.*, at Sect. 5.)

d.      All unaltered terms and conditions of the Gas Key Agreement remained in full force and effect. (*Id.*, at Sect. 7.)

30.     On December 9, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed another amendment to the Gas Key Agreement ("Second Gas Key Amendment"). (*See* Exhibit 3.)

31.     The Second Gas Key Amendment was signed by Stacy Rybacki a/k/a Stacy Paras.

32.     The Second Gas Key Amendment was signed by Chris Gosell.

33.     In pertinent part, the Second Gas Key Amendment provided:

    a.     DRG would no longer purchase the gas block, and would instead only purchase the gas key. (*Id.*, at Sect. 3-4.)

    b.     The weekly quantity for the gas key was altered to provide for a range that the Related Rybacki Family Companies could choose from, and pricing would fluctuate based on volume. (*Id.*, at Sect. 5-6; *see also* Exhibit A thereto.)

    c.     All unaltered terms and conditions of the Gas Key Agreement remained in full force and effect. (*Id.*, at Sect. 8.)

### (The Upper and Lower Agreement)

34.     On January 29, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed another Purchase and Supply Agreement ("Upper and Lower Agreement"). (*See* Exhibit 4.)

35.     David Rybacki signed the Upper and Lower Agreement.

36.     The Upper and Lower Agreement concerned DRG's purchase of several products from Little Mountain, including upper receivers and lower receivers. (*See id.*, and Ex. A thereto.)

37.     The Upper and Lower Agreement provided that DRG would purchase weekly quantities up to: 2,000 upper receivers and/or lower receivers.  (*Id.*)

38.     The Upper and Lower Agreement provided for an initial delivery lead time of 52 weeks, and a production lead time of 20 weeks. (*Id.*)

39.     The Upper and Lower Agreement provided for an initial term of five (5) years, with the possibility of one year renewals thereafter. (*Id.*, at Sect. 3.)

40.     The Upper and Lower Agreement's Force Majeure provision provided, in pertinent part:

    Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive

governmental laws or regulations, insurrection, war, **pandemic**, or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Agreement, then the period for the performance of any such work or acts shall be extended for a period equivalent to the period of such delay. The provisions of this Section shall not operate to excuse Buyer from prompt payment of Parts sold and delivered, or any other payments required by the terms of this Agreement.

(*Id.*, at Sect. 11(L). Emphasis added.)

41.     The Upper and Lower Agreement's Default, Termination, and Remedies provision provided, in pertinent part:

Default. Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement. In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

***

In the event of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

(*Id.*, at Sect. 9(A) and (E).)

8

**(The Carrier Agreement)**

42.     On February 22, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed another Purchase and Supply Agreement ("Carrier Agreement").[2] (*See* Exhibit 5.)

43.     David Rybacki signed the Carrier Agreement.

44.     Stacy Rybacki a/k/a Stacy Paras signed the Carrier Agreement.

45.     The Carrier Agreement concerned DRG's purchase of bolt carriers from Little Mountain. (*See id.*, and Ex. A thereto.)

46.     The Carrier Agreement provided that DRG would purchase weekly quantities of 4,800 bolt carriers. (*Id.*)

47.     The Carrier Agreement provided for a lead time of 14 weeks. (*Id.*)

48.     The Carrier Agreement provided for an initial term of three (3) years, with the possibility of one year renewals thereafter. (*Id.*, at Sect. 3.)

49.     The Carrier Agreement's Default, Termination, and Remedies provision provided, in pertinent part:

> Default. Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement. In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.
>
> ***
>
> In the event of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this

---

[2] As discussed *infra*, the term Carrier Agreement includes the First Carrier Amendment and Second Carrier Amendment as defined and discussed below.

> Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

(*Id.*, at Sect. 9(A) and (E).)

50.     On July 16, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed an amendment to the Carrier Agreement. ("First Carrier Amendment"). (*See* Exhibit 6.)

51.     The First Carrier Amendment was signed by David Rybacki.

52.     In pertinent part, the First Carrier Amendment provided:

  a.     In addition to the purchase of the "Bolt Carrier Blank" (part no. 4007), DRG would also purchase another bolt carrier (part. no. 4007A), with the addition of honing three IDs and grinding one OD, through December 31, 2021. (*Id.*, at Sect. 2-4.)

  b.     The lead time was changed from 14 weeks to 30 weeks. (*Id.*, at Sect. 5.)

  c.     The minimum weekly quantity was changed from 3,840 to 3,460. (*Id.*, at Sect. 7; *see also* Exhibit A thereto.)

  d.     All unaltered terms and conditions of the Carrier Agreement remained in full force and effect. (*Id.*, at Sect. 9.)

53.     On August 23, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed another amendment to the Carrier Agreement. ("Second Carrier Amendment"). (*See* Exhibit 7.)

54.     Stacy Rybacki a/k/a Stacy Paras signed the Second Carrier Amendment.

55.     In pertinent part, the Second Carrier Amendment provided:

  a.     Parts would also go through tumble deburring and shot blasting. (*Id.*, at Sect. 2; *see also* Exhibit A thereto.)

  b.     All unaltered terms and conditions of the Carrier Agreement remained in full force and effect. (*Id.*, at Sect. 5.)

**(The Grinding Agreement)**

56.     On May 14, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed another Purchase and Supply Agreement ("Grinding Agreement").[3] (*See* Exhibit 8.)

57.     David Rybacki signed the Grinding Agreement.

58.     Stacy Rybacki a/k/a Stacy Paras signed the Grinding Agreement.

59.     The Grinding Agreement concerned DRG's request to have Little Mountain grind bolts and bolt carriers. (*See id.*, and Ex. A thereto.)

60.     The Grinding Agreement provided that DRG would purchase weekly quantities of at least 8,640 grinded bolts and 8,640 grinded bolt carriers, but no more than 10,560 grinded bolts and 10,560 grinded bolt carriers. (*Id.*)

61.     The Grinding Agreement provided for an initial delivery lead time of 30 weeks and a production lead time of 14 weeks. (*Id.*)

62.     The Grinding Agreement provided for an initial term of three (3) years, with the possibility of one year renewals thereafter. (*Id.*, at Sect. 3.)

63.     The Grinding Agreement's Force Majeure provision provided, in pertinent part:

> Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, insurrection, war, **pandemic**, or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Agreement, then the period for the performance of any such work or acts shall be extended for a period equivalent to the period of such delay. The provisions of this Section shall not operate to excuse Buyer from prompt payment of Parts sold and delivered, or any other payments required by the terms of this Agreement.

(*Id.*, at Sect. 11(L). Emphasis added.)

64.     The Grinding Agreement's Default, Termination, and Remedies provision provided, in pertinent part:

---

[3] The Gas Key Agreement, Upper and Lower Agreement, Carrier Agreement, and Grinding Agreement are collectively referred to herein as the "Agreements."

**Default.** Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement. In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

\*\*\*

In the event of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

(*Id.*, at Sect. 9(A) and (E).)

65.     On December 9, 2021, Little Mountain and DRG—along with DRG's "subsidiaries, parent companies, and/or related companies wherever located"—executed an amendment to the Grinding Agreement ("Grinding Amendment"). (*See* Exhibit 9.)

66.     The Grinding Amendment was signed by Stacy Rybaki a/k/a Stacy Paras.

67.     The Grinding Amendment was signed by Chris Gosell.

68.     In pertinent part, the Grinding Amendment lowered the volume of the subject parts and increased the price of the subject parts. (*Id.*, at Sect. 4-5; *see also* Exhibit A thereto.)

69.     All unaltered terms and conditions of the Grinding Agreement remained in full force and effect. (*Id.*, at Sect. 5.)

12

**(Defendants Breached the Agreements)**

**(Defendants Breached the Gas Key Agreement and Carrier Agreement)**

70.     The Related Rybacki Family Companies breached the Gas Key Agreement and Carrier Agreement by, *inter alia*, failing to timely render payment for products Little Mountain delivered to the Related Rybacki Family Companies ("Payment Defaults").

71.     Little Mountain notified the Related Rybacki Family Companies of their Payment Defaults in December, 2021.

72.     The Related Rybacki Family Companies failed to cure the Purchase Defaults and Payment Defaults, so Little Mountain terminated the Gas Key Agreement and Carrier Agreement on May 25, 2022.

**(Defendants Breached the Upper and Lower Agreement and Grinding Agreement)**

73.     As stated above, the Upper and Lower Agreement and Grinding Agreement contained force majeure provisions that expressly tolled Little Mountain's performance under either agreement if Little Mountain was delayed, hindered, or prevented from performing as a result of, *inter alia*, pandemic.

74.     Given the events of the COVID-19 pandemic ("COVID-19 Impediments"), Little Mountain's performance under the Agreements was impaired ("Excusable Delay").

75.     However, during the Excusable Delay, Defendants breached the Upper and Lower Agreement and Grinding Agreement by informing Little Mountain that Defendants would not be able to meet their volume commitments under the Upper and Lower Agreement or Grinding Agreement.

76.     Little Mountain is presently able to perform under the Upper and Lower Agreement and Grinding Agreement.

**COUNT ONE**

**(Breach of Contract: Little Mountain against the Related Rybacki Family Companies)**

77.     Little Mountain realleges and reincorporates by reference all allegations contained in this *Complaint* as if fully rewritten herein.

78.     Little Mountain and the Related Rybacki Family Companies entered into the Gas Key Agreement, Upper and Lower Agreement, Carrier Agreement, and Grinding Agreement.

79.     The Related Rybacki Family Companies breached the Gas Key Agreement and Carrier Agreement as a result of, *inter alia*, the uncured Payment Defaults.

13

80.     Little Mountain performed all its obligations under the Gas Key Agreement and Carrier Agreement.

81.     The Related Rybacki Family Companies breached the Upper and Lower Agreement and Grinding Agreement as a result of, *inter alia*, the uncured Payment Defaults.

82.     Little Mountain was temporarily unable to perform its obligations under the Upper and Lower Agreement and Grinding Agreement—as contemplated by the force majeure clauses therein—but is presently able to perform its obligations under the Upper and Lower Agreement and Grinding Agreement.

83.     As a direct and proximate result of the Related Rybacki Family Companies' breach of the Agreements, Little Mountain sustained damages in excess of $20,850,215.15, including but not limited to open and unpaid invoices, as well as Little Mountain's legal and litigation expenses as provided in the Agreements, with the exact sum to be determined by the Court.

**COUNT TWO**
**(*Declaratory Relief: Little Mountain against the Related Rybacki Family Companies*)**

84.     Little Mountain realleges and reincorporates by reference all allegations contained in this *Complaint* as if fully rewritten herein.

85.     Pursuant to Civ.R. 57, and under O.R.C. § 2721.02, "courts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect. Such a declaration has the effect of a final judgment or decree."

86.     Little Mountain is entitled to a declaration regarding the matters set forth herein to resolve an actual controversy among the parties, including but not limited to, a declaration as to Little Mountain' rights and status, and the legal relations between Little Mountain and Defendants.

87.     Little Mountain is entitled to a declaration that its performance under the Upper and Lower Agreement and Grinding Agreement was tolled under the force majeure provisions as a result of the COVID-19 Impediments.

**WHEREFORE**, Little Mountain respectfully request judgment in their favor and against Defendants, as follows:

- **<u>As to Count One</u>**, damages in excess of in excess of $20,850,215.15, including but not limited to open and unpaid invoices, as well as Little Mountain's legal and litigation expenses as provided in the Agreements, with the exact sum to be determined by the Court; and

- **<u>As to Count Two</u>**, a declaration that Little Mountain's performance under the Upper and Lower Agreement and Grinding Agreement was tolled under the force majeure provisions as a result of the COVID-19 Impediments; and

- Pre-judgment and post-judgment interest; and

- For such other and further relief as the Court may deem equitable and just.

Dated: July 29, 2022

Respectfully submitted,

/s/  *Robert A. Hager*

Robert A. Hager (0040196)
Mathew E. Doney (0093845)
**BRENNAN, MANNA & DIAMOND, LLC**
200 Public Square, Ste. 3270
Cleveland, OH 44114
Phone: (216) 658-2155 / Fax:  (216) 658-2156
Email:       rahager@bmdllc.com
                 medoney@bmdllc.com

and

Daniel J. Rudary (0090482)
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH  44308
Phone: (330) 253-5060 / Fax: (330) 253-1977
E-mail:       djrudary@bmdllc.com

*Counsel for Plaintiff,*
*Little Mountain Precision, LLC*

15

## <u>INSTRUCTIONS TO THE CLERK</u>

Please issue service of the Summons and Complaint by certified mail, return receipt requested, upon the Defendants at the addresses listed in the caption of the Complaint.

*/s/ Robert A. Hager* _____

*Counsel for Plaintiff,*
*Little Mountain Precision, LLC*

4895-5715-7676, v. 1

16

EXHIBIT 1

## PURCHASE AND SUPPLY AGREEMENT

PURCHASE AND SALE AGREEMENT (this "Agreement") made and entered into this _29_ day of January, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory,** with a having its principal place of business in Lake Zurich, Illinois  60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC.,** an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");

This is an agreement to establish the terms and conditions for the sale of Parts from Seller to Buyer.  In consideration of the mutual promises herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

1. **Definitions.**  As used in this Agreement:

   A. "Parts" means all of the materials, parts, assemblies, and/or services listed on **Exhibit "A"**, attached hereto and incorporated herein, and "Part" means one of the Parts.

   B.  "Specifications" means the design, dimensions, tolerances, and materials requirements for each Part provided from Buyer to Seller.

2. **Purchase Quantities and Lead Time.**

   A. Agreement to Purchase.  During the Term, Buyer agrees to purchase from Seller the "Weekly Quantity" of Parts listed on **Exhibit "A,"** attached to and made a part hereof, at the Part Prices itemized therein. The Buyer hereby gives Seller permission to sell the Parts listed in **Exhibit "A"** or Parts, similar thereto, to other customers of Seller provided, however, as follows:

   (i)     Buyer's Weekly Quantity for the Parts shall be given preference at all times during the Term hereof for production and shipment scheduling over the Parts being produced for third parties (i.e. parties other than Buyer); and

   (ii)     Any Sales to third parties listed on Exhibit "B" shall be accounted for, on a monthly basis, and a full   credit for said orders shall be given against Buyer's Weekly Quantity.

   (iii)     Any Sales to third parties not listed on Exhibit "B" shall be accounted for, on a monthly basis, but no full credit for said orders shall be given against Buyer's Weekly Quantity.

The minimum sales quantity per release for customers referred by Buyer or a third party purchaser obtained by Buyer or Seller including, without limitation, those listed in **Exhibit B**, attached to

and made a part hereof, shall be one hundred (100) of either Part per month for a minimum of twelve (12) months with the proviso, however, that Seller shall provide them with reasonable credit on any purchases and shipments based on said customers' credit references.

.

B. Release Quantity: As used in this Agreement, the term "Release Quantity Multiple" means the number of Parts listed on Exhibit "A." Each release or purchase order from Buyer must be a multiple of the Release Quantity Multiple.

C. Lead Time. BUYER must supply Seller with adequate Lead Time necessary to supply each Part. "Lead Time" for normal production is defined on Exhibit "A" and may be modified only as mutually agreed by the parties in writing. Lead time for the First Article Parts may be as high as fifty-two (52) weeks from the Effective Date but production shipments will start early if the Parts are ready early.

D. Purchase Orders. The Buyer will issue "Purchase Orders" for all Part numbers. Buyer's Purchase Orders to Seller for Parts will only be used as a tool to schedule shipping dates and to ship, receive, bill and pay against. The Purchase Orders shall not change, modify, amend, and/or alter any terms set forth in this Agreement. All releases must meet all the terms of this Agreement including but not limited to Lead Time and Weekly Quantity. If at any time during the Term there is no Purchase Order from the Buyer open and in effect, then the Seller may nevertheless ship Parts to Buyer in the Weekly Quantity of each Part.

3. **Term.** This Agreement shall become effective on the Effective Date and shall terminate at the conclusion of the five (5) year-period that commences as of the first production delivery of Parts ("Term" or "Initial Term"), unless earlier terminated by either party pursuant hereto. This Agreement shall be extended automatically for additional one-year terms (each an "Additional Term") unless notice is given by a party, in writing, at least sixty (60) days prior to the expiration of the Initial Term (or an Additional Term then in effect) of that party's desire to not extend the Term of this Agreement.

4. **Part Price.** The total price for each Part is listed on Exhibit "A" attached hereto and will vary according to changes in the "Variable Cost" also list on Exhibit "A" (the "Part Price"). Variable cost may be reviewed by the Seller every six (6) months and changes will only be made if the change in the Variable cost is five (5%) percent or more from the costs listed on Exhibit "A". If the Specifications for one or more Parts are changed by Buyer, Buyer and the Seller shall in good faith renegotiate the Part Price for the affected Parts to reflect changes in Seller's cost to produce the re-designed Parts.

5. **Seller's Representations and Warranties.** Seller represents and warrants to Buyer that:

A. Seller will comply with all other applicable laws in the manufacture, storage and shipment of the Parts;

B. Seller will transfer to Buyer ownership and good title to the Parts, free of all liens, encumbrances, and rights of third parties;

C. All Parts shall conform to the Specifications when shipped;

D. Parts were not manufactured and are not being sold or priced in violation of the Fair Labor Standards Act of 1938, Executive Orders 11114, 11246, 11375, and 11701, with respect to nondiscrimination in employment by government contractors and subcontractors, or any other federal. state, or local law.

SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE PARTS, INCLUDING ANY IMPLIED WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

6.    **Buyer's Representation and Warranties.** Buyer represents and warrants to Seller that:

A. Any Part names, logos, and Specifications provided by Buyer will not violate any third-party patents.

B. Buyer will indemnify Seller and hold it harmless from and against any all claims, demands, liability, or costs (including reasonable attorney fees), including but not limited to claims for personal injury or property damage, that in any way arise out of the use of the Parts by any person, firm, or corporation as long as the harm was not caused by the Seller producing the Parts outside of the Specifications.

7.    **Freight/Payment Terms.**

A. Payment terms will be net payable within thirty (30) days after shipment of each Part. Freight terms shall be F.O.B. Seller's dock, and will be paid via Automated Clearing House ("ACH") transactions to Seller's bank. Notwithstanding any other language in this Agreement to the contrary, Buyer shall be entitled to take a 1/2% (0.50%) discount off the Parts price if it pays within ten (10) days of shipment. In order to take this discount no payments can be in excess of the stated terms. If at any time Buyer is late in its payment to Seller, then Seller may stop production of Parts and/or shipment to Buyer until all past due invoices are paid in full. This action by the Seller does not release Buyer from its commitments outlined in this Agreement. Seller must provide notification to Buyer describing the non-payment issue no later than one (1) day before production and/or a shipment is stopped. Missed or delayed shipments due to late payment will not be counted against Seller as a failure to meet delivery requirements and/or breach this Agreement in any way. All sales use excise or other taxes will be paid by Buyer.

B. Buyer shall be obligated to inspect each shipment of Parts in order to verify the completeness thereof. Buyer shall bear the risk of loss, theft, or damage to Parts while in transit from Seller once the Parts are in the hands of Buyer's common carrier. The rights

granted to Buyer pursuant to this subsection are the exclusive remedy for Parts shortages. Any shortage in Parts quantity must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer in Lake Zurich, Illinois, or such claim shall be forever waived.

**C.** Seller shall conform to any and all shipping and/or packaging specifications provided by Buyer for shipment of Parts. If there is an increase in cost to meet the Buyer's shipping and/or packaging specifications, then this cost will be added to the Part Price listed on Exhibit "A". The Part Price includes the cost of standard packaging (bulk layer pack with cardboard dividers to provide some protection during shipment).

## 8. <u>Quality Standards.</u>

A. **<u>First Article</u>**. BUYER shall conduct a first article inspection of initial Parts samples supplied by Seller and will notify Seller within thirty (30) days of its receipt of samples, in writing, if its inspection revealed that any of such first article Parts do not conform to the Specifications. If no such notice is timely given, Buyer will be deemed to have accepted the samples, and the Specifications will be deemed to have been modified to conform to the approved samples; and Seller shall proceed to manufacture the Parts in conformity with the samples and the provisions of this Agreement.

B. **<u>Quality Inspection</u>**. Buyer shall be obligated to inspect all Parts upon receipt for discrepancy to the Part Specifications. It is expected that there may be some nonconformity issues with the Parts but Buyer will use their best and fair judgment to determine if the nonconformity negatively effects the function of the Parts. If the nonconformity does not affect the function of the Part then the Part will be accepted. If it does affect the function of the Part, then Buyer will request an RMA number from the Seller per paragraph 10. Any claim that one or more of the Parts fails to conform to the Specifications must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer or such claim shall be forever waived.

## 9. <u>Default, Termination, and Remedies.</u>

A. <u>Default.</u> Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement. In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

B.  <u>Parties Obligations at Termination</u>. If this Agreement is terminated either in its entirety or as to one or more Parts, including but not limited to expiration of the Initial Term or an Additional Term, then Buyer shall be required to purchase all Raw Material, Work in Process, Finished Goods, and tooling purchased specifically for the manufacture of the Parts.

C.  In the event of an uncured event of Default, the non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercising the remedies available to it.

D.  In the event of an uncured event of Default by Seller, BUYER may recover its actual out-of-pocket damages or costs directly caused by Seller's breach, but in any event incidental or consequential damages (including specifically lost profits) shall not be recoverable. Any legal action on the part of BUYER must be brought within one (1) year of the earlier of: i) the date of delivery of the subject Parts; or ii) the date of the alleged Default, or any such claim shall be waived.

E.  In the event of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

## 10.  **Return Material Authorizations**

Buyer may reject Parts that are not manufactured in accordance with the Specifications. Seller shall give Buyer written notice of the extent to which it is recognizing the validity of such claim. Seller shall give Buyer a written return merchandise authorization ("RMA") for all allowed claims. Seller shall not be liable for consequential or other damages associated with allegedly non-conforming Parts. BUYER's sole and exclusive remedy for Parts that do not conform to the warranties provided for herein will be to reject the non-conforming Parts, and to require Seller, at Seller's option and expense (including applicable shipping costs), to either repair or replace the non-conforming Parts.

## 11.  **Miscellaneous.**

A.  <u>Assignment.</u> This Agreement shall not be assignable or transferable by either Party, either in whole or in part, without the prior written consent of the other Party which shall not be withheld unreasonably.

B. <u>Indemnification</u>. Subject to the terms and limitations set forth in this Agreement, Seller shall be solely liable for all damage, loss, personal injury, and death caused by the Parts except to the extent such damage, loss, personal injury, or death is caused in whole or in part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied and/or directed materials. Subject to the terms and limitations set forth in this Agreement, Seller shall indemnify and hold harmless Buyer and its agents, employees, officers and directors from any and all alleged and actual claims, liabilities, demands, actions lawsuits, settlements, judgments, fines, penalties, fees and expenses, and all other losses of any and all types ("Claims") alleged or arising from, resulting from or relating to, (i) any Claim or Claims (whether or not successful or legally sufficient) relating to any Part including, but not limited to, any alleged or actual defect thereof except to the extent Buyer negligently causes such defect, (ii) any breach by Seller of this Agreement or any warranty or representation made to Buyer, (iii) any Claim or Claims (whether or not successful or legally sufficient) relating to environmental damage caused by the act or omission of Seller, except to the extent Buyer negligently causes such environmental damage, (iv) any Claim or Claims (whether or not successful or legally sufficient) relating to any matter for which Seller is or would be responsible or liable under this Section or any other agreement, and/or (iv) any Claim or Claims that any Parts or their development, manufacture, sale, use or importation infringe the Intellectual Property Rights of any third party, except to the extent such infringement was caused in whole or in part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied and/or directed materials. Buyer agrees to provide Seller prompt notice of any claim covered by this Section and to authorize Seller to defend and settle such claim at Seller's expense; provided, however, that any failure to comply with the provisions of this sentence shall only constitute or result in a defense or reduction of Seller's obligations to the limited extent that Supplier is actually prejudiced and damaged by such failure.

C. Safety. If any Part reasonably causes either party any concerns about the safety or health of end users of Part, such party shall promptly (and, where practicable, prior to notifying any government agency) advise the other party of the same. The parties shall promptly thereafter engage in good faith discussions to attempt to agree upon the issue of whether the safety or health concerns necessitate remediation, recognizing that even in the absence of a substantial threat to safety or health, a customer's incorrect but reasonable perceptions of potential safety or health hazards (as where a condition may appear to a customer to be threatening even though technical analysis reveals that the Part is not actually a threat to health or safety) may harm Buyer's reputation and necessitate remediation. If agreement is reached that remediation should be undertaken, the parties shall also attempt to agree in good faith on the scope and nature of the remediation (including, but not limited to, a recall or field repair of Parts already delivered to customers or in Buyer's warehouses) as promptly as possible to ensure a timely and effective resolution of the concern. Seller shall bear the reasonable and necessary cost of such action except to the extent that the cause of the Part failure is due to a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied or directed materials. In the event the parties are unable to agree upon remediation within five (5) calendar days after receipt of written notification, Buyer may commence any remediation it believes is prudent and such commencement shall not prejudice any of Buyer's or Seller's rights. In the event a less costly repair is agreed to,

Seller's liability for previous repairs shall be limited to the negotiated amount. In the event the parties are unable to agree in good faith, Buyer shall be entitled to reimbursement for its reasonable expenses to the extent that Buyer's decision to remediate was reasonable in view of the foregoing considerations and the facts known to Buyer at the time.

D. <u>Tooling</u>.  Seller shall own all tooling at all times.

E. <u>No Public Disclosure</u>.  Except as may be reasonably necessary for Buyer to sell and service the Parts, the parties agree not to knowingly disclose the fact that Seller has furnished, or contracted to furnish to Buyer, the Parts and/or services specified, and the terms and conditions of this Agreement or documents issued hereunder, except (a) as may be reasonably necessary to enforce any party's rights under this Agreement, (b) as may be required by law, by any court or by any government rule or regulation, or (c) without the express written consent of the executive management and corporate communications department of the other party in each instance; provided that whenever possible, that where disclosure is required by law, court order or government rule or regulation, the party required to effect the disclosure will first notify the other party and cooperate with such party's attempt to obtain confidential treatment for such information as must be disclosed. Notwithstanding anything to the contrary stated in this paragraph, Buyer may disclose the terms and conditions of this Agreement to financial institutions that are providing services to Buyer, provided that any such third party is limited to use of such information solely in connection with Buyer's business operations and provided that Buyer has an agreement with such third party that obligates the third party to hold the terms and conditions of this Agreement confidential

F. <u>Headings and Survival</u>.  Headings used in this Agreement are for the convenience of the parties only and shall not be resorted to in construing it.  Any rights and/or obligations of the parties listed in this Agreement (including, but not limited to, Seller's warranty and indemnification obligations) that reasonably may be construed to survive termination of this Agreement shall so survive.

G. <u>Choice of Law/Invoices/Government</u>.  This Agreement shall be governed by and construed according to the laws of the State of Ohio without regard to its conflicts of law principles. Terms and conditions in Seller's invoices, or in Buyer's purchase orders, that are in addition to or otherwise purport to modify the terms and conditions of this Agreement shall be void and of no effect.  If Buyer's purchase order notes applicability of a United States government contract, Seller agrees to abide by any and all additional/contrary terms and conditions that may be imposed by such government contract.

H. <u>Insurance</u>.  During the term of this Agreement, Seller shall maintain the following insurance coverage in at least the following amounts:

(1)  Workers' Compensation, or equivalent, with statutory limits required by each state, or country exercising jurisdiction over the Seller's employees engaged in performing services under this Agreement.

(2)     Employer's Liability coverage with a minimum limit of one million dollars ($1,000,000) for bodily injury by accident or disease.

(3)     Commercial General Liability coverage (including products and completed operations, broad form contractual, personal injury liability and broad form property damage) with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury/property damage and one million dollars ($1,000,000) for personal injury and products/completed operations.

I.   <u>Entire Agreement/Amendments.</u>  This Agreement, which includes its Exhibits, represents the entire understanding of the Parties regarding the subject matter hereof, and supersedes all prior understandings, whether written or oral.  Further amendments or modifications may only be made in writing and must be signed by an authorized representative of each Party.

J.   <u>No Joint Venture.</u>  Nothing contained herein shall be construed to place the Parties in the relationship of partners or joint ventures, and neither Party shall have the power to obligate or bind the other in any manner whatsoever.  Each Party is and shall be at all times an independent contractor; and nothing herein shall be construed as constituting a party as the agent, partner or legal representative of the other Party for any purpose whatsoever.  Each Party shall be solely responsible for its compliance with all federal, state and local requirements and licenses in the operation of its business.

K.   <u>No Waiver.</u>  No waiver of the breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition

L.   <u>Force Majeure.</u>  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, insurrection, war, pandemic, or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Agreement, then the period for the performance of any such work or acts shall be extended for a period equivalent to the period of such delay.  The provisions of this Section shall not operate to excuse Buyer from prompt payment of Parts sold and delivered, or any other payments required by the terms of this Agreement.

M.   <u>Severability.</u>  A finding that any provision of this Agreement is invalid or unenforceable in any jurisdiction will not affect the validity or enforceability of any other provision of the Agreement or the validity or enforceability of that provision in any other jurisdiction.

N.   <u>Notices.</u>  All notices under this Agreement shall be in writing and sent to the following:

       If to Seller:
       Little Mountain Precision, LLC

8687 Tyler Blvd.
Mentor, Ohio 44060
Attn: Mario Manocchio
mmanocchio@littlemountainprecision.com
with a copy to:
dhabe@littlemountainprecision.com
walter.matthias@att.net

If to Buyer:
DR GUNS LLC
551 Telser Rd.
Lake Zurich, Illinois 60047
Attn: David Rybacki
dave@drgmanufacturing.com


     **IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.


**DR GUNS LLC**

By:   **RYGBACKI MANAGEMENT, INC.,**
       **Manager**

By: _____
     President

**LITTLE MOUNTAIN PRECISION, LLC**

By: _____

NAME: _____

TITLE: _____

# Exhibit "A" (5 Year)

| Part Number | Part Description | Rev | Weekly Quantity | Release Quantity Multiple | Lead Time (weeks) | Variable Cost | | | | | Part Price/Each |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Raw Material (complete cost delivered to Sellers Dock. Including any, scrap, material freight, surcharges, or other costs) | Cost to for coatings (shall include any cost of freight, expected scrap, inspection and any other related costs) | Cost for any purchased parts used in assembly | Labor cost per piece (This includes any direct labor cost (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of tools used to remove material from the forging | |
| 1001 | Gas Key | TBD | 7,000 | 1,000 | 20 | $ 0.350 | $ - | $ | $ 0.099 | $ 0.35 | $ 3.556 |
| 1002 | Trigger | TBD | 4,600 | 1,160 | 20 | $ 1.750 | $ . | $ | $ 0.099 | $ 0.10 | $ 5.282 |
| 1003 | Hammer | TBD | 4,600 | 1,150 | 20 | $ 1.500 | $ . | $ 0.050 | $ 0.298 | $ 0.10 | $ 4.987 |
| 1004 | Gas Block | TBD | 4,000 | 2,000 | 20 | $ 0.649 | $ - | $ - | $ 0.099 | $ 0.45 | $ 3.700 |

DGRWI. Initials: _____

Little Mountain Precision Initials: _____

All Parts are in the white. (no coating)

**EXHIBIT 2**

### AMENDMENT TO AGREEMENT

This AMENDMENT TO AGREEMENT ("Amendment") made and entered into this _____ day of June, 2021 (the "Effective Date") between DR GUNS LLC, an Illinois limited liability company dba DRG Manufacturing and dba White Label Armory, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and LITTLE MOUNTAIN PRECISION, LLC., an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");BUYER

BUYER and Seller entered into a certain Purchase and Supply Agreement dated January 29th, 2021 (the "Agreement"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto desire to amend the Agreement in the following respects:

1. All defined terms stated in this Amendment shall have the same meanings as defined in the Agreement.
2. The Agreement initially contemplated the manufacture and sale of four different Part numbers listed on the original Exhibit "A"
   a. 1001 Gas Key
   b. 1002 Trigger
   c. 1003 Hammer
   d. 1004 Gas Block
3. The Buyer and Seller agree to reduce the total Part numbers to Two.
   a. 1001 Gas Key
   b. 1004 Gas Block
4. The Buyer and Seller agree to take the Weekly Quantity and makes it a total for both Part Numbers rather than individual Part Numbers. This gives the Buyer some flexibility in terms of parts purchased. As part of this step an additional column was added stating that each Part will have a Minimum Run Quantity. The Buyer must take this Minimum Run Quantity over a maximum of 6 months.
5. The Buyer and Seller agree to change the lead time to 30 weeks from 20 weeks to reflect the change in lead time for raw materials.
6. The Exhibit "A" attached to this Amendment will be the new Exhibit "A" to the Agreement showing the changes listed above.
7. With the exception of contrary terms stated in this Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the Effective Date.

**DR GUNS LLC**

BY: _____

TITLE: president

DATE: 6-30-21

**LITTLE MOUNTAIN PRECISION, LTD.**

BY: _____

TITLE: President

DATE: 6-30-21

# Exhibit "A" (5 Year)

| Part Number | Part Description | Industry Category | Maximum Annual Volume | Estimated Cumulative Release Volume | Lead Time (months) | Raw Material (aggregate cost delivered to Reliance Dodi including any scrap, overcharges, or other surcharges, or other costs) | Cost to buy outside components (job shops, outside heat treat, heights, exported items, inspection and any other related costs) | Variable Cost — Cost for any purchased parts used in assembly | Labour cost per piece (This means any person that must touch, operate, or otherwise monitor equipment used to operate, assemble, adjust, or set, operate, repair, etc. any of the pieces of equipment used to make the Parts and any labor involved to prevent the part) | Cost of tools used to process this Cald Drawn Bar | Part Price/Each |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1801 | One Row | 10,200 | 180,000 | 1,000 | 30 | $ 0.300 | $ | $ | $ 0.000 | $ 0.26 | $ 3,866 |
| 1804 | One Block | | 180,000 | 2,000 | 30 | $ 0.640 | $ | $ | $ 0.000 | $ 0.65 | $ 3,700 |

DUPWK. Name: DRG

Little Mountain Precision Initials: ___

All Prices are in the whole: (no cents)

**EXHIBIT 3**

## SECOND AMENDMENT TO AGREEMENT

This SECOND AMENDMENT TO AGREEMENT (" Second Amendment") made and entered into this 25th day of October, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC.**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");

BUYER and Seller entered into a certain Purchase and Supply Agreement dated January 29th, 2021 (the "Agreement") and amended on June 30th, 2021 (the "First Amendment"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto desire to amend the Agreement and the First Amendment in the following respects:

1. All defined terms stated in this Second Amendment shall have the same meanings as defined in the Agreement.
2. The Attached Exhibit "A" will be the new Exhibit "A" to the Agreement.
3. The Agreement initially contemplated the sale and purchase of four Part numbers. The First Amendment reduced the number of Part numbers to two.
4. The Buyer and Seller agree to lower the number of Part numbers to one. Removing the Gas Block (Part 1004) and keeping the Gas Key (Part 1001)
5. The Agreement had a set volume per week. The Buyer and Seller agree that the Buyer will now have a volume range that the Buyer can choose from. The maximum and minimum weekly quantities that the Buyer can choose from is listed on the attached Exhibit "A".
6. Pricing will fluctuate based on the volume chosen by the Buyer. The price will be determined by the lowest volume chosen by the Buyer over the previous 8 weeks. Whatever that lowest volume is will be matched up with the prices on Exhibit "A" to determine the price per piece for that week's release.
7. The Buyer and Seller agree that the production shipments will be as listed on Exhibit "C". The Buyer will issue or revise purchase orders to match this release schedule.
8. With the exception of contrary terms stated in this Second Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment as of the Effective Date.

**DR GUNS LLC**

BY: _____
Stacy Paras
TITLE: _Manager_

DATE: _11-17-2021_

BY: _____
Chris Gosell
TITLE: _CEO_

DATE: _11-18-21_

**LITTLE MOUNTAIN PRECISION, LTD.**

BY: _____
Mario Manocchio
TITLE: _Sales Manager_

DATE: _12-9-2021_

Exhibit "C"

1001

| Ship Date | Quantity |
|-----------|----------|
| 11/19/2021 | 10,000 |
| 12/3/2021 | 10,000 |
| 12/10/2021 | 10,000 |
| 12/17/2021 | 10,000 |
| 12/31/2021 | 12,500 |
| 1/7/2022 | 12,500 |
| 1/14/2022 | 12,500 |
| 1/21/2022 | 12,500 |
| 1/28/2022 | 12,500 |
| 2/4/2022 | 12,500 |
| 2/11/2022 | 12,500 |
| 2/18/2022 | 12,500 |
| 2/25/2022 | 12,500 |
| 3/4/2022 | 12,500 |
| 3/11/2022 | 12,500 |
| 3/18/2022 | 12,500 |
| 3/25/2022 | 12,500 |
| 4/1/2022 | 12,500 |
| 4/8/2022 | 12,500 |
| 4/15/2022 | 12,500 |
| 4/22/2022 | 12,500 |
| 4/29/2022 | 12,500 |
| 5/6/2022 | 12,500 |
| 5/13/2022 | 12,500 |
| 5/20/2022 | 12,500 |
| 5/27/2022 | 12,500 |
| 6/3/2022 | 12,500 |
| 6/10/2022 | 12,500 |
| 6/17/2022 | 12,500 |
| 6/24/2022 | 12,500 |
| 7/1/2022 | 12,500 |
| 7/8/2022 | 12,500 |
| 7/15/2022 | 12,500 |
| 7/22/2022 | 12,500 |
| 7/29/2022 | 12,500 |
| 8/5/2022 | 12,500 |
| 8/12/2022 | 12,500 |
| 8/19/2022 | 12,500 |
| 8/26/2022 | 12,500 |
| 9/2/2022 | 12,500 |
| 9/9/2022 | 12,500 |
| 9/16/2022 | 12,500 |

Dates and quantities to be added as required by the Agreement

Buyer Initials: _____ 11-17-2021

Seller Initials: MM 12-9-21

## Exhibit "A"

| Part Number | Part Description | Minimum Weekly Quantity | Maximum Weekly Quantity | Minimum Run Quantity | Release Quantity Multiple | Lead Time (weeks) | Variable Cost | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Raw Material (complete coatings) cost delivered to Boiters includes cost of Duck including any scrap, material expected scrap, surcharges, or other costs) | Cost for any freight, purchased inspection and parts used in assembly | Labor cost per piece (this includes any direct labor cost (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of tools used to remove material from the Cold Drawn Bar | Pricing when the previous 8 weeks volume is a minimum of 12,500 per week | Pricing when the previous 8 weeks volume is a minimum of 10,000 and a maximum of 14,999 per week | Pricing when the previous 8 weeks volume is a maximum of 7,500 and a maximum of 9,999 per week |
| 1004 | Gas Key | 7,500 | 15,000 | 150,000 | 1,500 | 30 | $ | $ 0.390 | $ | $ 0.290 | $ 0.75 | $ 3.556 | $ 4.060 | $ 4.910 |

MM 12-9-2021

11-17-2021

All Parts are in the white (no coating)

PROPRIETARY Little Mountain Precision Holdings

**EXHIBIT 4**

## PURCHASE AND SUPPLY AGREEMENT

PURCHASE AND SALE AGREEMENT (this "Agreement") made and entered into this ___29ᵗʰ___ day of January, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC.**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");

This is an agreement to establish the terms and conditions for the sale of Parts from Seller to Buyer. In consideration of the mutual promises herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

1.  **Definitions.** As used in this Agreement:

    A.  "Parts" means all of the materials, parts, assemblies, and/or services listed on **Exhibit "A"**, attached hereto and incorporated herein, and "Part" means one of the Parts.

    B.  "Specifications" means the design, dimensions, tolerances, and materials requirements for each Part provided from Buyer to Seller.

2.  **Purchase Quantities and Lead Time.**

    A.  <u>Agreement to Purchase.</u>  During the Term, Buyer agrees to purchase from Seller the "Weekly Quantity" of Parts listed on **Exhibit "A,"** attached to and made a part hereof, at the Part Prices itemized therein. The Buyer hereby gives Seller permission to sell the Parts listed in **Exhibit "A"** or Parts, similar thereto, to other customers of Seller provided, however, as follows:

        (i)      Buyer's Weekly Quantity for the Parts shall be given preference at all times during the Term hereof for production and shipment scheduling over the Parts being produced for third parties (i.e. parties other than Buyer); and

        (ii)     Any Sales to third parties listed on Exhibit "B" shall be accounted for, on a monthly basis, and a full  credit for said orders shall be given against Buyer's Weekly Quantity.

        (iii)     Any Sales to third parties not listed on Exhibit "B" shall be accounted for, on a monthly basis, but no full credit for said orders shall be given against Buyer's Weekly Quantity.

The minimum sales quantity per release for customers referred by Buyer or a third party purchaser obtained by Buyer or Seller including, without limitation, those listed in **Exhibit B**, attached to

and made a part hereof, shall be one hundred (100) of either Part per month for a minimum of twelve (12) months with the proviso, however, that Seller shall provide them with reasonable credit on any purchases and shipments based on said customers' credit references.

B. <u>Release Quantity:</u>  As used in this Agreement, the term "Release Quantity Multiple" means the number of Parts listed on Exhibit "A." Each release or purchase order from Buyer must be a multiple of the Release Quantity Multiple.

C. <u>Lead Time</u>.  BUYER must supply Seller with adequate Lead Time necessary to supply each Part.  "Lead Time" for normal production is defined on Exhibit "A" and may be modified only as mutually agreed by the parties in writing.  Lead time for the First Article Parts may be as high as fifty-two (52) weeks from the Effective Date but production shipments will start early if the Parts are ready early.

D. <u>Purchase Orders</u>.  The Buyer will issue "Purchase Orders" for all Part numbers.  Buyer's Purchase Orders to Seller for Parts will only be used as a tool to schedule shipping dates and to ship, receive, bill and pay against.  The Purchase Orders shall not change, modify, amend, and/or alter any terms set forth in this Agreement.  All releases must meet all the terms of this Agreement including but not limited to Lead Time and Weekly Quantity.  If at any time during the Term there is no Purchase Order from the Buyer open and in effect, then the Seller may nevertheless ship Parts to Buyer in the Weekly Quantity of each Part.

**3.     Term.**  This Agreement shall become effective on the Effective Date and shall terminate at the conclusion of the five (5) year-period that commences as of the first production delivery of Parts ("Term" or "Initial Term"), unless earlier terminated by either party pursuant hereto. This Agreement shall be extended automatically for additional one-year terms (each an "Additional Term") unless notice is given by a party, in writing, at least sixty (60) days prior to the expiration of the Initial Term (or an Additional Term then in effect) of that party's desire to not extend the Term of this Agreement.

**4.     Part Price.**  The total price for each Part is listed on Exhibit "A" attached hereto and will vary according to changes in the "Variable Cost" also list on Exhibit "A" (the "Part Price"). Variable cost may be reviewed by the Seller every six (6) months and changes will only be made if the change in the Variable cost is five (5%) percent or more from the costs listed on Exhibit "A". If the Specifications for one or more Parts are changed by Buyer, Buyer and the Seller shall in good faith renegotiate the Part Price for the affected Parts to reflect changes in Seller's cost to produce the re-designed Parts.

**5.    Seller's Representations and Warranties.**  Seller represents and warrants to Buyer that:

A. Seller will comply with all other applicable laws in the manufacture, storage and shipment of the Parts;

B. Seller will transfer to Buyer ownership and good title to the Parts, free of all liens, encumbrances, and rights of third parties;

C. All Parts shall conform to the Specifications when shipped;

D. Parts were not manufactured and are not being sold or priced in violation of the Fair Labor Standards Act of 1938, Executive Orders 11114, 11246, 11375, and 11701, with respect to nondiscrimination in employment by government contractors and subcontractors, or any other federal. state, or local law.

SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE PARTS, INCLUDING ANY IMPLIED WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

6. **Buyer's Representation and Warranties.** Buyer represents and warrants to Seller that:

A. Any Part names, logos, and Specifications provided by Buyer will not violate any third-party patents.

B. Buyer will indemnify Seller and hold it harmless from and against any all claims, demands, liability, or costs (including reasonable attorney fees), including but not limited to claims for personal injury or property damage, that in any way arise out of the use of the Parts by any person, firm, or corporation as long as the harm was not caused by the Seller producing the Parts outside of the Specifications.

7. **Freight/Payment Terms.**

A. Payment terms will be net payable within thirty (30) days after shipment of each Part. Freight terms shall be F.O.B. Seller's dock, and will be paid via Automated Clearing House ("ACH") transactions to Seller's bank. Notwithstanding any other language in this Agreement to the contrary, Buyer shall be entitled to take a 1/2% (0.50%) discount off the Parts price if it pays within ten (10) days of shipment. In order to take this discount no payments can be in excess of the stated terms. If at any time Buyer is late in its payment to Seller, then Seller may stop production of Parts and/or shipment to Buyer until all past due invoices are paid in full. This action by the Seller does not release Buyer from its commitments outlined in this Agreement. Seller must provide notification to Buyer describing the non-payment issue no later than one (1) day before production and/or a shipment is stopped. Missed or delayed shipments due to late payment will not be counted against Seller as a failure to meet delivery requirements and/or breach this Agreement in any way. All sales use excise or other taxes will be paid by Buyer.

B. Buyer shall be obligated to inspect each shipment of Parts in order to verify the completeness thereof. Buyer shall bear the risk of loss, theft, or damage to Parts while in transit from Seller once the Parts are in the hands of Buyer's common carrier. The rights

granted to Buyer pursuant to this subsection are the exclusive remedy for Parts shortages. Any shortage in Parts quantity must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer in Lake Zurich, Illinois, or such claim shall be forever waived.

**C.** Seller shall conform to any and all shipping and/or packaging specifications provided by Buyer for shipment of Parts.  If there is an increase in cost to meet the Buyer's shipping and/or packaging specifications, then this cost will be added to the Part Price listed on Exhibit "A".  The Part Price includes the cost of standard packaging (bulk layer pack with cardboard dividers to provide some protection during shipment).

**8.** **Quality Standards.**

**A.** **First Article**.  BUYER shall conduct a first article inspection of initial Parts samples supplied by Seller and will notify Seller within thirty (30) days of its receipt of samples, in writing, if its inspection revealed that any of such first article Parts do not conform to the Specifications.  If no such notice is timely given, Buyer will be deemed to have accepted the samples, and the Specifications will be deemed to have been modified to conform to the approved samples; and Seller shall proceed to manufacture the Parts in conformity with the samples and the provisions of this Agreement.

**B.** **Quality Inspection**.  Buyer shall be obligated to inspect all Parts upon receipt for discrepancy to the Part Specifications.  It is expected that there may be some nonconformity issues with the Parts but Buyer will use their best and fair judgment to determine if the nonconformity negatively effects the function of the Parts.  If the nonconformity does not affect the function of the Part then the Part will be accepted.  If it does affect the function of the Part, then Buyer will request an RMA number from the Seller per paragraph 10. Any claim that one or more of the Parts fails to conform to the Specifications must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer or such claim shall be forever waived.

**9.** **Default, Termination, and Remedies.**

**A.** Default.  Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement.  In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

B. <u>Parties Obligations at Termination</u>.  If this Agreement is terminated either in its entirety or as to one or more Parts, including but not limited to expiration of the Initial Term or an Additional Term, then Buyer shall be required to purchase all Raw Material, Work in Process, Finished Goods, and tooling purchased specifically for the manufacture of the Parts.

C. In the event of an uncured event of Default, the non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercising the remedies available to it.

D. In the event of an uncured event of Default by Seller, BUYER may recover its actual out-of-pocket damages or costs directly caused by Seller's breach, but in any event incidental or consequential damages (including specifically lost profits) shall not be recoverable. Any legal action on the part of BUYER must be brought within one (1) year of the earlier of: i) the date of delivery of the subject Parts; or ii) the date of the alleged Default, or any such claim shall be waived.

E. In the event  of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

## 10.  **Return Material Authorizations**

Buyer may reject Parts that are not manufactured in accordance with the Specifications. Seller shall give Buyer written notice of the extent to which it is recognizing the validity of such claim. Seller shall give Buyer a written return merchandise authorization ("RMA") for all allowed claims. Seller shall not be liable for consequential or other damages associated with allegedly non-conforming Parts. BUYER's sole and exclusive remedy for Parts that do not conform to the warranties provided for herein will be to reject the non-conforming Parts, and to require Seller, at Seller's option and expense (including applicable shipping costs), to either repair or replace the non-conforming Parts.

## 11.  **Miscellaneous.**

A. <u>Assignment.</u>  This Agreement shall not be assignable or transferable by either Party, either in whole or in part, without the prior written consent of the other Party which shall not be withheld unreasonably.

B. <u>Indemnification</u>.  Subject to the terms and limitations set forth in this Agreement, Seller shall be solely liable for all damage, loss, personal injury, and death caused by the Parts except to the extent such damage, loss, personal injury, or death is caused in whole or in part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied and/or directed materials.  Subject to the terms and limitations set forth in this Agreement, Seller shall indemnify and hold harmless Buyer and its agents, employees, officers and directors from any and all alleged and actual claims, liabilities, demands, actions lawsuits, settlements, judgments, fines, penalties, fees and expenses, and all other losses of any and all types ("Claims") alleged or arising from, resulting from or relating to, (i) any Claim or Claims (whether or not successful or legally sufficient) relating to any Part including, but not limited to, any alleged or actual defect thereof except to the extent Buyer negligently causes such defect, (ii) any breach by Seller of this Agreement or any warranty or representation made to Buyer, (iii) any Claim or Claims (whether or not successful or legally sufficient) relating to environmental damage caused by the act or omission of Seller, except to the extent Buyer negligently causes such environmental damage, (iv) any Claim or Claims (whether or not successful or legally sufficient) relating to any matter for which Seller is or would be responsible or liable under this Section or any other agreement, and/or (iv) any Claim or Claims that any Parts or their development, manufacture, sale, use or importation infringe the Intellectual Property Rights of any third party, except to the extent such infringement was caused in whole or in part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied and/or directed materials.  Buyer agrees to provide Seller prompt notice of any claim covered by this Section and to authorize Seller to defend and settle such claim at Seller's expense; provided, however, that any failure to comply with the provisions of this sentence shall only constitute or result in a defense or reduction of Seller's obligations to the limited extent that Supplier is actually prejudiced and damaged by such failure.

C. Safety.  If any Part reasonably causes either party any concerns about the safety or health of end users of Part, such party shall promptly (and, where practicable, prior to notifying any government agency) advise the other party of the same.  The parties shall promptly thereafter engage in good faith discussions to attempt to agree upon the issue of whether the safety or health concerns necessitate remediation, recognizing that even in the absence of a substantial threat to safety or health, a customer's incorrect but reasonable perceptions of potential safety or health hazards (as where a condition may appear to a customer to be threatening even though technical analysis reveals that the Part is not actually a threat to health or safety) may harm Buyer's reputation and necessitate remediation.  If agreement is reached that remediation should be undertaken, the parties shall also attempt to agree in good faith on the scope and nature of the remediation (including, but not limited to, a recall or field repair of Parts already delivered to customers or in Buyer's warehouses) as promptly as possible to ensure a timely and effective resolution of the concern.  Seller shall bear the reasonable and necessary cost of such action except to the extent that the cause of the Part failure is due to a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied or directed materials.  In the event the parties are unable to agree upon remediation within five (5) calendar days after receipt of written notification, Buyer may commence any remediation it believes is prudent and such commencement shall not prejudice any of Buyer's or Seller's rights.  In the event a less costly repair is agreed to,

Seller's liability for previous repairs shall be limited to the negotiated amount. In the event the parties are unable to agree in good faith, Buyer shall be entitled to reimbursement for its reasonable expenses to the extent that Buyer's decision to remediate was reasonable in view of the foregoing considerations and the facts known to Buyer at the time.

D. <u>Tooling</u>. Seller shall own all tooling at all times.

E. <u>No Public Disclosure</u>. Except as may be reasonably necessary for Buyer to sell and service the Parts, the parties agree not to knowingly disclose the fact that Seller has furnished, or contracted to furnish to Buyer, the Parts and/or services specified, and the terms and conditions of this Agreement or documents issued hereunder, except (a) as may be reasonably necessary to enforce any party's rights under this Agreement, (b) as may be required by law, by any court or by any government rule or regulation, or (c) without the express written consent of the executive management and corporate communications department of the other party in each instance; provided that whenever possible, that where disclosure is required by law, court order or government rule or regulation, the party required to effect the disclosure will first notify the other party and cooperate with such party's attempt to obtain confidential treatment for such information as must be disclosed. Notwithstanding anything to the contrary stated in this paragraph, Buyer may disclose the terms and conditions of this Agreement to financial institutions that are providing services to Buyer, provided that any such third party is limited to use of such information solely in connection with Buyer's business operations and provided that Buyer has an agreement with such third party that obligates the third party to hold the terms and conditions of this Agreement confidential

F. <u>Headings and Survival</u>. Headings used in this Agreement are for the convenience of the parties only and shall not be resorted to in construing it. Any rights and/or obligations of the parties listed in this Agreement (including, but not limited to, Seller's warranty and indemnification obligations) that reasonably may be construed to survive termination of this Agreement shall so survive.

G. <u>Choice of Law/Invoices/Government</u>. This Agreement shall be governed by and construed according to the laws of the State of Ohio without regard to its conflicts of law principles. Terms and conditions in Seller's invoices, or in Buyer's purchase orders, that are in addition to or otherwise purport to modify the terms and conditions of this Agreement shall be void and of no effect. If Buyer's purchase order notes applicability of a United States government contract, Seller agrees to abide by any and all additional/contrary terms and conditions that may be imposed by such government contract.

H. <u>Insurance</u>. During the term of this Agreement, Seller shall maintain the following insurance coverage in at least the following amounts:

(1)     Workers' Compensation, or equivalent, with statutory limits required by each state, or country exercising jurisdiction over the Seller's employees engaged in performing services under this Agreement.

(2)     Employer's Liability coverage with a minimum limit of one million dollars ($1,000,000) for bodily injury by accident or disease.

(3)     Commercial General Liability coverage (including products and completed operations, broad form contractual, personal injury liability and broad form property damage) with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury/property damage and one million dollars ($1,000,000) for personal injury and products/completed operations.

I.   <u>Entire Agreement/Amendments.</u>  This Agreement, which includes its Exhibits, represents the entire understanding of the Parties regarding the subject matter hereof, and supersedes all prior understandings, whether written or oral.  Further amendments or modifications may only be made in writing and must be signed by an authorized representative of each Party.

J.   <u>No Joint Venture.</u>  Nothing contained herein shall be construed to place the Parties in the relationship of partners or joint ventures, and neither Party shall have the power to obligate or bind the other in any manner whatsoever.  Each Party is and shall be at all times an independent contractor; and nothing herein shall be construed as constituting a party as the agent, partner or legal representative of the other Party for any purpose whatsoever.  Each Party shall be solely responsible for its compliance with all federal, state and local requirements and licenses in the operation of its business.

K.   <u>No Waiver.</u>  No waiver of the breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition

L.   <u>Force Majeure.</u>  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, insurrection, war, pandemic, or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Agreement, then the period for the performance of any such work or acts shall be extended for a period equivalent to the period of such delay.  The provisions of this Section shall not operate to excuse Buyer from prompt payment of Parts sold and delivered, or any other payments required by the terms of this Agreement.

M.   <u>Severability.</u>  A finding that any provision of this Agreement is invalid or unenforceable in any jurisdiction will not affect the validity or enforceability of any other provision of the Agreement or the validity or enforceability of that provision in any other jurisdiction.

N.   <u>Notices.</u>  All notices under this Agreement shall be in writing and sent to the following:

    If to Seller:
    Little Mountain Precision, LLC

8687 Tyler Blvd.
Mentor, Ohio 44060
Attn: Mario Manocchio
mmanocchio@littlemountainprecision.com
with a copy to:
dhabe@littlemountainprecision.com
walter.matthias@att.net

If to Buyer:
DR GUNS LLC
551 Telser Rd.
Lake Zurich, Illinois 60047
Attn: David Rybacki
dave@drgmanufacturing.com

    **IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.

**DR GUNS LLC**

By: **RYGBACKI MANAGEMENT, INC., Manager**

By: _____
        President

**LITTLE MOUNTAIN PRECISION, LLC**

By: _____

NAME: _____

TITLE: _____

# Exhibit "A" (5 Year)

| Part Number | Part Description | Raw Material | Maximum Weekly | Release Quantity Multiple | Lead Time (weeks) | Raw Material (complete cost delivered to Sellers Dock including any, scrap, material surcharges, freight surcharges, or other costs) | Variable Cost Cost to for coatings (shall include cost of freight, expected scrap, inspection and any other related costs) | Labor cost per piece (This includes any direct labor cost (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of tools used to remove material from the forging. | Part Price/Each |
|---|---|---|---|---|---|---|---|---|---|---|
| NA981890 | Upper Receiver Machined Complete (no coating) | Forging Number: TBD | 2,000 | 100 | 20 | $ 10.530 | $ - | $ 1.750 | $ 0.25 | $ 34.43 |
| NA983690 | Lower Receiver Machined Complete (no coating) | Forging Number: TBD | | 100 | 20 | $ 10.530 | $ - | $ 2.321 | $ 0.25 | $ 35.00 |

DGRWL Initials: _DSR_

Little Mountain Precision Initials: _____

**EXHIBIT 5**

## PURCHASE AND SUPPLY AGREEMENT

PURCHASE AND SALE AGREEMENT (this "Agreement") made and entered into this 22nd day of February, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC.**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");

This is an agreement to establish the terms and conditions for the sale of Parts from Seller to Buyer. In consideration of the mutual promises herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

1.    **Definitions.** As used in this Agreement:

   A.  "Parts" means all of the materials, parts, assemblies, and/or services listed on **Exhibit "A"**, attached hereto and incorporated herein, and "Part" means one of the Parts.

   B.  "Specifications" means the design, dimensions, tolerances, and materials requirements for each Part provided from Buyer to Seller.

2.    **Purchase Quantities and Lead Time.**

   A.  <u>Agreement to Purchase</u>.  During the Term, Buyer agrees to purchase from Seller the a total "Weekly Quantity" of Parts at or above the "Minimum Weekly Quantity" and at or below the "Maximum Weekly Quantity" listed on **Exhibit "A,"** attached to and made a part hereof, at the Part Prices itemized therein. The Buyer hereby gives Seller permission to sell the Parts listed in **Exhibit "A"** or Parts, similar thereto, to other customers of Seller.  The quantity sold to third parties will not count towards the Buyer's Weekly Quantity.

   B.  .  <u>Release Quantity</u>:  As used in this Agreement, the term "Release Quantity Multiple" means the number of Parts listed on Exhibit "A." Each release or purchase order from Buyer must be a multiple of the Release Quantity Multiple.

   C.  <u>Lead Time</u>.  BUYER must supply Seller with adequate Lead Time necessary to supply each Part.  "Lead Time" for normal production is defined on Exhibit "A" and may be modified only as mutually agreed by the parties in writing.  Lead time for the First Article Parts may be as high as fourteen (14) weeks from the Effective Date but production shipments will start early if the Parts are ready early.

   D.  <u>Purchase Orders</u>.  The Buyer will issue "Purchase Orders" for all Part numbers.  Buyer's Purchase Orders to Seller for Parts will only be used as a tool to schedule shipping dates and to ship, receive, bill and pay against.  The Purchase Orders shall not change, modify, amend, and/or alter any terms set forth in this Agreement.  All releases must meet all the

terms of this Agreement including but not limited to Lead Time and Weekly Quantity.  If at any time during the Term there is no Purchase Order from the Buyer open and in effect, then the Seller may nevertheless ship Parts to Buyer in the Weekly Quantity of each Part.

3. **Term**.  This Agreement shall become effective on the Effective Date and shall terminate at the conclusion of the three (3) year-period that commences as of the first production delivery of Parts ("Term" or "Initial Term"), unless earlier terminated by either party pursuant hereto. This Agreement shall be extended automatically for additional one-year terms (each an "Additional Term") unless notice is given by a party, in writing, at least sixty (60) days prior to the expiration of the Initial Term (or an Additional Term then in effect) of that party's desire to not extend the Term of this Agreement.

4. **Part Price.**  The total price for each Part is listed on Exhibit "A" attached hereto and will vary according to changes in the "Variable Cost" also list on Exhibit "A" (the "Part Price"). Variable cost may be reviewed by the Seller every six (6) months and changes will only be made if the change in the Variable cost is five (5%) percent or more from the costs listed on Exhibit "A". If the Specifications for one or more Parts are changed by Buyer, Buyer and the Seller shall in good faith renegotiate the Part Price for the affected Parts to reflect changes in Seller's cost to produce the re-designed Parts.

5.  **Seller's Representations and Warranties**.  Seller represents and warrants to Buyer that:

   A.  Seller will comply with all other applicable laws in the manufacture, storage and shipment of the Parts;

   B.  Seller will transfer to Buyer ownership and good title to the Parts, free of all liens, encumbrances, and rights of third parties;

   C.  All Parts shall conform to the Specifications when shipped;

   D.  Parts were not manufactured and are not being sold or priced in violation of the Fair Labor Standards Act of 1938, Executive Orders 11114, 11246, 11375, and 11701, with respect to nondiscrimination in employment by government contractors and subcontractors, or any other federal, state, or local law.

   SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE PARTS, INCLUDING ANY IMPLIED WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

6. **Buyer's Representation and Warranties**.  Buyer represents and warrants to Seller that:

   A.  Any Part names, logos, and Specifications provided by Buyer will not violate any third-party patents.

B. Buyer will indemnify Seller and hold it harmless from and against any all claims, demands, liability, or costs (including reasonable attorney fees), including but not limited to claims for personal injury or property damage, that in any way arise out of the use of the Parts by any person, firm, or corporation as long as the harm was not caused by the Seller producing the Parts outside of the Specifications.

7.    **Freight/Payment Terms.**

A. Payment terms will be net payable within thirty (30) days after shipment of each Part and will be paid via Automated Clearing House ("ACH") transactions to Seller's bank. Freight terms shall be F.O.B. Seller's dock,. Notwithstanding any other language in this Agreement to the contrary, Buyer shall be entitled to take a 1/2% (0.50%) discount off the Parts price if it pays within ten (10) days of shipment. In order to take this discount no payments can be in excess of the stated terms. If at any time Buyer is late in its payment to Seller, then Seller may stop production of Parts and/or shipment to Buyer until all past due invoices are paid in full. This action by the Seller does not release Buyer from its commitments outlined in this Agreement. Seller must provide notification to Buyer describing the non-payment issue no later than one (1) day before production and/or a shipment is stopped. Missed or delayed shipments due to late payment will not be counted against Seller as a failure to meet delivery requirements and/or breach this Agreement in any way. All sales use excise or other taxes will be paid by Buyer.

B. Buyer shall be obligated to inspect each shipment of Parts in order to verify the completeness thereof. Buyer shall bear the risk of loss, theft, or damage to Parts while in transit from Seller once the Parts are in the hands of Buyer's common carrier. The rights granted to Buyer pursuant to this subsection are the exclusive remedy for Parts shortages. Any shortage in Parts quantity must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer in Lake Zurich, Illinois, or such claim shall be forever waived.

C. Seller shall conform to any and all shipping and/or packaging specifications provided by Buyer for shipment of Parts. If there is an increase in cost to meet the Buyer's shipping and/or packaging specifications, then this cost will be added to the Part Price listed on Exhibit "A". The Part Price includes the cost of standard packaging (bulk layer pack with cardboard dividers to provide some protection during shipment).

8.    **Quality Standards.**

A. **First Article.** BUYER shall conduct a first article inspection of initial Parts samples supplied by Seller and will notify Seller within thirty (30) days of its receipt of samples, in writing, if its inspection revealed that any of such first article Parts do not conform to the Specifications. If no such notice is timely given, Buyer will be deemed to have accepted the samples, and the Specifications will be deemed to have been modified to conform to the approved samples; and Seller shall proceed to manufacture the Parts in conformity with the samples and the provisions of this Agreement.

B. **Quality Inspection**.  Buyer shall be obligated to inspect all Parts upon receipt for discrepancy to the Part Specifications.  It is expected that there may be some nonconformity issues with the Parts but Buyer will use their best and fair judgment to determine if the nonconformity negatively effects the function of the Parts.  If the nonconformity does not affect the function of the Part then the Part will be accepted.  If it does affect the function of the Part, then Buyer will request an RMA number from the Seller per paragraph 10. Any claim that one or more of the Parts fails to conform to the Specifications must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer or such claim shall be forever waived.

9.   **Default, Termination, and Remedies.**

A. **Default.**  Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement.  In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

B. **Parties Obligations at Termination**.  If this Agreement is terminated either in its entirety or as to one or more Parts, including but not limited to expiration of the Initial Term or an Additional Term, then Buyer shall be required to purchase all Raw Material, Work in Process, Finished Goods, and tooling purchased specifically for the manufacture of the Parts.

C. In the event of an uncured event of Default, the non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercising the remedies available to it.

D. In the event of an uncured event of Default by Seller, BUYER may recover its actual out-of-pocket damages or costs directly caused by Seller's breach, but in any event incidental or consequential damages (including specifically lost profits) shall not be recoverable. Any legal action on the part of BUYER must be brought within one (1) year of the earlier of: i) the date of delivery of the subject Parts; or ii) the date of the alleged Default, or any such claim shall be waived.

E. In the event  of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the

aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to
be sold and delivered under this Agreement after the date of BUYER's Default (BUYER
acknowledges that the actual damages sustained by Seller resulting from BUYER's
breach of the Agreement are not readily calculable and that this liquidated damages
amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

10. **Return Material Authorizations**

Buyer may reject Parts that are not manufactured in accordance with the Specifications. Seller
shall give Buyer written notice of the extent to which it is recognizing the validity of such claim.
Seller shall give Buyer a written return merchandise authorization ("RMA") for all allowed claims.
Seller shall not be liable for consequential or other damages associated with allegedly non-
conforming Parts. BUYER's sole and exclusive remedy for Parts that do not conform to the
warranties provided for herein will be to reject the non-conforming Parts, and to require Seller, at
Seller's option and expense (including applicable shipping costs), to either repair or replace the
non-conforming Parts.

11. **Miscellaneous.**

A. <u>Assignment.</u> This Agreement shall not be assignable or transferable by either Party, either
in whole or in part, without the prior written consent of the other Party which shall not be
withheld unreasonably.

B. <u>Indemnification.</u> Subject to the terms and limitations set forth in this Agreement, Seller
shall be solely liable for all damage, loss, personal injury, and death caused by the Parts
except to the extent such damage, loss, personal injury, or death is caused in whole or in
part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied
and/or directed materials. Subject to the terms and limitations set forth in this Agreement,
Seller shall indemnify and hold harmless Buyer and its agents, employees, officers and
directors from any and all alleged and actual claims, liabilities, demands, actions lawsuits,
settlements, judgments, fines, penalties, fees and expenses, and all other losses of any and
all types ("Claims") alleged or arising from, resulting from or relating to, (i) any Claim or
Claims (whether or not successful or legally sufficient) relating to any Part including, but
not limited to, any alleged or actual defect thereof except to the extent Buyer negligently
causes such defect, (ii) any breach by Seller of this Agreement or any warranty or
representation made to Buyer, (iii) any Claim or Claims (whether or not successful or
legally sufficient) relating to environmental damage caused by the act or omission of Seller,
except to the extent Buyer negligently causes such environmental damage, (iv) any Claim
or Claims (whether or not successful or legally sufficient) relating to any matter for which
Seller is or would be responsible or liable under this Section or any other agreement, and/or
(iv) any Claim or Claims that any Parts or their development, manufacture, sale, use or
importation infringe the Intellectual Property Rights of any third party, except to the extent
such infringement was caused in whole or in part by a design created by Buyer,
Specifications supplied by Buyer, or by Buyer supplied and/or directed materials. Buyer
agrees to provide Seller prompt notice of any claim covered by this Section and to authorize
Seller to defend and settle such claim at Seller's expense; provided, however, that any
failure to comply with the provisions of this sentence shall only constitute or result in a

defense or reduction of Seller's obligations to the limited extent that Supplier is actually prejudiced and damaged by such failure.

C.  Safety.  If any Part reasonably causes either party any concerns about the safety or health of end users of Part, such party shall promptly (and, where practicable, prior to notifying any government agency) advise the other party of the same.  The parties shall promptly thereafter engage in good faith discussions to attempt to agree upon the issue of whether the safety or health concerns necessitate remediation, recognizing that even in the absence of a substantial threat to safety or health, a customer's incorrect but reasonable perceptions of potential safety or health hazards (as where a condition may appear to a customer to be threatening even though technical analysis reveals that the Part is not actually a threat to health or safety) may harm Buyer's reputation and necessitate remediation.  If agreement is reached that remediation should be undertaken, the parties shall also attempt to agree in good faith on the scope and nature of the remediation (including, but not limited to, a recall or field repair of Parts already delivered to customers or in Buyer's warehouses) as promptly as possible to ensure a timely and effective resolution of the concern.  Seller shall bear the reasonable and necessary cost of such action except to the extent that the cause of the Part failure is due to a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied or directed materials.  In the event the parties are unable to agree upon remediation within five (5) calendar days after receipt of written notification, Buyer may commence any remediation it believes is prudent and such commencement shall not prejudice any of Buyer's or Seller's rights.  In the event a less costly repair is agreed to, Seller's liability for previous repairs shall be limited to the negotiated amount.  In the event the parties are unable to agree in good faith, Buyer shall be entitled to reimbursement for its reasonable expenses to the extent that Buyer's decision to remediate was reasonable in view of the foregoing considerations and the facts known to Buyer at the time.

D.  Tooling.  Seller shall own all tooling at all times.

E.  No Public Disclosure.  Except as may be reasonably necessary for Buyer to sell and service the Parts, the parties agree not to knowingly disclose the fact that Seller has furnished, or contracted to furnish to Buyer, the Parts and/or services specified, and the terms and conditions of this Agreement or documents issued hereunder, except (a) as may be reasonably necessary to enforce any party's rights under this Agreement, (b) as may be required by law, by any court or by any government rule or regulation, or (c) without the express written consent of the executive management and corporate communications department of the other party in each instance; provided that whenever possible, that where disclosure is required by law, court order or government rule or regulation, the party required to effect the disclosure will first notify the other party and cooperate with such party's attempt to obtain confidential treatment for such information as must be disclosed. Notwithstanding anything to the contrary stated in this paragraph, Buyer may disclose the terms and conditions of this Agreement to financial institutions that are providing services to Buyer, provided that any such third party is limited to use of such information solely in connection with Buyer's business operations and provided that Buyer has an agreement with such third party that obligates the third party to hold the terms and conditions of this Agreement confidential

F. <u>Headings and Survival</u>.  Headings used in this Agreement are for the convenience of the parties only and shall not be resorted to in construing it.  Any rights and/or obligations of the parties listed in this Agreement (including, but not limited to, Seller's warranty and indemnification obligations) that reasonably may be construed to survive termination of this Agreement shall so survive.

G. <u>Choice of Law/Invoices/Government</u>.  This Agreement shall be governed by and construed according to the laws of the State of Ohio without regard to its conflicts of law principles.  Terms and conditions in Seller's invoices, or in Buyer's purchase orders, that are in addition to or otherwise purport to modify the terms and conditions of this Agreement shall be void and of no effect.  If Buyer's purchase order notes applicability of a United States government contract, Seller agrees to abide by any and all additional/contrary terms and conditions that may be imposed by such government contract.

H. <u>Insurance</u>.  During the term of this Agreement, Seller shall maintain the following insurance coverage in at least the following amounts:

(1)     Workers' Compensation, or equivalent, with statutory limits required by each state, or country exercising jurisdiction over the Seller's employees engaged in performing services under this Agreement.

(2)     Employer's Liability coverage with a minimum limit of one million dollars ($1,000,000) for bodily injury by accident or disease.

(3)     Commercial General Liability coverage (including products and completed operations, broad form contractual, personal injury liability and broad form property damage) with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury/property damage and one million dollars ($1,000,000) for personal injury and products/completed operations.

I. <u>Entire Agreement/Amendments</u>.  This Agreement, which includes its Exhibits, represents the entire understanding of the Parties regarding the subject matter hereof, and supersedes all prior understandings, whether written or oral.  Further amendments or modifications may only be made in writing and must be signed by an authorized representative of each Party.

J. <u>No Joint Venture</u>.  Nothing contained herein shall be construed to place the Parties in the relationship of partners or joint ventures, and neither Party shall have the power to obligate or bind the other in any manner whatsoever.  Each Party is and shall be at all times an independent contractor; and nothing herein shall be construed as constituting a party as the agent, partner or legal representative of the other Party for any purpose whatsoever.  Each Party shall be solely responsible for its compliance with all federal, state and local requirements and licenses in the operation of its business.

K. <u>No Waiver</u>.  No waiver of the breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition

L. <u>Force Majeure</u>.  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, insurrection, war, pandemic, or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Agreement, then the period for the performance of any such work or acts shall be extended for a period equivalent to the period of such delay.  The provisions of this Section shall not operate to excuse Buyer from prompt payment of Parts sold and delivered, or any other payments required by the terms of this Agreement.

M. <u>Severability</u>.  A finding that any provision of this Agreement is invalid or unenforceable in any jurisdiction will not affect the validity or enforceability of any other provision of the Agreement or the validity or enforceability of that provision in any other jurisdiction.

N. <u>Notices</u>.  All notices under this Agreement shall be in writing and sent to the following:

If to Seller:
Little Mountain Precision, LLC
8687 Tyler Blvd.
Mentor, Ohio  44060
Attn: Mario Manocchio
mmanocchio@littlemountainprecision.com
with a copy to:
dhabe@littlemountainprecision.com

If to Buyer:
DR GUNS LLC
551 Telser Rd.
Lake Zurich, Illinois  60047
Attn: David Rybacki
dave@drgmanufacturing.com

SIGNATUERES ON THE NEXT PAGE

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.

**DR GUNS LLC**

By:   **David Rybacki**
      **Manager**

By:

Title: Head Janitor

**DR GUNS LLC**

By:   **Stacy Rybacki**

By:

Title: Owner

**LITTLE MOUNTAIN PRECISION, LLC.**

By:

NAME: Doug Habe

TITLE: President

Exhibit "A" (3 Year)

| Part Number | Part Description | Minimum Weekly Volume | Maximum Weekly Quantity | Release Quantity Multiple | Lead Time (weeks) | Variable Cost | | | | Part Price at Weekly Volume of 3,480 to 3,840 | Part Price at Weekly Volume of 3,841 to 4,820 (Must average this weekly quantity over a 4 month period of time) |
| | | | | | | Raw Material (complete cost delivered to Sellers Dock including any scrap, material surcharges, freight surcharges, or other costs) | Cost to for coatings and Heat Treating (shall include cost of freight, expected scrap, inspection and any other related costs) | Labor cost per piece (This includes any direct labor cost (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of tools used to remove material from bar stock | | |
| 4807 | Bolt Carrier Blank* | 3840 | 4,820 | 94 | 14 | $ 1.032 | $ 0.520 | $ 1.190 | $ 2.01 | $ 19.898 | $ 18.691 |

DGRWL initials: ___D.S.R.___ (signature)

Little Mountain Precision initials: ___(signature)___

Bolt Carrier Blank includes:
1. Raw Material Saw cut to length
2. CNC Machining Op 10 (Lathe), Op 20 (Mill), Op 30 (Ratchet on Mill)
3. Heat Treat
4. Inspect & Pack (including packaging)

**EXHIBIT 6**

## AMENDMENT TO AGREEMENT

This AMENDMENT TO AGREEMENT ("Amendment") made and entered into this 16th day of July, 2021 (the "Effective Date") between DR GUNS LLC, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois  60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");BUYER

BUYER and Seller entered into a certain Purchase and Supply Agreement dated February 22nd, 2021 (the "Agreement"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto desire to amend the Agreement in the following respects:

1. All defined terms stated in this Amendment shall have the same meanings as defined in the Agreement.
2. The Agreement initially contemplated the manufacture and sale of one Part number listed on the original Exhibit "A".
   a. 4007 - Bolt Carrier Blank
3. The Buyer and Seller agree to temporarily add one Part number for a total of two Part numbers.
   a. 4007 - Bolt Carrier Blank
   b. 4007A - Bolt Carrier blank with the addition of Honing three ID's and Grinding one OD
4. The new Part number (4007A) is only being offered on a temporary basis to last through December 31, 2021.  The Seller is offering to make this Part number to help the Buyer with a temporary supply problem with a secondary operation for Part number 4007.
5. The Buyer and Seller agree to change the lead time to 30 weeks from 14 weeks to reflect the change in lead time for raw materials.  First Articles have been delivered for Part Number 4007 but have not been delivered for 4007A.  First Articles for 4007A are expected to be delivered by 8-16-2021.  No production shipments have been delivered for either Part number.
6. Production shipments will start 9-3-2021.  The current purchase order will be modified to match the release schedule listed in Exhibit "C" for Part number 4007 and add the production releases for 4007A.
7. The Buyer and Seller agree to reduce the Minimum Weekly Quantity listed on Exhibit "A" from 3,840 to 3,460.
8. The Exhibit "A" attached to this Amendment will be the new Exhibit "A" to the Agreement showing the changes listed above.
9. With the exception of contrary terms stated in this Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the Effective Date.

DR GUNS LLC                                          LITTLE MOUNTAIN PRECISION, LTD.

BY: _____                         BY: _____

TITLE: President                                    TITLE: President

DATE: 7-16-2021                                      DATE: 7-16-21

## Exhibit "A" (5 Year)

| Part Number | Part Description | Minimum Weekly Quantity | Maximum Weekly Quantity | Release Quantity Multiple | Lead Time (weeks) | Variable Cost | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Raw Material (complete cost delivered to Steelers Dock including any scrap, material surcharges, freight surcharges, or other costs) | Cost for coatings and Heat Treating (includes any cost (small include cost of freight, expected scrap, inspection and any other related costs) | Labor cost per piece (This includes any direct labor cost (including benefit(s) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the material from bar stock) | Cost of tools used to remove material from bar stock | Part Price at Weekly Volume of 3,841 to 4,800 (Must average this Quantity over a 3 month period of time) | Part Price at Weekly Volume of 3,460 to 3840 |
| 4807 | Bolt Carrier Blank | 3,460 | 4,800 | 84 | 30 | $ 1.612 | $ 0.520 | $ 1.109 | $ 2.01 | $ 18.898 | $ 18,601 |
| 4807A | Same as 4807 but with the addition of Honing the three id's and Grinding the one OD | | | | | | | | | $ 23.728 | $ 23.431 |

OVERALL includes:

1. Raw material (saw cut to length)
2. CNC Machining Op 10 (Lathe), Op 20 (Mill), Op 30 (Return on Mill)
3. Heat Treat
4. Inspect & Pack (including Packaging)

Little Mountain Precision on initials _____ [signatures]

Exhibit "C"

Delivery of Samples

| Date | Quantity |
|------|----------|
| 8/16/2021 | 50 |

Production Deliveries

| Date | Quantity |
|------|----------|
| 9/3/2021 | 2400 |
| 9/10/2021 | 3000 |
| 9/17/2021 | 3600 |
| 9/24/2021 | 4000 |
| 10/1/2021 | 4800 |
| 10/8/2021 | 4800 |
| 10/15/2021 | 4800 |
| 10/22/2021 | 4800 |
| 10/29/2021 | 4800 |
| 11/5/2021 | 4800 |
| 11/12/2021 | 4800 |
| 11/19/2021 | 4800 |
| 11/26/2021 | 4800 |
| 12/3/2021 | 4800 |
| 12/10/2021 | 4800 |
| 12/17/2021 | 4800 |
| 12/24/2021 | 4800 |
| 12/31/2021 | 4800 |
| 1/7/2022 | 4800 |
| 1/14/2022 | 4800 |
| 1/21/2022 | 4800 |
| 1/28/2022 | 4800 |
| 2/4/2022 | 4800 |
| 2/11/2022 | 4800 |
| 2/18/2022 | 4800 |
| 2/25/2022 | 4800 |
| 3/4/2022 | 4800 |
| 3/11/2022 | 4800 |
| 3/18/2022 | 4800 |
| 3/25/2022 | 4800 |
| 4/1/2022 | 4800 |

## SECOND AMENDMENT TO AGREEMENT

This SECOND AMENDMENT TO AGREEMENT ("Second Amendment") made and entered into this 23rd day of August, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");BUYER

BUYER and Seller entered into a certain Purchase and Supply Agreement dated February 22nd, 2021 (the "Agreement") and an Amendment dated July 16, 2021 (the "Amendment"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto desire to amend the Agreement in the following respects:

1. All defined terms stated in this Second Amendment shall have the same meanings as defined in the Agreement and the Amendment.
2. The Buyer and Seller agree to add an additional operation to all Part's. The operations to be added are Tumble deburring and Shot Blasting per the samples provided. The new order of operation will be as follows:
   a. Raw Material Saw cut to length
   b. CNC Machining Op 10 (Lathe), Op 20 (Mill), Op 30 (Ratchet on Mill)
   c. Heat Treat
   d. **Tumble Deburr (No Thermal deburr per customers request)**
   e. **Shot Blast**
   f. Inspect & Pack (Including packaging)
3. Production shipments will start one week later to allow for the addition of these operations. The current purchase order will be modified to match the release schedule listed in Exhibit "C".
4. The Exhibit "A" attached to this Second Amendment will be the new Exhibit "A" to the Agreement showing the changes listed above.
5. With the exception of contrary terms stated in this Second Amendment, all terms and conditions of the Agreement and the Amendment shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment as of the Effective Date.

DR GUNS LLC

BY: _____

TITLE: Managing Member

DATE: 9-3-2021

LITTLE MOUNTAIN PRECISION, LTD.

BY: _____

TITLE: President

DATE: 9-3-21

# Exhibit "A"

| Part Number | Part Description | Minimum Weekly Quantity | Maximum Weekly Quantity | Release Quantity Multiple | Lead Time (weeks) | Variable Cost | | | | Part Price at Weekly Volume of 3,841 to 4,800 (Must average this Quantity over a 4 month period of time) | Part Price at Weekly Volume of 3,460 to 3,840 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Raw Material (complete cost delivered to Sellers Dock including any scrap, material surcharges, freight surcharges, or other costs) | Cost for coatings, tumble deburr, shot blasting and Heat Treating (shall include operator, assemble, set up any of the pieces of equipment used to remove material from bar stock. | Labor cost per piece (This includes any direct labor costs (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of tools used to make the Parts and any labor needed to inspect the parts) | | |
| 4007 | Bolt Carrier Blank | 3,460 | 4,800 | 64 | 30 | $ 1,632 | $ 1,380 | $ 1,100 | $ 2.01 | $ 19,423 | $ 19,126 |
| 4007A | Same as 4007 but with the addition of Honing the three id's and Grinding the one OD | | | 64 | 30 | $ 1,632 | $ 1,360 | $ 1,100 | $ 2.11 | $ 24,253 | $ 23,956 |

DGRWVL Initials _____

Little Mountain Precision Initials _____

Bolt Carrier Blank includes
1  Raw material Saw cut to length
2  CNC Machining Op 10 (Lathe), Op 20 (Mill), Op 30 (Ratchet on Mill)
3  Heat Treat
4  Tumble Deburr (No thermal deburr per customer)
5  Shot Blast
6  Inspect & Pack (including Packaging)

9-3-2021

9-3-21

Exhibit "C"

| Part Number | Date | Quantity |
|---|---|---|
| 4007A | 9/13/2021 | 2400 |
| 4007A | 9/20/2021 | 3000 |
| 4007A | 9/27/2021 | 3600 |
| 4007A | 10/4/2021 | 4000 |
| 4007A | 10/11/2021 | 4800 |
| 4007A | 10/18/2021 | 4800 |
| 4007A | 10/25/2021 | 4800 |
| 4007A | 11/1/2021 | 4800 |
| 4007A | 11/8/2021 | 4800 |
| 4007A | 11/15/2021 | 4800 |
| 4007A | 11/22/2021 | 4800 |
| 4007A | 11/29/2021 | 4800 |
| 4007A | 12/6/2021 | 4800 |
| 4007A | 12/13/2021 | 4800 |
| 4007A | 12/20/2021 | 4800 |
| 4007A | 12/27/2021 | 4800 |
| 4007A | 1/3/2022 | 4800 |
| 4007 | 1/10/2022 | 4800 |
| 4007 | 1/17/2022 | 4800 |
| 4007 | 1/24/2022 | 4800 |
| 4007 | 1/31/2022 | 4800 |
| 4007 | 2/7/2022 | 4800 |
| 4007 | 2/14/2022 | 4800 |
| 4007 | 2/21/2022 | 4800 |
| 4007 | 2/28/2022 | 4800 |
| 4007 | 3/7/2022 | 4800 |
| 4007 | 3/14/2022 | 4800 |
| 4007 | 3/21/2022 | 4800 |
| 4007 | 3/28/2022 | 4800 |
| 4007 | 4/4/2022 | 4800 |
| 4007 | 4/11/2022 | 4800 |
| 4007 | 4/18/2022 | 4800 |
| 4007 | 4/25/2022 | 4800 |
| 4007 | 5/2/2022 | 4800 |
| 4007 | 5/9/2022 | 4800 |
| 4007 | 5/16/2022 | 4800 |
| 4007 | 5/23/2022 | 4800 |
| 4007 | 5/30/2022 | 4800 |
| 4007 | 6/6/2022 | 4800 |
| 4007 | 6/13/2022 | 4800 |
| 4007 | 6/20/2022 | 4800 |
| 4007 | Every Week | 4800 |

**EXHIBIT 8**

## PURCHASE AND SUPPLY AGREEMENT

PURCHASE AND SALE AGREEMENT (this "Agreement") made and entered into this 14th day of May, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC.**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");

This is an agreement to establish the terms and conditions for the sale of Parts from Seller to Buyer. In consideration of the mutual promises herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

1. **Definitions.** As used in this Agreement:

   A. "Parts" means all of the materials, parts, assemblies, and/or services listed on **Exhibit "A"**, attached hereto and incorporated herein, and "Part" means one of the Parts.

   B. "Blanks" means the blank used to produce the Parts. Some of the Blanks will be supplied by the Seller per a separate Purchase and Supply Agreement signed on 2-22-2021. The remainder will be supplied by the Buyer from other sources.

   C. "Specifications" means the design, dimensions, tolerances, and materials requirements for each Part provided from Buyer to Seller.

2. **Purchase Quantities and Lead Time.**

   A. Agreement to Purchase. During the Term, Buyer agrees to purchase from Seller a total "Weekly Quantity" of Parts at or above the "Minimum Weekly Quantity" and at or below the "Maximum Weekly Quantity" listed on **Exhibit "A,"** attached to and made a part hereof, at the Part Prices itemized therein. This Agreement is for the Seller to grind Blanks into Parts. The Buyer must supply the Blanks 2 - 4 weeks before the finished Parts are due to ship from Seller.

   B. Release Quantity: As used in this Agreement, the term "Release Quantity Multiple" means the number of Parts listed on Exhibit "A." Each release or purchase order from Buyer must be a multiple of the Release Quantity Multiple.

   C. Lead Time. Buyer must supply Seller with adequate Lead Time necessary to supply each Part. "Lead Time" for normal production is defined on Exhibit "A" and may be modified only as mutually agreed by the parties in writing. Lead time for the First Article Parts may be as high as thirty (30) weeks from the Effective Date but production shipments will start early if the Parts are ready early.

   D. Purchase Orders. The Buyer will issue "Purchase Orders" for all Part numbers. Buyer's Purchase Orders to Seller for Parts will only be used as a tool to schedule shipping dates

and to ship, receive, bill and pay against.  The Purchase Orders shall not change, modify, amend, and/or alter any terms set forth in this Agreement.  All releases must meet all the terms of this Agreement including but not limited to Lead Time and Weekly Quantity.  If at any time during the Term there is no Purchase Order from the Buyer open and in effect, then the Seller may nevertheless ship Parts to Buyer in the Weekly Quantity of each Part.

3.     **Term**.  This Agreement shall become effective on the Effective Date and shall terminate at the conclusion of the three (3) year-period that commences as of the first production delivery of Parts ("Term" or "Initial Term"), unless earlier terminated by either party pursuant hereto. This Agreement shall be extended automatically for additional one-year terms (each an "Additional Term") unless notice is given by a party, in writing, at least sixty (60) days prior to the expiration of the Initial Term (or an Additional Term then in effect) of that party's desire to not extend the Term of this Agreement.

4.     **Part Price.**  The total price for each Part is listed on Exhibit "A" attached hereto and will vary according to changes in the "Variable Cost" also list on Exhibit "A" (the "Part Price"). Variable cost may be reviewed by the Seller every six (6) months and changes will only be made if the change in the Variable cost is five (5%) percent or more from the costs listed on Exhibit "A". If the Specifications for one or more Parts are changed by Buyer, Buyer and the Seller shall in good faith renegotiate the Part Price for the affected Parts to reflect changes in Seller's cost to produce the re-designed Parts.

5.     **Seller's Representations and Warranties**.  Seller represents and warrants to Buyer that:

   A.   Seller will comply with all other applicable laws in the manufacture, storage and shipment of the Parts;

   B.   Seller will transfer to Buyer ownership and good title to the Parts, free of all liens, encumbrances, and rights of third parties;

   C.   All Parts shall conform to the Specifications when shipped;

   D.   Parts were not manufactured and are not being sold or priced in violation of the Fair Labor Standards Act of 1938, Executive Orders 11114, 11246, 11375, and 11701, with respect to nondiscrimination in employment by government contractors and subcontractors, or any other federal, state, or local law.

   SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE PARTS, INCLUDING ANY IMPLIED WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

6.     **Buyer's Representation and Warranties**.  Buyer represents and warrants to Seller that:

   A.   Any Part names, logos, and Specifications provided by Buyer will not violate any third-party patents.

B.  Buyer will indemnify Seller and hold it harmless from and against any all claims, demands, liability, or costs (including reasonable attorney fees), including but not limited to claims for personal injury or property damage, that in any way arise out of the use of the Parts by any person, firm, or corporation as long as the harm was not caused by the Seller producing the Parts outside of the Specifications.

7.  **Freight/Payment Terms.**

A.  Payment terms will be net payable within thirty (30) days after shipment of each Part and will be paid via Automated Clearing House ("ACH") transactions to Seller's bank.  Freight terms shall be F.O.B. Seller's dock,.  Notwithstanding any other language in this Agreement to the contrary, Buyer shall be entitled to take a 1 2% (0.50%) discount off the Parts price if it pays within ten (10) days of shipment.  In order to take this discount no payments can be in excess of the stated terms.  If at any time Buyer is late in its payment to Seller, then Seller may stop production of Parts and/or shipment to Buyer until all past due invoices are paid in full.  This action by the Seller does not release Buyer from its commitments outlined in this Agreement.  Seller must provide notification to Buyer describing the non-payment issue no later than one (1) day before production and/or a shipment is stopped.  Missed or delayed shipments due to late payment will not be counted against Seller as a failure to meet delivery requirements and/or breach this Agreement in any way.  All sales use excise or other taxes will be paid by Buyer.

B.  Buyer shall be obligated to inspect each shipment of Parts in order to verify the completeness thereof.  Buyer shall bear the risk of loss, theft, or damage to Parts while in transit from Seller once the Parts are in the hands of Buyer's common carrier. The rights granted to Buyer pursuant to this subsection are the exclusive remedy for Parts shortages.  Any shortage in Parts quantity must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer in Lake Zurich, Illinois, or such claim shall be forever waived.

C.  Seller shall conform to any and all shipping and/or packaging specifications provided by Buyer for shipment of Parts.  If there is an increase in cost to meet the Buyer's shipping and/or packaging specifications, then this cost will be added to the Part Price listed on Exhibit "A".  The Part Price includes the cost of standard packaging (bulk layer pack with cardboard dividers to provide some protection during shipment).

8.  **Quality Standards.**

A.  **First Article.**  BUYER shall conduct a first article inspection of initial Parts samples supplied by Seller and will notify Seller within thirty (30) days of its receipt of samples, in writing, if its inspection revealed that any of such first article Parts do not conform to the Specifications.  If no such notice is timely given, Buyer will be deemed to have accepted the samples, and the Specifications will be deemed to have been modified to conform to the approved samples, and Seller shall proceed to manufacture the Parts in conformity with the samples and the provisions of this Agreement.

B. **Quality Inspection**  Buyer shall be obligated to inspect all Parts upon receipt for discrepancy to the Part Specifications. It is expected that there may be some nonconformity issues with the Parts but Buyer will use their best and fair judgment to determine if the nonconformity negatively effects the function of the Parts. If the nonconformity does not affect the function of the Part then the Part will be accepted. If it does affect the function of the Part, then Buyer will request an RMA number from the Seller per paragraph 10. Any claim that one or more of the Parts fails to conform to the Specifications must be asserted by written notice to Seller within ten (10) business days of receipt of shipment by Buyer or such claim shall be forever waived.

9.  **Default, Termination, and Remedies.**

A. <u>Default.</u>  Either Party will be in "Default" under this Agreement if it (1) fails to perform any obligation under this Agreement and fails to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance (provided, late deliveries must be cured within ten (10) calendar days), (2) admits in writing its inability to pay its debts as they become due, commences a bankruptcy, insolvency, receivership, or similar proceeding, or makes a general assignment for the benefit of creditors, or (3) becomes a debtor in a bankruptcy insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement. In the event of an uncured event of Default, either non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercise the remedies provided in this Agreement.

B. <u>Parties Obligations at Termination.</u>  If this Agreement is terminated either in its entirety or as to one or more Parts, including but not limited to expiration of the Initial Term or an Additional Term, then Buyer shall be required to purchase all Raw Material, Work in Process, Finished Goods, and tooling purchased specifically for the manufacture of the Parts.

C. In the event of an uncured event of Default, the non-defaulting Party may terminate this Agreement by giving written notice to the other Party, and/or exercising the remedies available to it.

D. In the event of an uncured event of Default by Seller, BUYER may recover its actual out-of-pocket damages or costs directly caused by Seller's breach, but in any event incidental or consequential damages (including specifically lost profits) shall not be recoverable. Any legal action on the part of BUYER must be brought within one (1) year of the earlier of: i) the date of delivery of the subject Parts; or ii) the date of the alleged Default, or any such claim shall be waived.

E. In the event of an uncured Default by BUYER, Seller may recover from BUYER all damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the

cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the date of BUYER's Default (BUYER acknowledges that the actual damages sustained by Seller resulting from BUYER's breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable); and (5) Seller's reasonable legal and litigation expenses.

## 10. Return Material Authorizations

Buyer may reject Parts that are not manufactured in accordance with the Specifications. Seller shall give Buyer written notice of the extent to which it is recognizing the validity of such claim. Seller shall give Buyer a written return merchandise authorization ("RMA") for all allowed claims. Seller shall not be liable for consequential or other damages associated with allegedly non-conforming Parts. BUYER's sole and exclusive remedy for Parts that do not conform to the warranties provided for herein will be to reject the non-conforming Parts, and to require Seller, at Seller's option and expense (including applicable shipping costs), to either repair or replace the non-conforming Parts.

## 11. Miscellaneous.

A. Assignment. This Agreement shall not be assignable or transferable by either Party, either in whole or in part, without the prior written consent of the other Party which shall not be withheld unreasonably.

B. Indemnification. Subject to the terms and limitations set forth in this Agreement, Seller shall be solely liable for all damage, loss, personal injury, and death caused by the Parts except to the extent such damage, loss, personal injury, or death is caused in whole or in part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied and/or directed materials. Subject to the terms and limitations set forth in this Agreement, Seller shall indemnify and hold harmless Buyer and its agents, employees, officers and directors from any and all alleged and actual claims, liabilities, demands, actions lawsuits, settlements, judgments, fines, penalties, fees and expenses, and all other losses of any and all types ("Claims") alleged or arising from, resulting from or relating to, (i) any Claim or Claims (whether or not successful or legally sufficient) relating to any Part including, but not limited to, any alleged or actual defect thereof except to the extent Buyer negligently causes such defect, (ii) any breach by Seller of this Agreement or any warranty or representation made to Buyer, (iii) any Claim or Claims (whether or not successful or legally sufficient) relating to environmental damage caused by the act or omission of Seller, except to the extent Buyer negligently causes such environmental damage, (iv) any Claim or Claims (whether or not successful or legally sufficient) relating to any matter for which Seller is or would be responsible or liable under this Section or any other agreement, and/or (iv) any Claim or Claims that any Parts or their development, manufacture, sale, use or importation infringe the Intellectual Property Rights of any third party, except to the extent such infringement was caused in whole or in part by a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied and/or directed materials. Buyer agrees to provide Seller prompt notice of any claim covered by this Section and to authorize Seller to defend and settle such claim at Seller's expense; provided, however, that any

failure to comply with the provisions of this sentence shall only constitute or result in a defense or reduction of Seller's obligations to the limited extent that Supplier is actually prejudiced and damaged by such failure.

C. Safety. If any Part reasonably causes either party any concerns about the safety or health of end users of Part, such party shall promptly (and, where practicable, prior to notifying any government agency) advise the other party of the same. The parties shall promptly thereafter engage in good faith discussions to attempt to agree upon the issue of whether the safety or health concerns necessitate remediation, recognizing that even in the absence of a substantial threat to safety or health, a customer's incorrect but reasonable perceptions of potential safety or health hazards (as where a condition may appear to a customer to be threatening even though technical analysis reveals that the Part is not actually a threat to health or safety) may harm Buyer's reputation and necessitate remediation. If agreement is reached that remediation should be undertaken, the parties shall also attempt to agree in good faith on the scope and nature of the remediation (including, but not limited to, a recall or field repair of Parts already delivered to customers or in Buyer's warehouses) as promptly as possible to ensure a timely and effective resolution of the concern. Seller shall bear the reasonable and necessary cost of such action except to the extent that the cause of the Part failure is due to a design created by Buyer, Specifications supplied by Buyer, or by Buyer supplied or directed materials. In the event the parties are unable to agree upon remediation within five (5) calendar days after receipt of written notification, Buyer may commence any remediation it believes is prudent and such commencement shall not prejudice any of Buyer's or Seller's rights. In the event a less costly repair is agreed to, Seller's liability for previous repairs shall be limited to the negotiated amount. In the event the parties are unable to agree in good faith, Buyer shall be entitled to reimbursement for its reasonable expenses to the extent that Buyer's decision to remediate was reasonable in view of the foregoing considerations and the facts known to Buyer at the time.

D. Tooling. Seller shall own all tooling at all times.

E. No Public Disclosure. Except as may be reasonably necessary for Buyer to sell and service the Parts, the parties agree not to knowingly disclose the fact that Seller has furnished, or contracted to furnish to Buyer, the Parts and/or services specified, and the terms and conditions of this Agreement or documents issued hereunder, except (a) as may be reasonably necessary to enforce any party's rights under this Agreement, (b) as may be required by law, by any court or by any government rule or regulation, or (c) without the express written consent of the executive management and corporate communications department of the other party in each instance; provided that whenever possible, that where disclosure is required by law, court order or government rule or regulation, the party required to effect the disclosure will first notify the other party and cooperate with such party's attempt to obtain confidential treatment for such information as must be disclosed. Notwithstanding anything to the contrary stated in this paragraph, Buyer may disclose the terms and conditions of this Agreement to financial institutions that are providing services to Buyer, provided that any such third party is limited to use of such information solely in connection with Buyer's business operations and provided that Buyer has an agreement

with such third party that obligates the third party to hold the terms and conditions of this Agreement confidential

F.  Headings and Survival.  Headings used in this Agreement are for the convenience of the parties only and shall not be resorted to in construing it.  Any rights and/or obligations of the parties listed in this Agreement (including, but not limited to, Seller's warranty and indemnification obligations) that reasonably may be construed to survive termination of this Agreement shall so survive.

G.  Choice of Law/Invoices/Government.  This Agreement shall be governed by and construed according to the laws of the State of Ohio without regard to its conflicts of law principles. Terms and conditions in Seller's invoices, or in Buyer's purchase orders, that are in addition to or otherwise purport to modify the terms and conditions of this Agreement shall be void and of no effect.  If Buyer's purchase order notes applicability of a United States government contract, Seller agrees to abide by any and all additional/contrary terms and conditions that may be imposed by such government contract.

H.  Insurance.  During the term of this Agreement, Seller shall maintain the following insurance coverage in at least the following amounts:

(1)    Workers' Compensation, or equivalent, with statutory limits required by each state, or country exercising jurisdiction over the Seller's employees engaged in performing services under this Agreement.

(2)    Employer's Liability coverage with a minimum limit of one million dollars ($1,000,000) for bodily injury by accident or disease.

(3)    Commercial General Liability coverage (including products and completed operations, broad form contractual, personal injury liability and broad form property damage) with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury property damage and one million dollars ($1,000,000) for personal injury and products/completed operations.

I.  Entire Agreement/Amendments.  This Agreement, which includes its Exhibits, represents the entire understanding of the Parties regarding the subject matter hereof, and supersedes all prior understandings, whether written or oral.  Further amendments or modifications may only be made in writing and must be signed by an authorized representative of each Party.

J.  No Joint Venture.  Nothing contained herein shall be construed to place the Parties in the relationship of partners or joint ventures, and neither Party shall have the power to obligate or bind the other in any manner whatsoever.  Each Party is and shall be at all times an independent contractor; and nothing herein shall be construed as constituting a party as the agent, partner or legal representative of the other Party for any purpose whatsoever.  Each Party shall be solely responsible for its compliance with all federal, state and local requirements and licenses in the operation of its business.

K. No Waiver. No waiver of the breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition.

L. Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, insurrection, war, pandemic, or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Agreement, then the period for the performance of any such work or acts shall be extended for a period equivalent to the period of such delay. The provisions of this Section shall not operate to excuse Buyer from prompt payment of Parts sold and delivered, or any other payments required by the terms of this Agreement.

M. Severability. A finding that any provision of this Agreement is invalid or unenforceable in any jurisdiction will not affect the validity or enforceability of any other provision of the Agreement or the validity or enforceability of that provision in any other jurisdiction.

N. Notices. All notices under this Agreement shall be in writing and sent to the following:

If to Seller:
Little Mountain Precision, LLC
8687 Tyler Blvd.
Mentor, Ohio 44060
Attn: Mario Manocchio
mmanocchio@littlemountainprecision.com
with a copy to:
dhabe@littlemountainprecision.com

If to Buyer:
DR GUNS LLC
551 Telser Rd.
Lake Zurich, Illinois 60047
Attn: David Rybacki
dave@drymanufacturing.com

SIGNATUERES ON THE NEXT PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

DR GUNS LLC

By:     David Rybacki
        Manager

By: Stacy Rybacki

LITTLE MOUNTAIN PRECISION, LLC.

By:

NAME:

TITLE:

Exhibit "A" (3 Year)

| Part Number | Part Description | Minimum Weekly Volume | Maximum Weekly Quantity | Release Quantity Multiple | Lead Time (Weeks) | Variable Cost | | Part Price |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor cost per piece (This includes any direct labor cost (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of Grinding Wheels | |
| 4007G | Bolt Carrier Grind (grinding the one OD and three ID's) | 8,640 | 10,560 | 960 | 14 | $ 0.246 | $ 0.55 | $ 3,410 |
| 4809C | Bolt Grind (grinding the normal OD's and Face) | 8,640 | 10,560 | 960 | 14 | $ 0.240 | $ 0.33 | $ 1,320 |

OGRWL Initials: _____

Little Mountain Precision Initials: _____

EXHIBIT 9

## AMENDMENT TO AGREEMENT

This AMENDMENT TO AGREEMENT ("Amendment") made and entered into this 17th day of November, 2021 (the "Effective Date") between **DR GUNS LLC**, an Illinois limited liability company dba **DRG Manufacturing and dba White Label Armory**, with a having its principal place of business in Lake Zurich, Illinois 60084 and its subsidiaries, parent companies, and/or related companies wherever located ("Buyer"), and **LITTLE MOUNTAIN PRECISION, LLC.**, an Ohio limited liability company, having its principal place of business in Mentor, Ohio (the "Seller"), with reference to the following (Seller and Buyer may hereafter be individually referred to herein as a "Party" or collectively as the "Parties");

BUYER and Seller entered into a certain Purchase and Supply Agreement dated May 14th, 2021 (the "Agreement"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto desire to amend the Agreement in the following respects:

1. All defined terms stated in this Amendment shall have the same meanings as defined in the Agreement.
2. The Attached Exhibit "A" will be the new Exhibit "A" to the Agreement.
3. The Agreement initially contemplated the grinding and sale of two Part numbers at certain prices and volumes.
4. The Buyer and Seller agree to lower the volume and increase the price of the two part numbers. The Buyer and Seller agree that the Buyer will now have a volume range that the Buyer can choose from that is lower than the original volume. The maximum and minimum weekly quantities that the Buyer can choose from is listed on the attached Exhibit "A".
5. Pricing will fluctuate based on the volume chosen by the Buyer. The price will be determined by the lowest volume chosen by the Buyer over the previous 8 weeks. Whatever that lowest volume is will be matched up with the prices on Exhibit "A" to determine the price per piece for that week's release.
6. For Part 4007G (Bolt Carrier Grind) the Buyer and Seller agree that a portion of these parts will be ground from Bolt Carrier's being supplied by the Seller under a different Purchase and Supply Agreement with the balance of the pre-grind Bolt Carriers being supplied by the Buyer.
7. For Part 4009G (Bolt Grind) the Buyer and Seller agree that 100% of the volume will be produced from pre-grind Bolts supplied by the Buyer.
8. The Buyer and Seller agree that the pre-grind Bolt Carriers and pre-grind Bolts being supplied by the Buyer should be delivered to the Seller a minimum of 10 business days and a maximum of 30 business days before the parts are due to ship back to the Buyer. The Buyer provided parts will be packed in a manner to provide safe transportation to and from the Seller that will also be easy to load and unload into the Sellers automated grinding cell. The Buyers skid quantities to ship to the Seller will be 2,000 to 2,496 per skid for the 4007G and 4,800 per skid 4009G to match the weekly quantity to be shipped back to the Buyer.
9. The Buyer and Seller agree that the production shipments will start 1-28-2022 for the 4007G and 2-4-2022 for the 4009G as listed on Exhibit "C". The Buyer will issue purchase orders to match this release schedule and plan on delivering the blanks on the dates also listed on Exhibit "C".
10. With the exception of contrary terms stated in this Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

SIGNATURES ON THE NEXT PAGE

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the Effective Date.

DR GUNS LLC

BY: _____
Stacy Paras
TITLE: _Manager_

DATE: _12-3-2021_

BY: _____
Chris Gosell
TITLE: _CEO_

DATE: _11/18-21_

LITTLE MOUNTAIN PRECISION, LTD.

BY: _____
Mario Manocchio
TITLE: _Sales Manager_

DATE: _12-9-2021_

# Exhibit "A"

| Part Number | Part Description | Minimum Weekly Quantity | Maximum Weekly Quantity | Minimum Run Quantity | Release Quantity Multiple | Lead Time (weeks) | Variable Cost | | Pricing when the previous 8 weeks volume is at the Minimum Weekly Quantity up to the Maximum Weekly Quantity | Pricing when the previous 8 weeks volume is at the Maximum Weekly Quantity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Labor cost per piece (This includes any direct labor cost (including benefits) used to operate, assemble, adjust, or set up any of the pieces of equipment used to make the Parts and any labor needed to inspect the parts) | Cost of of Grinding Wheels | | |
| 4007TG | Bolt Carrier Grind (grinding the one OD and three ID's) | 2000 | 2496 | 25,000 | 960 | 14 | $ 0.240 | $ 0.55 | $ 4.17 | $ 4.00 |
| 4009G | Bolt Grind (grinding the normal OD's and Face) | 4800 | 9600 | 50,000 | 960 | 14 | $ 0.240 | $ 0.35 | $ 2.17 | $ 1.82 |

DGRRWL Initials: _____

Little Mountain Precision Initials: _MM_  12-8-2021

Exhibit "C"

**4007G**

| Ship Date | Quantity | Price | Date the Buyer will deliver the 4007G pre-grind blanks to the Sellers facility | Quantity the Buyer will deliver the 4007G pre-grind blanks to the Sellers facility |
|---|---|---|---|---|
| 1/28/2022 | 960 | $ 4.000 | 1/7/2022 | 0 |
| 2/4/2022 | 1920 | $ 4.000 | 1/14/2022 | 2496 |
| 2/11/2022 | 2496 | $ 4.000 | 1/21/2022 | 2496 |
| 2/18/2022 | 2496 | $ 4.000 | 1/28/2022 | 2496 |
| 2/25/2022 | 2496 | $ 4.000 | 2/4/2022 | 2496 |
| 3/4/2022 | 2496 | $ 4.000 | 2/11/2022 | 2496 |
| 3/11/2022 | 2496 | $ 4.000 | 2/18/2022 | 2496 |
| 3/18/2022 | 2496 | $ 4.000 | 2/25/2022 | 2496 |
| 3/25/2022 | 2496 | $ 4.000 | 3/4/2022 | 2496 |
| 4/1/2022 | 2496 | $ 4.000 | 3/11/2022 | 2496 |
| 4/8/2022 | 2496 | $ 4.000 | 3/18/2022 | 2496 |
| 4/15/2022 | 2496 | $ 4.000 | 3/25/2022 | 2496 |
| 4/22/2022 | 2496 | $ 4.000 | 4/1/2022 | 2496 |
| 4/29/2022 | 2496 | $ 4.000 | 4/8/2022 | 2496 |
| 5/6/2022 | 2496 | $ 4.000 | 4/15/2022 | 2496 |
| 5/13/2022 | 2496 | $ 4.000 | 4/22/2022 | 2496 |
| 5/20/2022 | 2496 | $ 4.000 | 4/29/2022 | 2496 |
| 5/27/2022 | 2496 | $ 4.000 | 5/6/2022 | 2496 |
| 6/3/2022 | 2496 | $ 4.000 | 5/13/2022 | 2496 |
| 6/10/2022 | 2496 | $ 4.000 | 5/20/2022 | 2496 |
| 6/17/2022 | 2496 | $ 4.000 | 5/27/2022 | 2496 |
| 6/24/2022 | 2496 | $ 4.000 | 6/3/2022 | 2496 |

Dates and quantities to be added as required by the Agreement

**4009G**

| Ship Date | Quantity | Price | Date the Buyer will deliver the 4007G pre-grind blanks to the Sellers facility | Quantity the Buyer will deliver the 4007G pre-grind blanks to the Sellers facility |
|---|---|---|---|---|
| 1/7/2022 | | | 1/7/2022 | 0 |
| 1/14/2022 | | | 1/14/2022 | 1920 |
| 1/21/2022 | | | 1/21/2022 | 1920 |
| 1/28/2022 | | | 1/28/2022 | 4800 |
| 2/4/2022 | 1920 | $ 2.170 | 2/4/2022 | 4800 |
| 2/11/2022 | 1920 | $ 2.170 | 2/11/2022 | 4800 |
| 2/18/2022 | 4800 | $ 2.170 | 2/18/2022 | 4800 |
| 2/25/2022 | 4800 | $ 2.170 | 2/25/2022 | 4800 |
| 3/4/2022 | 4800 | $ 2.170 | 3/4/2022 | 4800 |
| 3/11/2022 | 4800 | $ 2.170 | 3/11/2022 | 4800 |
| 3/18/2022 | 4800 | $ 2.170 | 3/18/2022 | 4800 |
| 3/25/2022 | 4800 | $ 2.170 | 3/25/2022 | 4800 |
| 4/1/2022 | 4800 | $ 2.170 | 4/1/2022 | 4800 |
| 4/8/2022 | 4800 | $ 2.170 | 4/8/2022 | 4800 |
| 4/15/2022 | 4800 | $ 2.170 | 4/15/2022 | 4800 |
| 4/22/2022 | 4800 | $ 2.170 | 4/22/2022 | 4800 |
| 4/29/2022 | 4800 | $ 2.170 | 4/29/2022 | 4800 |
| 5/6/2022 | 4800 | $ 2.170 | 5/6/2022 | 4800 |
| 5/13/2022 | 4800 | $ 2.170 | 5/13/2022 | 4800 |
| 5/20/2022 | 4800 | $ 2.170 | 5/20/2022 | 4800 |
| 5/27/2022 | 4800 | $ 2.170 | 5/27/2022 | 4800 |
| 6/3/2022 | 4800 | $ 2.170 | 6/3/2022 | 4800 |
| 6/10/2022 | 4800 | $ 2.170 | 6/10/2022 | 4800 |
| 6/17/2022 | 4800 | $ 2.170 | 6/17/2022 | 4800 |
| 6/24/2022 | 4800 | $ 2.170 | 6/24/2022 | 4800 |

Dates and quantities to be added as required by the Agreement

Buye Initials:

Seller Initials:  MM  12-9-21

# SUMMONS
## COURT OF COMMON PLEAS
## LAKE COUNTY OHIO


LITTLE MOUNTAIN PRECISION, LLC
                Plaintiff

                VS.                                    Case Number: **22CV000974**
                                                       Judge JOHN P. O`DONNELL

RYBACKI MANAGEMENT INC. et al
                Defendant

To the following named DEFENDANT(S):
                File Copy
        You have been named a Defendant in a complaint filed in the Lake County Court of Common
Pleas, Lake County Courthouse, Painesville, Ohio.  A copy of the complaint is attached hereto.  The
name and address of the plaintiff's attorney is:

                ROBERT A HAGER
                BRENNAN, MANNA & DIAMOND, LLC
                200 PUBLIC SQUARE, SUITE 3270
                CLEVELAND OH 44114
        You are hereby summoned and required to do the following:
        1.      **Within 28 days after service of this Summons upon you, serve a copy of an Answer to the
                Complaint on the Plaintiff's Attorney or on the Plaintiff, if he/she has no attorney of rec-
                ord;**

        2.      **Within 3 days after you serve the Plaintiff or the Plaintiff's Attorney, file an Answer with
                your original signature with the Lake County Clerk of Court.**

                **Calculations of time are exclusive of the day of service.**
        If you fail to appear and defend, judgment by default will be rendered against you for the relief
demanded in the complaint.

                                        Faith Andrews
                                        Clerk, Court of Common Pleas
                                        Lake County, Ohio
                                        25 N. Park Place
                                        Painesville OH 44077


                                        By *CRAIG ANDERSON*

                                        Deputy Clerk

August 1, 2022

**Certified Article Number**

9414 7266 9904 2198 1363 51

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 51

EQUIPMUNK LEASING LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1363 68

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 68

551 TELSER ROAD LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

**Certified Article Number**

9414 7266 9904 2198 1363 75

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 75

551 TELSER ROAD LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1363 82

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 82

HOBBIT HOLDINGS INC.
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1363 99

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 99

DR GUNS LLC
CO ROGER T STELLE
1515 E. WOODFIELD RD STE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1364 05

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1364 05

DR GUNS LLC
551 TELSER ROAD
LAKE ZURICH, IL 60047

**Certified Article Number**

9414 7266 9904 2198 1362 76

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1362 76

RYBACKI MANAGEMENT INC.
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1362 83

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1362 83

SRW INDUSTRIES, LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

**Certified Article Number**

9414 7266 9904 2198 1362 90

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1362 90

SRW INDUSTRIES, LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1363 06

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 06

500 CAPITAL DRIVE, LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

**Certified Article Number**

9414 7266 9904 2198 1363 13

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 13

500 CAPITAL DRIVE, LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1363 20

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 20

SLD REAL ESTATE HOLDINGS LL
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

**Certified Article Number**

9414 7266 9904 2198 1363 37

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 37

SLD REAL ESTATE HOLDINGS LL
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

**Certified Article Number**

9414 7266 9904 2198 1363 44

**SENDER'S RECORD**

22CV000974
9 414 7266 9904 2198 1363 44

EQUIPMUNK LEASING LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1362 76

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ 1/33 |
| Total Postage and Fees | $ |



Postmark
Here

## Sent to:

```
RYBACKI MANAGEMENT INC.
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173
```

JPD

## Reference Information



```
22CV000974
9 414 7266 9904 2198 1362 76
```

PS Form 3800, Facsimile, July 2015

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®

# CERTIFIED MAIL® RECEIPT

*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1362 83

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | |
| Certified Mail Restricted Delivery | $ | |
| Postage | $ | |
| Total Postage and Fees | $ | |

11.33

PAINESVILLE OH 44077
AUG -2 2022
Postmark
Here
USPS

**Sent to:**

SRW INDUSTRIES, LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

## Reference Information

22CV000974
9 414 7266 9904 2198 1362 83

PS Form 3800, Facsimile, July 2015

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1362 90

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | |
| Certified Mail Restricted Delivery | $ | |
| Postage | $ | |
| Total Postage and Fees | $ | |





PAINESVILLE OH 44077
AUG - 2 2022
Postmark
Here
USPS

**Sent to:**

SRW INDUSTRIES, LLC
C/O ROGER T. STELLE
1515 WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173



## Reference Information

22CV000974
9 414 7266 9904 2198 1362 90

PS Form 3800, Facsimile, July 2015

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 06

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |



PAINESVILLE OH 44077
AUG - 2 2022
Postmark
Here
USPS

**Sent to:**

500 CAPITAL DRIVE, LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

## Reference Information



22CV000974
9 414 7266 9904 2198 1363 06

PS Form 3800, Facsimile, July 2015

# WALZ

**A COVIUS SOLUTION**

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better*, *faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 13

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |



**Sent to:**

500 CAPITAL DRIVE, LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

## Reference Information

22CV000974
9 414 7266 9904 2198 1363 13

PS Form 3800, Facsimile, July 2015

# WALZ

### A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®

# CERTIFIED MAIL® RECEIPT

*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363-20

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | PAINESVILLE OH 44077 |
| Certified Mail Restricted Delivery | $ | AUG - 2 2022 |
| Postage | $ | Postmark Here |
| Total Postage and Fees | $ | USPS |

**Sent to:**

SLD REAL ESTATE HOLDINGS LL
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

## Reference Information

22CV000974
9 414 7266 9904 2198 1363 20

PS Form 3800, Facsimile, July 2015

# WALZ

### A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:

# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better*, *faster* and *easier* way!

# CERTIFIED MAIL® RECEIPT

*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 37

| | | |
|---|---|---|
| **Certified Mail Fee** | $ | |
| **Return Receipt (Hardcopy)** | $ | |
| **Return Receipt (Electronic)** | $ | 33 |
| **Certified Mail Restricted Delivery** | $ | |
| **Postage** | $ | |
| **Total Postage and Fees** | $ | |



PAINESVILLE OH 44077
AUG -2 2022
Postmark Here
USPS

**Sent to:**

```
SLD REAL ESTATE HOLDINGS LL
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173
```

## Reference Information

```
22CV000974
9 414 7266 9904 2198 1363 37
```





**WALZ**

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
## www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

## For a *better, faster* and *easier* way!

# U.S. Postal Service®
## CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

### USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 44

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

PAINESVILLE OH 44077
AUG -2 2022
Postmark
Here

**Sent to:**

EQUIPMUNK LEASING LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

### Reference Information

22CV000974
9 414 7266 9904 2198 1363 44

PS Form 3800, Facsimile, July 2015



# WALZ
### A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
## www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

## For a *better, faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 51

| | |
|---|---|
| **Certified Mail Fee** | $ |
| **Return Receipt (Hardcopy)** | $ |
| **Return Receipt (Electronic)** | $ |
| **Certified Mail Restricted Delivery** | $ |
| **Postage** | $ |
| **Total Postage and Fees** | $ |

11.33



PAINESVILLE OH 44077
AUG – 2 2022
Postmark
Here
USPS

### Sent to:

```
EQUIPMUNK LEASING LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173
```



### Reference Information

```
22CV000974
9 414 7266 9904 2198 1363 51
```

PS Form 3800, Facsimile, July 2015

# WALZ

**A COVIUS SOLUTION**

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
## www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 68

| | |
|---|---|
| **Certified Mail Fee** | $ |
| **Return Receipt (Hardcopy)** | $ |
| **Return Receipt (Electronic)** | $ |
| **Certified Mail Restricted Delivery** | $ |
| **Postage** | $ |
| **Total Postage and Fees** | $ |





PAINESVILLE OH 44077

AUG - 2 2022

**Postmark Here** USPS

**Sent to:**

```
551 TELSER ROAD LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047
```



## Reference Information

```
22CV000974
9 414 7266 9904 2198 1363 68
```

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:

## www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 75

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

PAINESVILLE OH 44077

AUG - 2 2022

Postmark Here

**Sent to:**

551 TELSER ROAD LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

JPO

## Reference Information

22CV000974
9 414 7266 9904 2198 1363 75

PS Form 3800, Facsimile, July 2015



Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better, faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT

*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 82

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

*1133*



PAINESVILLE OH 44077
AUG -2 2022
Postmark
Here
USPS

**Sent to:**

HOBBIT HOLDINGS INC.
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

*JPO*

## Reference Information

22CV000974
9 414 7266 9904 2198 1363 82

PS Form 3800, Facsimile, July 2015

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
## www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better*, *faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1363 99

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

*PAINESVILLE OH 44077*
AUG - 2 2022
Postmark
Here
USPS

**Sent to:**

DR GUNS LLC
CO ROGER T STELLE
1515 E. WOODFIELD RD STE 250
SCHAUMBURG, IL 60173

## Reference Information

22CV000974
9 414 7266 9904 2198 1363 99

PS Form 3800, Facsimile, July 2015

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
## www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better*, *faster* and *easier* way!

# U.S. Postal Service®
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

## USPS® ARTICLE NUMBER

9414 7266 9904 2198 1364 05

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | |
| Certified Mail Restricted Delivery | $ | |
| Postage | $ | |
| Total Postage and Fees | $ | |

*133*



PAINESVILLE OH 44077
AUG -2 2022
Postmark
Here
USPS

**Sent to:**

DR GUNS LLC
551 TELSER ROAD
LAKE ZURICH, IL 60047

## Reference Information

22CV000974
9 414 7266 9904 2198 1364 05

# WALZ

A COVIUS SOLUTION

Walz Certified Mailer™ form #45663
Version E0921

For use with WCM Plus™ software

Reorder forms online at:
# www.walzpostal.com

or contact WALZ at:
Email: sales@walzpostal.com
Toll Free: (800) 381-3811

For a *better*, *faster* and *easier* way!

Return Receipt (Form 3811) Barcode



9590 9266 9904 2198 1363 99

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ZQ 7330
☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery
TCY            8/5/22

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:          ☐ No

2022 AUG 15 PM 2:00

FAITH ANDREWS
LAKE CO. CLERK OF COURT

JPo

1. Article Addressed to:

DR GUNS LLC
CO ROGER T STELLE
1515 E. WOODFIELD RD STE 250
SCHAUMBURG, IL 60173

22CV000974

3. Service Type:

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1363 99

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2198 1363 99

PS Form 3811, Facsimile, July 2015                    Domestic Return Rece



USPS TRACKING #

9590 9266 9904 2198 1363 92

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service®**

● Sender: Please print your name, address and ZIP+4® below ●

**LAKE COUNTY CLERK OF COURTS**
**25 NORTH PARK PLACE**
**PAINESVILLE OH 44077-3416**

Return Receipt (Form 3811) Barcode



9590 9266 9904 2198 1362 79

1. Article Addressed to:

2022 AUG 11

RYBACKI MANAGEMENT INC.
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

FAITH ANDREWS
LAKE CO. CLERK OF COURT

22CV000974

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2198 1362 76

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                        ☒ Addresse

B. Received by (Printed Name)     C. Date of Delivery

8/6/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

AM 11: 15

3. Service Type:

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1362 76

PS Form 3811, Facsimile, July 2015       Domestic Return Receipt



9590 9266 9904 2198 1362 79

**United States**
**Postal Service®**

● Sender: Please print your name, address and ZIP+4® below ●

**LAKE COUNTY CLERK OF COURTS**
**25 NORTH PARK PLACE**
**PAINESVILLE OH 44077-3416**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

Return Receipt (Form 3811) Barcode

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery
Kate Villall | 8-5-22

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9266 9904 2198 1362 86

1. Article Addressed to:

SRW INDUSTRIES, LLC
500 CAPITAL DRIVE
LAKE ZURICH, IL 60047

22CV000974

2012 AUG -9 PM12:02
FAITH ANDREWS
LAKE CO. CLERK OF COURT

3. Service Type:

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1362 83

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2198 1362 83

PS Form 3811, Facsimile, July 2015 | Domestic Return Receipt



USPS TRACKING #

CAROL STREAM IL 601

9590 9266 9904 2198 1362 86

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service®**

● Sender: Please print your name, address and ZIP+4® below ●

**LAKE COUNTY CLERK OF COURTS**
**25 NORTH PARK PLACE**
**PAINESVILLE OH 44077-3416**

341625





Return Receipt (Form 3811) Barcode

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

9590 9266 9904 2198 1363 16

1. Article Addressed to:

500 CAPITAL DRIVE LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

22CV000974

2022 AUG -9 PM 12:02
FAITH ANDREWS
LAKE CO. CLERK OF COURT

3. Service Type:

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1363 13

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2198 1363 13

PS Form 3811, Facsimile, July 2015          Domestic Return Receipt



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9266 9904 2198 1363 16

**United States**
**Postal Service®**

● Sender: Please print your name, address and ZIP+4® below ●

**LAKE COUNTY CLERK OF COURTS**
**25 NORTH PARK PLACE**
**PAINESVILLE OH 44077-3416**

Return Receipt (Form 3811) Barcode

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery

8/5/22

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

9590 9266 9904 2198 1363 30

1. Article Addressed to:

SLD REAL ESTATE HOLDINGS
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

22CV000974

FILED
2022 AUG 3 PM 2:00
FAITH ANDREWS
LAKE CO. CLERK OF COURT

3. Service Type:

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1363 37

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2198 1363 37

PS Form 3811, Facsimile, July 2015          Domestic Return Receipt



USPS TRACKING #

9590 9266 9904 2198 1363 30

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service®**

● Sender: Please print your name, address and ZIP+4® below ●

LAKE COUNTY CLERK OF COURTS
25 NORTH PARK PLACE
PAINESVILLE OH 44077-3416



Return Receipt (Form 3811) Barcode

9590 9266 9904 2198 1363 78

**1. Article Addressed to:**

2022 AUG 11

551 TELSER ROAD LLC
C/O ROGER T. STELLE
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

FAITH ANDREWS
LAKE CO. CLERK OF COURT

22CV000974

**2. Certified Mail (Form 3800) Article Number**

9414 7266 9904 2198 1363 75

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
 8/6/22

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

AM 11: 15

**3. Service Type:**

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1363 75

PS Form 3811, Facsimile, July 2015                    Domestic Return Receipt



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9246 9904 2198 1363 78

**United St.**
**Postal Ser**

● Sender: Please print your name, address and ZIP+4® below ●

**LAKE COUNTY CLERK OF COURTS**
**25 NORTH PARK PLACE**
**PAINESVILLE OH 44077-3416**



**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

*Return Receipt (Form 3811) Barcode*

9590 9266 9904 2198 1363 85

1. Article Addressed to:

HOBBIT HOLDINGS INC.
C/O ROGER T. STERN
1515 E. WOODFIELD ROAD
SUITE 250
SCHAUMBURG, IL 60173

22CV000974

3. Service Type:

☒ Certified Mail

Reference Information

9 414 7266 9904 2198 1363 82

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2198 1363 82

PS Form 3811, Facsimile, July 2015  Domestic Return Receipt



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service®**

● Sender: Please print your name, address and ZIP+4® below ●

**LAKE COUNTY CLERK OF COURTS
25 NORTH PARK PLACE
PAINESVILLE OH 44077-3416**

# FAITH ANDREWS
# CLERK OF COURTS
## LAKE COUNTY COMMON PLEAS COURT

### ATTENTION ALL PARTIES TO THE CASE

Whether you are represented by an Attorney or representing yourself
in this legal action, LAKE COUNTY LOCAL
COURT RULES require that all participants familiarize
themselves with, and follow the requirements of each court.

Pre-trial Orders and Procedures are available on our website
at

www.lakecountyohio.gov/coc

Select **Forms and Downloads**

Scroll to **Pre-trial Orders/ Orders of Procedure**

Select the appropriate pre-trial order/procedure for YOUR
Respective case and Judge.

If you are unable to access or unclear as to which pre-trial
Order/procedure applies to you, contact the Office of the Clerk
of Courts, New Case Department (440.350.2657) during
normal business hours and a copy will be immediately
mailed to you.

**FAITH ANDREWS, CLERK OF COURTS**