# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISON

| | | |
|---|---|---|
| Little Mountain, LLC, | ) | **CASE NO. 1:22 CV 1471** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| DR Guns, LLC, et al., | ) | |
| | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

This matter is before the Court upon Plaintiff Little Mountain Precision, LLC's Motion for Partial Summary Judgment (Docs. 111 & 112); Defendants Rybacki Management Inc., SRW Industries, LLC, 500 Capital Drive, LLC, SLD Real Estate Holdings LLC, Equipmunk Leasing LLC, 551 Telser Road LLC, and Hobbit Holdings Inc.'s Motion for Summary Judgment (Docs. 115 & 116); Defendant DR Guns, LLC's Motion for Summary Judgment (Doc. 117); and Little Mountain Precision, LLC's Supplemental Motion for Summary Judgment on DR Guns, LLC's Fraudulent Inducement and Illegality Defenses (Doc. 143). This case is a breach of contract case. For the reasons that follow:

1. Little Mountain Precision, LLC's Motion for Partial Summary Judgment (Docs. 111 & 112) is granted in part and denied in part;

2.  Defendants Rybacki Management Inc., SRW Industries, LLC, 500 Capital Drive LLC, SLD Real Estate Holdings LLC, Equipmunk Leasing LLC, 551 Telser Road LLC, and Hobbit Holdings Inc.'s Motion for Summary Judgment (Docs. 115 & 116) is granted in part and denied in part;

3.  Defendant DR Guns, LLC's Motion for Summary Judgment (Doc. 117) is granted in part and denied in part; and

4.  Little Mountain Precision, LLC's Supplemental Motion for Summary Judgment on DR Guns, LLC's Fraudulent Inducement and Illegality Defenses (Doc. 143) is granted.

Defendants Rybacki Management Inc., SRW Industries, LLC, 500 Capital Drive LLC, SLD Real Estate Holdings LLC, Equipmunk Leasing LLC, 551 Telser Road LLC, and Hobbit Holdings Inc. are entitled to judgment entered in their favors as to all of Little Mountain's claims against them. This case will proceed with the following claims and parties: (1) Little Mountain's claim that DR Guns breached the Gas Key Agreement and the Carrier Agreement, (2) DR Guns' counterclaims that Little Mountain breached the Carrier Agreement, Upper & Lower Agreement, and Grinding Agreement.

**FACTS**

**1.     Procedural History**

Plaintiff Little Mountain Precision, LLC ("Little Mountain") filed this lawsuit against defendants DR Guns, LLC ("DR Guns"), Rybacki Management Inc. ("RMI"), SRW Industries, LLC ("SRW"), 500 Capital Drive, LLC ("500 Cap"), SLD Real Estate Holdings LLC "(SLD"), Equipmunk Leasing LLC ("Equipmunk"), 551 Telser Road LLC ("551 Telser"), and Hobbit

Holdings Inc. ("Hobbit") (collectively, "Defendants").[1] DR Guns then filed a counterclaim against Little Mountain.[2]

The parties' claims arise from four separately executed purchase and supply agreements governing the production and sale of various gun parts: (1) the "Gas Key Agreement"; (2) the "Carrier Agreement"; (3) the "Upper & Lower Agreement"; and (4) the "Grinding Agreement" (collectively, "the Agreements"). Each Agreement provided that Little Mountain would deliver gun parts to DR Guns that met certain specifications. The Agreements were chiefly negotiated between David Rybacki (on behalf of DR Guns) and John Habe, IV (on behalf of Little Mountain).

      **2.**        **The Parties**

DR Guns is a subsidiary of Hobbit. Hobbit also owns SRW and Equipmunk. Hobbit is owned by trusts for Stacy Rybacki and Laura Zelman, David Rybacki's sisters. SLD owns 500 Cap and 551 Telser. Trusts for the Rybacki sisters also own SLD. RMI is the corporate manager for these entities for purposes of satisfying Illinois corporate law, but RMI does not actively manage anything.

Little Mountain is wholly owned by Nineteen Eleven Capital, LLC, the members of which are Doug Habe, Chad Habe, and Richard Sippola. Doug and Chad Habe are brothers of John Habe, IV. Despite his substantial involvement in the negotiations of the Agreements, John Habe, IV is not an owner, officer, or employee of Little Mountain.

---

[1] Little Mountain also named David Rybacki and Stacy Rybacki as defendants. This Court previously dismissed both defendants on their motion. (Doc. 40.)

[2] DR Guns also filed a third-party complaint against John L. Habe, IV and Metal Seal Precision, Ltd. The Court previously dismissed the third-party complaint and both third-party defendants. (Doc. 92.)

Little Mountain contends John Habe, IV has no ownership interest in Little Mountain because the brothers wanted to equalize their shares in family companies. John Habe, IV does own other family companies. DR Guns contends that John Habe, IV does not own any part of Little Mountain because he has a prior felony conviction. Little Mountain and DR Guns possess federal firearm licenses, which are required to manufacture serialized parts (such as lower receivers). Federal regulations restrict felons from working as "Responsible Persons" for federal firearm license holders. *See* 18 U.S.C. § 843(b). A responsible person is defined as "[a]n individual who has the power to direct the management and policies of the applicant pertaining to explosive materials. Generally, the term includes partners, sole proprietors, site managers, corporate officers and directors, and majority shareholders." 27 CFR § 555.11

### 3.     The Agreements

The Agreements were originally executed on January 29, 2021. The Gas Key Agreement and the Carrier Agreement were each amended three separate times. Each amendment revised the number and/or type of parts that DR Guns was required to purchase. The third and final amendments to both agreements were executed on March 15, 2022. Little Mountain contends that the Agreements were amended because DR Guns could not keep up with its purchasing requirements. DR Guns counters that the Agreements were amended because Little Mountain could not produce the provided parts and/or quantities. No amendment, to either Agreement, specifies the reason for the ensuing reductions in the number and/or type of parts.

Still, during the life of the Agreements, Little Mountain did provide gas keys and carriers to DR Guns. DR Guns raised issues with at least some of the provided gas keys and carriers. Little Mountain contends that, despite DR Guns' complaints, the gas keys and carriers they provided

4

conformed to the contracted specifications. Little Mountain, however, never provided any parts to DR Guns under the Upper & Lower Agreement and the parties dispute whether Little Mountain ever performed under the Grinding Agreement.

Little Mountain terminated the Agreements on May 25, 2022, citing DR Guns' alleged payment defaults under the Gas Key Agreement and the Carrier Agreement. This suit followed.

**4.      The Pending Motions**

The parties engaged in early motion practice and only two claims remain before this Court: (1) Little Mountain's claim in its amended complaint that the Defendants breached all four Agreements and (2) DR Guns' counterclaim that Little Mountain breached three of the Agreements (Carrier Agreement, Upper & Lower Agreement, and Grinding Agreement).[3]

The parties have now filed cross motions for summary judgment, seeking judgment on several issues:

1. Little Mountain moves for this Court to hold that RMI, SRW, 500 Cap, SLD, Equipmunk, 551 Telser, and Hobbit are parties to the Agreements (Docs. 111 & 112.) Conversely, RMI, SRW, 500 Cap, SLD, Equipmunk, 551 Telser, and Hobbit move for this Court to hold that they are not. (Docs. 115 & 116.)

2. Little Mountain moves for judgment entered in its favor on its claims that Defendants breached the Gas Key Agreement and the Carrier Agreement (Docs. 111 & 112.)

---

[3] Little Mountain moves for judgment in its favor on a purported counterclaim for the Gas Key Agreement. However, DR Guns did not allege a counterclaim that Little Mountain breached the Gas Key Agreement.

3.  Little Mountain moves for judgment entered in its favor on DR Guns' counterclaims that Little Mountain breached the Gas Key Agreement and the Carrier Agreement. (Docs. 111 & 112.)

4.  Defendants move for judgment entered in their favor on all Little Mountain's claims that Defendants breached the Agreements. (Doc. 117.)

5.  Little Mountain moves for this Court to hold that it is entitled to recover liquidated damages under the Agreements' damages provision. (Docs. 111 & 112.) Conversely, DR Guns moves for this Court to hold that the liquidated damages are an unenforceable penalty. (Doc. 117.)

6.  Little Mountain moves for this Court to hold that DR Guns cannot maintain its fraudulent inducement affirmative and illegality defenses. (Doc. 143.)

The Court will address each issue in turn.

**STANDARD OF REVIEW**

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine dispute of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

6

return a verdict for the nonmoving party." *Id.* "The mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Id.* at 252.

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). In doing so, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). "The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249–50 (citation omitted).

### **ANALYSIS**

**1.     Whether RMI, SRW, 500 Cap, SLD, Equipmunk, 551 Telser, and Hobbit Are Parties to the Agreements**

Each of the four Agreements provides that it is "made and entered into" between Little Mountain and "DR Guns LLC, an Illinois limited liability company dba DRG Manufacturing and

7

dba White Label Armory . . . and its subsidiaries, parent companies, and/or related companies wherever located ('Buyer')." (Doc. 17-1 (Gas Key Agreement); Doc. 17-5 (Upper & Lower Agreement); Doc. 17-6 (Carrier Agreement); Doc. 17-9 (Grinding Agreement)). None of the Agreements further defines "subsidiaries," "parent companies," or "related companies."

Little Mountain contends that RMI, Hobbit, SRW, Equipmunk, SLD, 551 Telser, and 500 Cap (collectively, the "Other Corporate Entities") are all "subsidiaries, parent companies, and/or related companies" under the plain language of the Agreements and, thus, parties to the same. The Other Corporate Entities posit that the Agreements' language is irrelevant because there was never a contract formed between Little Mountain and the Other Corporate Entities.

To form a contract under Ohio law, there must be an offer, acceptance, contractual capacity, consideration, and a meeting of the minds or mutual assent. *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002). Further, Ohio's statute of frauds provides that "a contract for the sale of goods for the price of five hundred dollars or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Ohio Revised Code § 1302.04.

The Other Corporate Entities contend that none of them signed any of the Agreements and, even so, there was never a meeting of the minds that any of them would be bound as parties.

As an initial matter, so long as an authorized agent of the Other Corporate Entities signed the Agreements on their behalf, then the fact that there was no separate signature for each of the Other Corporate Entities is not, standing alone, conclusive evidence that they are not parties to the Agreements. *See* Ohio Revised Code § 1302.04; *see also, e.g.*, *Roberts v. KND Dev. 51, LLC*, 2020 WL 6193635, at *3 (Ohio Ct. App. Oct. 22, 2020) (rejecting argument that defendants were not

8

parties even though they were not specifically identified in agreement and did not separately sign document, where each defendant was alleged to be a ". . . parent, subsidiary or affiliate . . . ."); *see also Arthrex, Inc. v. Orthogen Aktiengesellschaft*, 250 F. App'x 293, 294 (11th Cir. 2007) (distribution agreement signed by subsidiary, which indicated that definition of party included subsidiary's "affiliates and related entities," bound parent corporation based on agency principals).

Further, "the meeting-of-the-minds formulation often requires far less than it suggests." *216 Jam. Ave., LLC v. S&R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008). In ascertaining whether there is a meeting of the minds, courts must focus on the objective manifestations of the parties. Courts presume that there has been a satisfactory "meeting of the minds" where the party enforcing the contract can point to a written and signed agreement that is clear and unambiguous. *Id.* ("[T]he terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous." (citing *Nilavar v. Osborn*, 711 N.E.2d 726, 733 (1998)). "Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time." *Id.* "[O]ne of full age in the possession of his faculties and able to read and write, who signs an instrument and remains acquiescent to its operative effect" is bound by the terms set forth therein. *See Cuyahoga Cty. Hosps. v. Price*, 581 N.E.2d 1125, 1128 (Ohio Ct. App. 1989) (quoting *Kroeger v. Brody*, 200 N.E. 836, 839 (Ohio 1936)).

Ordinarily, the existence of a contract, including whether there has been a meeting of the minds, is a question for the trier of fact. *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) (quoting *Costner Consulting Co. v. U.S. Bancorp*, 960 N.E.2d 1005, 1010

(Ohio Ct. App. 2011)). *See also Oglebay Norton Co. v. Armco, Inc.*, 556 N.E.2d 515, 519 (Ohio 1990) ("Whether the parties intended to be bound . . . is a question of fact properly resolved by the trier of fact"). But when the parties' objective manifestation is clear, a court may decide as a matter of law that the parties intended a contract. *See Arnold Palmer Golf Co. v. Fuqua Indus., Inc.*, 541 F.2d 584, 588 (6th Cir. 1976) (applying Ohio law).

Here, the issue turns then on whether someone with authority to bind the Other Corporate Entities signed the Agreements with the objective understanding that they would be so bound. It is undisputed that Stacy Rybacki signed three of the four Agreements (Gas Key Agreement, Carrier Agreement, and Grinding Agreement).[4] It is clear to this Court, based on the record before it, that Stacy Rybacki possessed the authority to sign contracts on behalf of the Other Corporate Entities. (*See* Doc. 154, at 4 ("The only individuals with authority to authorize any agent to sign on behalf of an Other Corporate] Entity were Stacy Rybacki or [her sister] Laura Zelman (or both)." (footnote omitted)); *see also* Doc. 115, at 19 (acknowledging Stacy Rybacki had the capacity to confer authority to sign on behalf of the Other Corporate Entities).) Nevertheless, they contend that there was no "meeting of the minds" because Stacy Rybacki testified that she did not intend to bind any of the Other Corporate Entities when signing the three Agreements—she intended to bind only DR

---

[4] It is undisputed that Stacy Rybacki never signed the Upper & Lower Agreement. Only David Rybacki signed the Upper & Lower Agreement. While Little Mountain contends David Rybacki possessed the requisite authority to bind not only DR Guns but also the Other Corporate Entities, the Court need not determine the parameters of David Rybacki's authority because, as discussed in more detail below, the Court finds that the undisputed evidence establishes that no defendant breached the Upper & Lower Agreement. As such, identifying the specific parties to that agreement is unnecessary.

10

Guns and "the other d/b/a's and companies that are associated with the gun company": White Label Armory, Saltwater Arms, Sharps Bros, Cujo, and DRG Manufacturing. (Doc. 101, at 32:4–16.)

Still, Stacy Rybacki signed three Agreements with language that defined the "Buyer" as "DR Guns LLC, an Illinois limited liability company dba DRG Manufacturing and dba White Label Armory . . . and its subsidiaries, parent companies, and/or related companies wherever located." Extrinsic evidence about Stacy Rybacki's subjective intention is relevant only to the extent that the Agreements she signed did not clearly and unambiguously bind the Other Corporate Entities as "Buyers." *See Sarum Mgmt., Inc. v. Alex N. Sill Co.*, 2006 WL 3078463, at *8 (Ohio Ct. App. Nov. 1, 2006) ("[W]hen the language of a contract is clear and unambiguous, neither party may advance extrinsic evidence to show a meeting of the minds or a lack thereof." (citing *Hite v. Leonard Ins. Servs. Agency, Inc.*, 2000 WL 1197023, at *4 (Ohio Ct. App. Aug. 23, 2000)) (further citation omitted)).

An agreement "is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). Ambiguity exists, however, "where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law); *see also Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 826 (6th Cir. 2012) ("A term is ambiguous if it is reasonably susceptible of more than one meaning.") (applying Ohio law).  "The question of whether the language of an agreement is ambiguous is a question of law." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir.2003) (*citing Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir.1993)).

11

Clear and unambiguous terms in an agreement are given their "plain and ordinary meaning." *SHH Holdings, LLC v. Allied World Specialty Ins., Co.*, 65 F.4th 830, 837 (6th Cir. 2023) (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 901 (Ohio 1999)). "Courts traditionally turn to dictionaries to determine the plain meaning of undefined terms in a contract." *MaxRelief USA, Inc. v. O'Maley*, 2024 WL 248948, at *4 (S.D. Ohio Jan. 23, 2024) (citing *Vandercar, LLC v. Port of Greater Cincinnati Dev. Auth.*, 196 N.E.3d 878, 886 (Ohio Ct. App. Sept. 9, 2022)).

Here, by the plain language of the Agreement, "Buyer" includes not only DR Guns, but also its "subsidiaries," "parent companies," and/or "related companies wherever located."[5] A "parent company" is a "corporation that has a controlling interest in another corporation . . . through ownership of more than one-half the voting stock." *See Parent Corporation*, Black's Law Dictionary (11th ed. 2019). It is undisputed that Hobbit Holdings is DR Guns' parent company—Stacy Rybacki testified to that fact. Thus, Hobbit Holdings is clearly and unambiguously included as a "Buyer" to the three Agreements that Stacy Rybacki signed: the Gas Key Agreement, the Carrier Agreement, and the Grinding Agreement. To hold otherwise would effectively read "and . . . parent companies" out of the Agreement. *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 295 (Ohio 2011) ("In interpreting a contract, [courts] are required, if possible, to give effect to every provision of the contract").

---

[5] Neither party contends that any of the Other Corporate Defendants are DR Guns' "subsidiaries." The only "subsidiary" was identified by Defendants as Saltwater Arms, who is not a named party to this dispute.

To be "related" is to be part of the same family—"connected by reason of an established or discoverable relation" or "connected by common ancestry or sometimes by marriage." *Related*, Merriam-Webster, https://www.merriam-webster.com/dictionary/related. To be sure, a synonym of "related" is "affiliate," *id.*, which is defined in a corporate context as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (11th ed. 2019).

Considering this ordinary meaning of "related" and the placement of "related companies" together with "subsidiaries" and "parent companies," this Court finds that the Agreement clearly and unambiguously encompasses any Other Corporate Entities that are in the same corporate family as DR Guns, such as sister corporations. *Sunoco, Inc. (R&M)*, 953 N.E.2d at 293 ("Under the doctrine of noscitur a sociis, the meaning of an unclear word may be derived from the meaning of accompanying words."). A sister corporation is "[o]ne of two or more corporations controlled by the same, or substantially the same, owners." *Sister Corporation*, Black's Law Dictionary (11th ed. 2019). It is undisputed that Hobbit is the owner and sole member of DR Guns, Equipmunk, and SRW. This makes Equipmunk and SRW "related companies" as sister corporations of DR Guns and, thus, "Buyers" under the terms of the three Agreements that Stacy Rybacki signed: the Gas Key Agreement, the Carrier Agreement, and the Grinding Agreement. The remaining Other Corporate Entities (SLD, 500 Cap, 551 Telser, and RMI), however, are not owned by Hobbit and are not sister corporations of DR Guns.

Little Mountain contends that RMI, SLD, 500 Cap, and 551 Telser are all "related companies" because they and DR Guns are owned by the same family: the Rybackis. But the Rybackis do not own DR Guns, RMI, 500 Cap, or 551 Telser. Hobbit owns DR Guns. SLD owns

13

500 Cap and 551 Telser. Trusts for the Rybacki sisters do own Hobbit and SLD, making them beneficial owners of DR Guns, 500 Cap and 551 Telser. However, nothing in the plain, unambiguous language of the Agreements suggests "related" means companies with the same beneficial owners.

One or more of the Rybacki siblings may have exercised control over DR Guns and the Other Corporate Entities, but the Court is concerned only with the plain, unambiguous language of the Agreements. The language in the Agreements does not speak of common control. Rather, as analyzed above, the plain language of the Agreement limits "Buyer" to companies in the same corporate family (parents, subsidiaries, sisters) as DR Guns. Defendants do not contend, and present no evidence that suggests, RMI, SLD, 500 Cap, or 551 are subsidiaries, parents, or sisters of DR Guns. In fact, Little Mountain does not explain how RMI is "related" at all, except acknowledging that it is the listed corporate manager for the Other Corporate Entities under Illinois corporate law. Little Mountain does not contend that a corporate manager is a parent, subsidiary or sister corporation.[6]

_____

[6] Little Mountain alternatively contends that SLD, 500 Cap and 551 Telser are "related to" DR Guns because they exist to lease real estate to DR Guns and SRW and were created for purposes of asset diversification. Little Mountain concedes that "asset diversification and the compartmentalization of corporate entities is a common business practice" but argues that defendants "cannot hide behind those notions." (Doc. 111, at 36.) To the extent Little Mountain is claiming SLD, 500 Cap and 551 Telser are liable for any breach of contract on a veil piercing theory, Little Mountain failed to plead any such basis for recovery. *See Song v. Rom*, 2016 WL 726899, at *3 (N.D. Ohio Feb. 24, 2016) ("While disregard of the corporate entity is not a cause of action itself, it is a means of imposing liability on a defendant; therefore, each basis for piercing the corporate veil is an independent ground of recovery that must be specifically pleaded." (internal quotation marks and citation omitted)).

The Other Corporate Entities argue alternatively that Little Mountain's attempt to enforce the Agreements against them is really an invalid attempt to enforce a guaranty. Little Mountain counters that, under the plain language of the Agreements, the Other Corporate Entities are parties who have an obligation to pay for purchases as "Buyers"—not guarantors. This Court agrees. For the reasons discussed above, Hobbit, SRW, and Equipmunk are parties to the Gas Key Agreement, the Carrier Agreement, and the Grinding Agreement as "Buyers." This Court cannot disregard the plain meaning of a valid contract, even if it means that parties not directly involved in the manufacturing of gun parts would nevertheless be obligated to purchase and/or pay for gun parts. *Beverage Holdings, LLC v. 5701 Lombardo, LLC*, 150 N.E.3d 28, 35 (Ohio 2019) ("'[I]t is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result.'" (quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997); *also citing Nat'l Union Fire Ins. Co. of Pittsburgh v. Circle, Inc.*, 915 F.2d 986, 991 (5th Cir. 1990) ("Although a business decision may be unwise, imprudent, risky, or speculative, it is not necessarily 'absurd.' We decline to allow contracting parties to escape the unfortunate and unexpected, though not objectively 'absurd,' consequences of a contract by subsequently characterizing their consequences as 'absurd'")).

For the aforementioned reasons, the Other Corporate Entities' motion for summary judgment is denied in part and Little Mountain's motion for summary judgment is granted in part because Hobbit, SRW, and Equipmunk are parties to the Gas Key Agreement, the Carrier Agreement, and the Grinding Agreement, but the Other Corporate Entities' motion for summary judgment is granted in part and Little Mountain's motion for summary judgment is denied in part

15

because SLD, 500 Cap, 551 Telser, and RMI are not parties to any of the Agreements. Accordingly, summary judgment entered in favor of SLD, 500 Cap, 551 Telser, and RMI is warranted.

> **2.** **Whether Little Mountain Is Entitled to Judgment Entered in Its Favor on Its Claims that Defendants Breached the Gas Key Agreement and the Carrier Agreement**

To show it is entitled to judgment on its breach of contract claim under Ohio law, Little Mountain must present evidence establishing there is no genuine dispute that: (1) a contract existed; (2) Little Mountain fulfilled its contractual obligations; (3) Defendants breached; and (4) damages resulted. *Kirkland v. St. Elizabeth Hosp. Med. Ctr.*, 34 F. App'x 174, 178 (6th Cir. 2002) (citing *Nilavar*, 711 N.E.2d at 732). "'Where a plaintiff seeks to recover damages for breach of contract, the burden is upon [the plaintiff] to show either substantial performance or tender of performance of the conditions on [the plaintiff's] part to be performed.'" *Lorad, LLC v. Azteca Milling L.P.*, 2023 WL 3043607, at *20 (N.D. Ohio Apr. 21, 2023) (citing *Lawless v. Bd. of Educ. of Lawrence Cnty. Educ. Serv. Ctr.*, 141 N.E.3d 267, 285 (Ohio Ct. App. 2020) (quoting *Cashland Fin. Servs., Inc. v. Hoyt*, 2013 WL 4542766, at *2 (Ohio Ct. App. 2013))).

Little Mountain contends that it is entitled to judgment entered in its favor on its claims that Defendants[7] breached the Gas Key Agreement and the Carrier Agreement because it is undisputed that Defendants failed to make timely payments for parts delivered. While Defendants do not seem to dispute that they made late and/or missed payments under the Gas Key and Carrier Agreements,[8]

---

[7] Having determined that RMI, SLD, 500 Cap and 551 Telser are entitled to judgment entered in their favor, "Defendants" as used throughout the remainder of this memorandum opinion shall refer to DR Guns, Equipmunk, SRW, and Hobbit.

[8] Defendants contend, based on Little Mountain's records, that, at most, they had late payments amounting to $5,663.97 as of May 25, 2022 (the date the Agreements were terminated). (Doc. 148, at 26 (citing Doc. 110 (Dec. of Rick Sippola, Ex. 2).) For its part, Little Mountain never explicitly

16

they posit that there remain genuine disputes of material fact as to whether Little Mountain fulfilled its own obligations under both Agreements.

The parties executed the Gas Key Agreement and the Carrier Agreement on January 29, 2021. Both agreements provided for Defendants to purchase certain quantities of different gun "Parts" from Little Mountain that met Defendants' "Specifications" (*i.e.*, "design, dimensions, tolerances, and materials requirements"). Little Mountain represented that "[a]ll" Parts would "conform to the Specifications when shipped." Little Mountain did deliver gas keys and carriers to Defendants, but Defendants contend the gas keys and carriers failed to meet the contracted Specifications.

The Agreements do not define Specifications beyond "design, dimensions, tolerances, and materials requirements." The term Specifications is, thus, ambiguous as used in the Agreements because it cannot be determined from the four corners of the Agreements. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) ("Contractual language is ambiguous 'only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.'" (quoting *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (further citations omitted)). When interpreting an ambiguous contract term, courts can look at extrinsic evidence. *Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC*, 740 N.E.2d 328, 339 (Ohio Ct. App. 2000). "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the

states Defendants' allegedly overdue balance, but its expert's report states the amount was $143,585 as of August 3, 2023 (the date of his report). (Doc. 106, at 18.)

17

parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998).

Here, Defendants testified that Specifications meant, at a minimum, industry-standard military specifications, which "calls for a workmanship call-out on its print" that included, among other things, "no tool marks, no nicks, no burrs, no oxidation, no adulterated material, no welding, [and] no bending." (Doc. 104, at 51:24–52:1–5.) Defendants testified that military specifications were the industry standard and Little Mountain knew that and made gas keys according to those specifications already. Defendants also testified that following military specifications was important so the gas keys and carriers would fit with other gun parts produced according to military specifications.[9] (*Id.* at 100, 104.)

In response, Little Mountain does not point the Court to any contrary interpretation of the Specifications. But John Habe, IV testified that the Specifications under the Agreements were "something similar" to but "different" than the industry-standard military specifications.[10] (Doc. 133, at 88:2–89:1.) John Habe, IV went on to testify that the Specifications did not include certain "aesthetic" items, such as lack of burrs or tool marks. (*Id.* at 107:2–8; 125:24–127:2.) Doug Habe

---

[9] Little Mountain faults Defendants with failing to proffer any expert testimony as to whether any Parts deviated from the requisite Specifications, but Little Mountain has, likewise, not proffered any expert testimony that the Parts did meet the Specifications. Regardless, Little Mountain bears the burden of establishing each element of its breach of contract claims, which includes that it fulfilled its obligations.

[10] Confusingly, John Habe, IV testified that the Specifications for the gas keys and the carriers were supplied by Little Mountain, but the Gas Key Agreement and the Carrier Agreement both state that the Specifications are "provided from Buyer [Defendants] to Seller [Little Mountain]." (*E.g.*, Doc. 17-1 ¶ 1(B).)

18

also testified that burrs were acceptable under the Specifications. (Doc. 132, at 60:10.) Accordingly, there is a genuine issue of material fact as to exactly what Specifications Little Mountain contracted to follow when producing the gas keys and carriers.

Notwithstanding the lack of any agreed-upon definition of the Specifications, Little Mountain maintains that it "substantially performed" under the Gas Key Agreement and the Carrier Agreement "by delivering hundreds of thousands of parts." (Doc. 111, at 38.) The undisputed record evidence does establish that Little Mountain sent several gas keys and carriers to Defendants. But the undisputed record evidence also demonstrates that Defendants notified Little Mountain of quality issues with gas keys and carriers on more than one occasion. For example, in a December 2021 email, Defendants indicated they were returning 148 gas keys for reasons including tool marks, dents, and dings. (Doc. 148-9, at 13.) In another December 2021 email, Defendants raised concerns about issues with some gas keys that affected performance. (*Id.* at 7.) A September 2021 email raised issues with delivered carriers, including burrs.[11] (*Id.* at 12.) Further, Little Mountain personnel acknowledged that at least some of the Parts had defects. (*See id.* at 6 (Q. "At a minimum, the off-center counterbores were non-compliant?" A. Correct."); *id.*  (Q. "[W]ere you

---

[11] To the extent Little Mountain claims Defendants failed to give sufficient notice of the alleged gas key and carrier issues, under either the Agreements' language or Ohio Rev. Code § 1302.65, the record evidence establishes otherwise. Little Mountain does not contend that any of the identified complaints were sent more than ten days after Defendants received the Parts (Agreements), let alone not within a reasonable time after discovery of the defects (Ohio Rev. Code § 1302.65). Defendants also point to record evidence showing that Little Mountain responded to at least some of Defendants' complaints by disagreeing with Defendants' understanding of the Specifications. (Doc. 104, at 58:2–59:12; Doc. 148-9, at 9.) Further, Little Mountain terminated the Agreements, preventing Defendants from providing Little Mountain any more specific notice of its alleged nonperformance or any further chance to cure its alleged nonperformance.

19

aware of these quality issues with the gas keys? A. I see that I was not copied on this e-mail, and even though I'm not in charge of quality, I can see that there's defects there.").)

Thus, the record suggests that some number of gas keys and carriers were delivered without conforming to the Agreements' agreed-upon Specifications, but it is unclear on the record before this Court exactly how many. Further, it is unclear whether that amount was large enough to substantially impair the entire Gas Key Agreement and/or Carrier Agreement, especially because both Agreements explicitly acknowledged that there "may be some nonconformity issues with the Parts." (Doc. 17-1 ¶ 8(B) (Gas Key Agreement); Doc. 17-6 ¶ 8(B) (Carrier Agreement). *See* Ohio Rev. Code § 1302.70 ("Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole."). Accordingly, there is a genuine issue of material fact as to whether Little Mountain substantially performed under the Gas Key and the Carrier Agreement.[12]

---

[12] Defendants argue Little Mountain never produced a ground bolt carrier (Part 4007A) under the Carrier Agreement. Little Mountain does not dispute that it failed to ever produce a ground bolt carrier (Part 4007A) under the Carrier Agreement. Instead, it contends that its obligation to provide any such ground bolt carrier expired as of December 31, 2021, and cannot excuse Defendants' nonperformance to pay for nonground carriers (Part 4000) after that date. The First Amendment to the Carrier Agreement does limit Little Mountain's obligation to provide ground bolt carriers (Part 4007A) only until December 31, 2021. However, the parties executed a Second Amendment that also obligated Little Mountain to provide ground carriers (Part 4007A) and the Second Amendment does not list any date-related limitation. The Parties then executed a Third Amendment on March 18, 2022. The Third Amendment reduced the number of "Parts" to be purchased and delivered, but neither party has provided the Third Amendment's "Exhibit A", which purports to list what Parts were to be provided. (Doc. 101-1, at 56 (Ex. 10); 148-3, at 35 (Ex. 10).) Without the Third Amendment's Exhibit A, the Court cannot determine whether Little Mountain had an obligation to provide ground carriers (Part 4007A) after December 31, 2021. This gap in the record concerning Little Mountain's performance is another reason that summary judgment is inappropriate as it relates to Little Mountain's claims under the Carrier Agreement. *Adickes v. S.H. Kress & Co.*, 398

20

As a final point, Little Mountain's focus on the Agreements' language preventing Defendants from returning gas keys or carriers with purely aesthetic issues is irrelevant to whether Little Mountain fulfilled its contract obligations.[13] While the Agreements' language acknowledges that there "may be *some* nonconformity issues with the Parts," and Defendants cannot reject Parts because of purely aesthetic nonconformity, Little Mountain still warranted that "*[a]ll* Parts shall conform to the Specifications when shipped." (*E.g.*, Doc. 17-1 ¶¶ 5(C), 8(B) (emphasis added).) The relevant inquiry, therefore, is whether Little Mountain produced a sufficient number of Parts that met the contracted Specifications.[14]

For the aforementioned reasons, there remain genuine issues of material fact as to what the Specifications are for gas keys and carriers under the Agreements and as to whether Little Mountain substantially fulfilled its obligations to ship gas keys and carriers adhering to those Specifications. Accordingly, Little Mountain is not entitled to judgment entered in its favor on its claims that Defendants breached the Gas Key Agreement and the Carrier Agreement. Little Mountain's motion for summary judgment as to these claims is denied.

---

U.S. 144, 157–60, (1970) (finding "unexplained gaps in the materials" submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment).

[13] Little Mountain takes issue with the fact that Defendants did not raise any quality issues with the gas keys in their counterclaim. Defendants' counterclaim is separate and apart from Defendants' defense(s) to Little Mountain's breach of contract claims. Defendants are within their rights to bring a counterclaim alleging that Little Mountain breached the Agreements for reasons other than nonconforming gas keys while also separately arguing that Little Mountain cannot maintain its breach of contract claim because it has failed to establish a prima facie element.

[14] For this reason, Little Mountain's point that Defendants do not have many documented "rejects" is not well taken. To be sure, the "Quality Control Report" Little Mountain points to as evidence that only 29 gas keys were "rejected" cannot be squared with Defendants' December 2021 email that they wanted to return 148 gas keys. (Doc. 148-9, at 13.)

### 3. Whether Little Mountain is Entitled to Judgment Entered in Its Favor on DR Guns' Counterclaim that Little Mountain Breached the Gas Key Agreement and the Carrier Agreement

Little Mountain moves for judgment entered in its favor as to DR Guns' counterclaim that Little Mountain breached the Carrier Agreement. Little Mountain also moves for judgment entered in its favor on DR Guns' purported counterclaim that Little Mountain breached the Gas Key Agreement. The Court will address each in turn.

#### DR Guns' Counterclaim that Little Mountain Breached the Carrier Agreement

For the reasons discussed above, Little Mountain is not entitled to judgment entered in its favor on DR Guns' counterclaim that Little Mountain breached the Carrier Agreement. In its counterclaim, DR Guns alleges that Little Mountain breached the Carrier Agreement "by failing to provide parts to [DR Guns] that conformed with the design, dimensions, tolerances, and materials requirements for each part . . . ('Specifications' as defined in the [] Carrier agreement)." (Doc. 31 ¶ 71.) There remain genuine issues of material fact as to what the Specifications are for carriers under the Agreement and as to whether Little Mountain substantially fulfilled its obligations to deliver carriers adhering to those Specifications.[15]

Accordingly, Little Mountain's motion for summary judgment is denied as to DR Guns' counterclaim that Little Mountain breached the Carrier Agreement.

---

[15] Additionally, as discussed above, there remains a genuine issue of material fact concerning whether Little Mountain had an obligation to provide ground bolt carriers (Part 4007A) under the Carrier Agreement after December 31, 2021.

22

**DR Guns' Counterclaim that Little Mountain Breached the Gas Key Agreement**

Although Little Mountain also moves for judgment entered in its favor on DR Guns' purported counterclaims that it breached the Gas Key Agreement, DR Guns has not alleged any such counterclaim. DR Guns explicitly alleges that Little Mountain breached each of the Carrier Agreement, Upper & Lower Agreement, and Grinding Agreement, but makes no similar allegation as to the Gas Key Agreement. Further, in its response to Little Mountain's motion, DR Guns does not even address Little Mountain's arguments relative to the Gas Key Agreement, which further indicates to this Court that it alleged no such claim.[16]

4.    **Whether Defendants Are Entitled to Judgment Entered in Their Favor on Little Mountain's Claims That They Breached the Upper & Lower Agreement and the Grinding Agreement**

Defendants move for judgment entered in their favor as to Little Mountain's claims that Defendants breached the Upper & Lower Agreement and the Grinding Agreement. The Court will address each claim in turn.

---

[16] Even if DR Guns' counterclaim could be read to have alleged that Little Mountain breached the Gas Key Agreement, DR Guns cannot establish a breach of the Gas Key Agreement based on DR Guns inability "to utilize [delivered gas keys] on account of Little Mountain's failure to perform its obligations under the [other three] Agreement[s]." (Doc. 31 ¶ 73.) And to the extent DR Guns attempts to allege through its response to Little Mountain's motion that Little Mountain breached the Gas Key Agreement by providing gas keys that did not conform to the contracted Specifications, DR Guns did not allege such a theory in its counterclaim and cannot do so for the first time in a response to a motion for summary judgment. *See, e.g.*, *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal."); *Powell-Lee v. HCR Manor Care*, 231 F. App'x 438, 440 (6th Cir. 2007) (finding that district court "properly rejected" the plaintiff's attempt "to amend her complaint via argument in opposition to the motion for summary judgment").

23

### Little Mountain's Claim That Defendants Breached the Upper & Lower Agreement

The Upper & Lower Agreement governed Defendants' purchase of upper and lower receivers from Little Mountain. To ensure the receivers met Defendants' Specifications, Little Mountain was required to provide Defendants with a First Article (*i.e.*, sample) of an upper and lower receiver within 52 weeks of the Agreement's January 29, 2021 effective date, or by January 28, 2022. Little Mountain does not dispute that it failed to produce a sample upper or lower receiver by January 28, 2022. In fact, according to Little Mountain, it did not produce any sample of an upper or lower receiver until July 14, 2022—almost two months after Little Mountain terminated the Upper & Lower Agreement. Little Mountain contends, however, that its delayed performance was excused by the Upper & Lower Agreement's force majeure clause because of COVID-19's impact on global supply chains.

Regardless of whether Little Mountain's delayed performance was excused under the Agreement's force majeure clause,[17] Little Mountain cannot establish that Defendants breached the Upper & Lower Agreement. In its amended complaint, Little Mountain alleges that Defendants breached the Upper & Lower Agreement by "informing Little Mountain that Defendants would not be able to meet their volume commitments under the Upper & Lower Agreement[.]" (Doc. 17 ¶ 89.) Little Mountain seems to contend this breaches the Upper & Lower Agreement's provision that the Buyer would be considered in "Default" if it "admits in writing its inability to pay its debts as they

---

[17] The impact of the Agreement's force majeure clause on Little Mountain's performance is also relevant to DR Guns' counterclaim that Little Mountain breached the Upper & Lower Agreement. Neither DR Guns nor Little Mountain has moved for summary judgment on this counterclaim and, as such, it will proceed.

become due." (Doc. 151, at 19.) Fatal to Little Mountain's argument, however, is its failure to point to any *admission* that Defendants made *in writing* that they were *unable* to pay their debts. As its only evidence to support its contention, Little Mountain points to "Defendants' repeated payment defaults under the Gas Key Agreement and Carrier Agreement," "financial information" submitted during John Habe, IV's inquiry to purchase DR Guns, "which illustrated that DR[ Guns] was in a severely strained financial condition," and John Habe, IV's recollection that some unspecified person told him DR Guns was not paying all nonrelated accounts payable within payment terms. (*Id.* at 31.) None of these are a written admission by Defendants that they were unable to pay their debts. Accordingly, Little Mountain has failed to point to any evidence that would establish Defendants breached the Upper & Lower Agreement.

Alternatively, Little Mountain contends that Defendants repudiated the Upper & Lower Agreement by both (1) failing to provide adequate assurances in response to Little Mountain's "many concerns over Defendants' ability to continue under the Agreements" (Ohio Rev. Code § 1302.67); and (2) "flatly refus[ing] to cure their payment defaults" (Ohio Rev. Code § 1302.68). (Doc. 151, at 29–31.) Little Mountain, however, has not pointed to any specific demand in writing for adequate assurances of payment. *Am. Aluminum Extrusions of Ohio, LLC v. Neb. Plastics, Inc.*, 2010 WL 2342485, at *3 (N.D. Ohio June 8, 2010) ("Simply possessing grounds for insecurity does not suffice; the party seeking assurances must communicate the grounds for insecurity, along with the demand, to the other party in writing." (citing Ohio Rev. Code § 1302.67)). Nor has Little Mountain pointed to any "definite and unequivocal refusal to perform" by Defendants. *Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1301 (Ohio Ct. App. 1982) ("Anticipatory repudiation centers upon an overt communication of intention or an action which renders

performance impossible or demonstrates a clear determination not to continue with performance."
(quoting Official Comment 1 to Ohio Rev. Code § 1302.68)).[18]

For these reasons, Defendants are entitled to judgment entered in their favor as to Little
Mountain's claim that they breached the Upper & Lower Agreement.

**Little Mountain's Claim That Defendants Breached the Grinding Agreement**

The Grinding Agreement provided that Little Mountain would grind bolts and bolt carriers
for Defendants. Like the Upper & Lower Agreement, the Grinding Agreement required Little
Mountain to produce First Articles of ground bolts and ground bolt carriers for Defendants' review
before full production started. And, like the Upper & Lower Agreement, Defendants had no
obligation to purchase any ground bolts or ground bolt carriers until they accepted the First Articles.
Under the Agreement, Little Mountain had 30 weeks from the Agreement's May 14, 2021 effective
date, or by December 10, 2021, to produce these First Articles.

Defendants testified that Little Mountain never produced an acceptable First Article of a
ground bolt or a ground bolt carrier. Without disputing that it failed to produce any acceptable First
Articles under the Grinding Agreement by December 2021[19]—or ever—Little Mountain insists that
it was "nonetheless able to perform its grinding services under the Grinding Agreement" by
utilizing a "honing type of grinding." (Doc. 151, at 15.) Still, Little Mountain has not pointed to any

---

[18] Because the Court agrees that Little Mountain failed to allege that Defendants breached the
Upper & Lower Agreement, the Court need not consider Defendants' alternative arguments that
they had no minimum purchasing requirements under the Upper & Lower Agreement and Little
Mountain's failure to satisfy a condition precedent excuses Defendants' performance.

[19] In fact, Little Mountain seems to concede it was incapable of grinding Defendants' bolts and bolt
carriers to produce First Articles until February 2022 at the very earliest. (*See* Doc. 151, at 14
(acknowledging that the required grinding equipment was not delivered until February 2022).)

26

evidence that Defendants accepted any honed samples under the Grinding Agreement,[20] which would have triggered Defendants' purchasing obligations. Further, here too, Little Mountain contends that its delayed performance was excused by the Upper & Lower Agreement's force majeure clause because of COVID-19's impact on global supply chains.[21]

Regardless of whether Little Mountain's "honing" satisfied its obligations under the Grinding Agreement or whether its delayed performance was excused under the Agreements' force majeure clause, Little Mountain has not pointed to any evidence that Defendants breached the Agreement. Little Mountain does not contend that Defendants defaulted on any payments under the Grinding Agreement. Rather, like the Upper & Lower Agreement, Little Mountain posits that Defendants breached the Grinding Agreement by "admit[ting] in writing its inability to pay its debts as they become due."[22] (Doc. 151, at 19.) And for all the same reasons discussed relative to the Upper & Lower Agreement, Little Mountain has failed to point to any evidence that supports this claim. Accordingly, Defendants are entitled to judgment entered in their favor as to Little Mountain's claim that they breached the Grinding Agreement.

---

[20] At best, Dave Habe, IV's testified that he "believe[d] [Defendants] were given samples of the bolt" but he was "not sure if it was approved or not." He further testified that Defendants "were never given carriers off of the Heartland equipment[,]" and he was "not sure" if Defendants received carriers under the Grinding Agreement at all. (Doc. 133, at 112:9–23.)

[21] The impact of the Agreement's force majeure clause on Little Mountain's performance is also relevant to DR Guns' counterclaim that Little Mountain breached the Grinding Agreement. Neither DR Guns nor Little Mountain has moved for summary judgment on this counterclaim and, as such, it will proceed.

[22] Little Mountain also attempts its novel theory that Defendants repudiated the Grinding Agreement. For all the reasons discussed above, this theory lacks any merit.

For all the aforementioned reasons, Defendants' motion for summary judgment is granted as to Little Mountain's claim that Defendants breached the Upper & Lower Agreement and the Grinding Agreement. (Doc. 117.)

**5.**      **Whether Little Mountain Gave Defendants the Requisite Notice to Maintain Its Breach of Contract Claims and Recover Under the Agreements' Damages Provision**

Defendants contend that Little Mountain failed to provide them with the required notice of default before terminating the Agreements. Defendants argue that this failure not only precludes Little Mountain from recovering any of the damages outlined in the Agreements, but also from maintaining any breach of contract claim against the Defendants. DR Guns argues, alternatively, that the Agreements' liquidated damages provision amounts to an unenforceable penalty under Ohio law. [23] Little Mountain maintains that Defendants had notice that Little Mountain considered them to be in legal default under the Gas Key Agreement and/or the Carrier Agreement for nonpayment and moves for this Court to find that it can recover damages to the full extent outlined in the Agreements.

**The Agreements' Notice Requirement**

The Court will first consider whether Little Mountain provided Defendants with the required notice of legal default under the Gas Key Agreement and Carrier Agreement before terminating the Agreements and seeking remedies. Both Agreements provide that "[i]n the event of an uncured event of Default the non-defaulting Party may terminate this Agreement by giving written notice [of

---

[23] The Court allowed DR Guns leave to file an amended answer to include unenforceability of the liquidated damages provision as an affirmative defense. As the Court noted in its memorandum opinion and order on the issue, only DR Guns sought leave to amend its answer to include this defense. (Doc. 120.)

termination] to the other Party, and/or exercising the remedies available to it." (*E.g.*, Doc. 17-1 ¶ 9(C) (Gas Key Agreement).)  Either party was in Default as that term is used in the Agreements if they "fail[ed] to perform any obligation under [the] Agreement and fail[ed] to cure the non-performance within ten (10) business days after notice from other party specifying the non-performance." (*Id.* ¶ 9(A).) Per the Agreements, all notices had to be written and sent to specified mailing and email addresses. (*Id.* ¶ 11(N).)

When interpreting a bargained-for agreement, "courts should give effect to the intentions of the parties as expressed in the language of their written agreement." *Sutton Bank v. Progressive Polymers, LLC*, 163 N.E.3d 546, 552 (Ohio 2020) (citation omitted). To give such effect, "[c]ontract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *CoMa Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (applying Ohio law) (citations omitted). Accordingly, when a contract includes a notice requirement, said notice must be provided. *See Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985) ("A right of action requiring notice as a condition precedent cannot be enforced unless the notice provided for has been given.") (applying Ohio law). Nevertheless, as noted by the Sixth Circuit in a recent opinion, several cases applying Ohio law "state the unremarkable proposition that actual notice can overcome a party's technical non-compliance with the contractually specified means of notice." *Kirkbride v. Antero Resources Corp.*, 2024 WL 340782, at *2 (6th Cir. Jan. 30, 2024).[24]

---

[24] Although the Sixth Circuit's remark in *Kirkbride* spoke of "actual notice" only, Ohio case law cited in *Kirkbride* held that "actual *or* constructive notice" can excuse a "failure to comply with a

Here, to satisfy the contractual notice outlined in the Agreements, Little Mountain had to send a written notice to 551 Telser Road, Lake Zurich, Illinois 66047, Attn: David Rybacki, dave@drgmanufacturing.com, specifying Defendants' nonperformance, and sent at least ten days before Little Mountain terminated the Agreements. (*E.g.*, Doc. 17-1 ¶¶ 9(A), 11(N).) Based on the record before it, the Court finds that Little Mountain did not send Defendants notice of Default that technically complied with the Agreements' requirements before terminating the Agreements.[25]

To maintain its breach of contract claims, therefore, Little Mountain must establish that it, nevertheless, provided each Defendant with adequate notice that Little Mountain considered Defendant to be in Default. Importantly, Defendants were not automatically in Default under the Agreements because of late payments. Rather, Defendants were only in Default if Little Mountain

---

contractual notice provision." *MRI Software, L.L.C. v. W. Oaks Mall FL, LLC*, 116 N.E.3d 694, 700–01 (Ohio Ct. App. 2018) (emphasis added); *see also Roger J. Au & Son, Inc. v. Ne. Ohio Reg'l Sewer Dist.*, 504 N.E.2d 1209, 1217 (Ohio Ct. App. 1986). Although this Court takes no position at this juncture as to whether constructive notice alone would be sufficient to excuse technical defects in providing contractual notice, the Court notes that Ohio's version of the UCC provides that "a person has 'notice' of a fact if the person: (1) [h]as actual knowledge of it; (2) [h]as received a notice or notification of it; or (3) [f]rom all the facts and circumstances known to the person at the time in question, has reason to know that it exists." Ohio Rev. Code § 1301.202.

[25] To the extent Little Mountain contends that John Habe, IV's December 2021 email provided the requisite contractual notice allowing Little Mountain to terminate the Agreements in May 2022, Defendants contend they cured their nonperformance and brought their overdue balance current after receiving that email. (Doc. 117-7 ¶¶ 4–6.) Little Mountain summarily states Defendants "never cured" their default (*e.g.*, Doc. 159, at 23), but has not cited any evidence that rebuts Defendants' testimony and records establishing otherwise. To be sure, John Habe, IV's email attached a balance sheet listing several outstanding invoices. Of those, only four listed invoices were overdue for payment as of December 21, 2021. Of those four, one invoice was not subject to the Agreements and DR Guns sent an email evidencing that checks had been sent for the other three. (Doc. 117-7, at 6–7.) The cited evidence before this Court suggests that Defendants did make themselves current under the Agreements as of December 21, 2021. As such, the December 21, 2021 email cannot serve as notice of default justifying Little Mountain's termination of the Agreements five months later.

30

notified them of nonpayment and Defendants failed to cure the nonpayment within 10 days. In other words, to trigger remedies under the Default provision (including termination), Little Mountain had to let Defendants know that it considered them to be in Default.

Little Mountain cites to several documents that it contends establish Defendants' notice of their Default. Several of these documents, however, cannot, as a matter of law, establish that Little Mountain provided Defendants with notice of Default. For example, purchase orders, invoices, and the Agreements themselves that do nothing more than reiterate Defendants' payment obligations cannot possibly establish that any Defendant had notice that Little Mountain considered it to be in Default. Similarly, DR Guns' internal accounting statements (dated after Little Mountain terminated the Agreements) cannot establish that any Defendant understood Little Mountain considered it to be in Default before the Agreements were terminated.

That being said, the Court cannot say as a matter of law that Little Mountain did not provide adequate notice of Default to DR Guns before terminating the Agreements. Rather, there is a question of fact as to whether DR Guns had adequate notice that Little Mountain considered it to be in Default. For example, Little Mountain emailed DR Guns accounting statements in February, March, and April 2022.[26] The February 2022 accounting statement lists two outstanding invoices,

---

[26] Defendants contend, without citing any authority, that the Court should not consider these accounting statements as evidence because Little Mountain did not mention them in its amended complaint. But Little Mountain's breach of contract claims need not be plead with particularity. *See Cuyahoga Metropolitan Housing Auth. v. 10-8 Sys., Inc.*, 2006 WL 543103, at *8 (N.D. Ohio Mar. 2, 2006). Further, nothing requires a plaintiff to plead all the evidence that will support the allegations in its complaint. *See McWreath v. Cortland Bank*, 2012 WL 2522933, at *6 (Ohio Ct. App. June 29, 2012) ("It is not necessary for the plaintiff to 'plead law or match facts to every element of a legal theory[.]'" (quoting *Nader v. Democratic Nat'l Commt.*, 590 F. Supp. 2d 164,

which Little Mountain represents are for Parts purchased subject to the Agreements (#284 and #328). Both of those outstanding invoices were more than 30 days overdue as of the February 2022 accounting statement. The March 2022 accounting statement also includes invoices #284 and #328—listed as outstanding for 115 and 87 days, respectively. The April 2022 accounting statement illustrates those invoices (#284 and #328) had still not been paid and that several additional invoices for Parts subject to the Agreements had become overdue.

However, none of these accounting statements were sent by Little Mountain unilaterally. Rather, each accounting statement was emailed after DR Guns requested updated statements. None of the accounting statements specify any nonperformance under the Agreements—at best, as Little Mountain says, they "illustrate" late payments. (*See* Doc. 159, at 23.) Even so, each accounting statement lists several outstanding invoices—not all of which are overdue or even subject to the Agreements. None of the accounting statements explicitly identifies on its face that any listed invoice is subject to the Gas Key Agreement and/or Carrier Agreement. Rather, DR Guns would presumably have to infer or cross-reference with other documents to know that an overdue invoice was subject to one of the Agreements. [27]

Little Mountain also contends that David Rybacki and Chris Gosell both testified that they were aware of "payment defaults under the Agreements." (Doc. 159, at 23–24.) Their testimony, however, is not clear as to when either one of them became aware of late payments. For example,

---

167 (D.D.C. 2008))). To be sure, "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." Fed. R. Civ. P. 9(c).

[27] To be sure, Little Mountain highlighted invoices subject to the Agreements for this Court's benefit because it otherwise would not have been obvious that an invoice was subject to one of the Agreements.

David Rybacki testified that he was aware of late payments "at the time the [A]greements were terminated." (*Id.* at 23 n.6.) The Court cannot say then that, as a matter of law, David Rybacki had adequate notice *before* the Agreements were terminated that Little Mountain considered DR Guns in Default. Chris Gosell's testimony also raises factual questions relative to when he became aware of late payments, and as to what his referenced "payment conversations on and off" entailed. (*Id.* at 24 n.7.)

As discussed elsewhere in this memorandum of opinion, Defendants maintain that Little Mountain produced Parts that failed to meet Defendants' Specifications. Defendants have pointed to documented quality concerns raised with Little Mountain. Further, Defendants have offered emails that suggest at least one of the overdue invoices in the accounting statements had a "discrepancy." (Doc. 117-7, at 6, 7 (noting "discrepancy of 231pcs of gas keys" for invoice #284, amounting to $821.44).) For all the Court knows, "payment conversations on and off" and the overdue invoices listed in the accounting statements concerned disputes over quality, but the Court cannot say one way or the other based on the record before it.[28]

Taken together, there is a genuine issue of material fact concerning whether there was adequate notice intended by Little Mountain and understood by DR Guns to mean that Little

---

[28] Defendants also contend that the Agreements were amended to address Little Mountain's inability to meet Defendants' quality Specifications. Little Mountain, on the other hand, contends that the Agreements were amended to address DR Guns' inability to meet purchasing requirements. While the amendments cannot serve as adequate notice that Little Mountain considered Defendants to be in Default before terminating the Agreements, this factual dispute further highlights that it would be inappropriate for this Court to find, as a matter of law, that Little Mountain did or did not provide Defendants with adequate notice because doing so involves deciding whether Little Mountain or Defendants' version of events is more credible.

Mountain considered DR Guns to be in Default under the Gas Key and the Carrier Agreements. *See Roger J. Au & Son, Inc.*, 504 N.E.2d at 1216.

On the other hand, there is no evidence establishing that Hobbit, SRW, or Equipmunk received adequate notice that Little Mountain considered them in Default under the Gas Key or Carrier Agreement.[29] As noted above, Little Mountain did not provide technical contractual notice to any of the Defendants. And in arguing that Defendants nevertheless received notice of default, Little Mountain does not point to any testimony, accounting statements, or other communication that could reasonably be construed as providing notice to Hobbit, SRW, or Equipmunk that Little Mountain considered them to be in Default.

Testimony by David Rybacki and Chris Gosell about late payments concerned questions specific to DR Guns only. Little Mountain's citation to DR Guns' internal accounting report is likewise unpersuasive because whether DR Guns may have documented late payments on its systems says nothing about whether Hobbit, SRW, or Equipmunk had notice that Little Mountain considered them to be in Default. Further, the cited accounting statements were sent to DR Guns, exclusively. The accounting statements list invoices outstanding as to DR Guns, exclusively. The accounting statements do not even mention Hobbit, SRW, or Equipmunk. Nothing in the accounting statements suggests that Little Mountain considered Hobbit, SRW, or Equipmunk to be in Default.

---

[29] Hobbit, SRW, and Equipmunk joined DR Guns in moving for dismissal of Little Mountain's breach of contract claims based on Little Mountain's failure to give the requisite notice to terminate the Agreements and seek damages. (Doc. 117, at 21 n.8.)

Accounting statements sent to DR Guns, illustrating outstanding invoices owed by DR Guns, is insufficient to establish notice to either Hobbit, SRW, or Equipmunk. Little Mountain has maintained throughout this litigation that Hobbit, SRW, and Equipmunk are separate parties to the Agreements—not guarantors of DR Guns. As parties to the Agreements, Little Mountain can only maintain its breach of contract claims against them if Little Mountain provided each of them adequate notice that Little Mountain considered them in Default. Little Mountain has failed to do so.

For all the aforementioned reasons, Defendants' motion for summary judgment is granted to the extent it asks this Court to hold that Little Mountain failed to provide Hobbit, SRW, and Equipmunk with adequate notice of Default before terminating the Agreements, but denied as that issue pertains to DR Guns. Hobbit, SRW, and Equipmunk are entitled to summary judgment entered in their favors as to Little Mountain's remaining claims that they breached the Gas Key Agreement and Carrier Agreement. Little Mountain's motion for summary judgment is denied to the extent it moves for this Court to hold that, as a matter of law, it did provide adequate notice of Default to all Defendants.

**The Agreements' Damages Provision**

The Court will now consider DR Guns' defense that the liquidated damages Little Mountain seeks amount to an unenforceable penalty. The Agreements' damages provision provides that, in the event of an uncured Default by Defendants, Little Mountain can recover:

> [A]ll damages recoverable at law including but not limited to any or all of the following: (1) its actual out-of-pocket damages or costs directly caused by BUYER's breach of this Agreement; (2) the sums owed for Parts delivered to BUYER but not paid for; (3) the cost of finished Parts not yet shipped to BUYER; (4) forty-five percent (45%) of the aggregate amount of monies that BUYER would have paid Seller for Parts scheduled to be sold and delivered under this Agreement after the

35

date of BUYER's Default (BUYER acknowledges that the actual damages sustained
by Seller resulting from BUYER's breach of the Agreement are not readily
calculable and that this liquidated damages amount is fair and reasonable); and (5)
Seller's reasonable legal and litigation and expenses.

Generally, under Ohio law, "parties are free to enter into contracts that contain provisions
which apportion damages in the event of default." *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183,
187 (Ohio 1993). The Ohio Supreme Court has recognized, however, that "[i]n certain
circumstances . . . complete freedom of contract is not permitted for public policy reasons. One
such circumstance is when stipulated damages constitute a penalty." *Id.* This is because damages
awarded for a breach of contract seek to compensate the nonbreaching party for losses suffered as a
result of a breach. Thus, proper liquidated damages are intended to reflect an "estimation and
adjustment" of "[r]easonable compensation for actual damages" in the event of a breach. *Samson
Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 394–95 (Ohio 1984).

"[W]here the amount specified is manifestly inequitable and unrealistic, courts will
ordinarily regard it as a penalty." *Id.* "A penalty is designed to coerce performance by punishing
nonperformance; its principal object is not compensation for the losses suffered by the
nonbreaching party." *Lake Ridge Academy*, 613 N.E.2d at 188. Thus, "[t]he characteristic feature of
a penalty is its lack of proportional relation to the damages which may actually flow from failure to
perform under a contract." *Id.* (quotation omitted)).

The Ohio Supreme Court has recognized that, "'[w]here the parties have agreed on the
amount of damages, ascertained by estimation and adjustment, and have expressed this agreement
in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and
not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if
(2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate

36

in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.'" *Samson Sales*, 465 N.E.2d at 394 (*quoting Jones v. Stevens*, 146 N.E. 894 (Ohio 1925)).[30]

For a contract provision to be construed as a liquidated damages clause, and not a penalty, all three conditions of the *Samson Sales* test must be met. *Kurtz v. W. Property, LLC*, 2011 WL 6916196, at *6 (Ohio Ct. App. Dec. 27, 2011) ("The tripartite test of *Samson Sales* is stated in the conjunctive, and, hence, all three elements must be met." (citation omitted)). "Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages depends upon the operative facts and circumstances surrounding each particular case," *Samson Sales*, 465 N.E.2d at 394, and that determination "necessarily involves analysis of the facts of the particular case." *Cad Cam, Inc. v. Underwood*, 521 N.E.2d 498, 503 (Ohio Ct. App. 1987). "[The] party seeking to invalidate a purported liquidated-damages clause is asserting an affirmative defense and bears the burden of proof establishing that the clause generates damages in the form of a penalty, rather than reasonably apportioned damages." *CosmetiCredit, LLC v. World Fin. Network Nat'l Bank*, 24 N.E.3d 762, 776–77 (Ohio Ct. App. 2014) (citing *MatchMaker Int'l, Inc. v. Long*, 654 N.E.2d 161, 162 (Ohio Ct. App. 1995)). "The determination of whether a liquidated damages provision is an unenforceable penalty is a matter of law to be determined by the Court in light of all the

---

[30] Similarly, the Ohio UCC provides that "[d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty." Ohio Rev. Code § 1302.92(A).

circumstances." *Easton Telecom Servs., LLC v. CoreComm Internet Grp., Inc.*, 216 F. Supp. 2d

695, 699 (N.D. Ohio 2002).

Here, the contested damages provision provides that in the event of DR Guns' breach, Little

Mountain can recover (among other damages):

> [F]orty-five percent (45%) of the aggregate amount of monies that BUYER would
> have paid Seller for Parts scheduled to be sold and delivered under this Agreement
> after the date of BUYER's Default (BUYER acknowledges that the actual damages
> sustained by Seller resulting from BUYER's breach of the Agreement are not readily
> calculable and that this liquidated damages amount is fair and reasonable)[.]

Little Mountain moves for an award of $8,968,090 in liquidated damages under this provision for

DR Guns' alleged breach of the Gas Key Agreement and the Carrier Agreement.

DR Guns does not contend or present any evidence suggesting that this damages provision

was not intended or negotiated by both sides or that the contact as a whole is unconscionable or

unreasonable.[31] Rather, DR Guns contends that the amount of Little Mountain's actual damages is

not uncertain or difficult to prove and the liquidated damages amount Little Mountain seeks bears

no reasonable relationship to Little Mountain's actual damages.

Having considered the provision, the Court finds that it is enforceable as a liquidated

damages provision. The provision properly serves to estimate Little Mountain's actual damages

under each Agreement in the event of DR Guns' breach. The provision estimates Little Mountain's

damages as 45% of the aggregate monies that DR Guns would have paid Little Mountain for parts

---

[31] In fact, the Agreements, including the damages provisions, were reviewed by DR Guns' counsel.
DR Guns' counsel recommended removing the damages provisions but, ultimately, DR Guns
agreed to include the provision in each Agreement. Stacy Rybacki testified that the damages
provisions were included against counsel's advice because Little Mountain insisted that they be
included. (Doc. 101, at 46:23–48:13.)

under the Agreements after the date of DR Guns' default. The provision does not call for any sum certain amount regardless of when the default occurs, nor does the provision call for full payment on parts that should have been purchased and delivered. *See Boone Coleman Constr., Inc. v. Piketon*, 50 N.E.3d 502, 512 (Ohio 2016) (citing *Tayloe v. T. & S. Sandiford*, 20 U.S. 13, 18 (1822) ("[T]he agreement to pay a specified sum weekly during the failure of the party to perform the work, partakes much more of the character of liquidated damages than the reservation of a sum in gross.")). Further, as evidenced by Little Mountain's expert's report, this estimation is close to Little Mountain's actual lost profit damages. Little Mountain's expert calculated its lost profit damages to be $8,861,613, compared to the $8,968,090 calculated liquidated damages.

DR Guns argues, without citing any authority, that Little Mountain's actual damages are limited to the unpaid invoices when the Agreements were terminated, which DR Guns contends, based on Little Mountain's expert, is $143,585.00. DR Guns posits the $8,968,090 liquidated damages amount is unreasonably disproportionate to the unpaid invoices amount.

As in initial matter, DR Guns' argument ignores the plain language of the parties' Agreements, which—even without liquidated damages—explicitly states that Little Mountain can recover "sums owned for Parts delivered to [DR Guns] but not paid for," *and* Little Mountain's "actual out-of-pocket damages for costs directly caused by [DR Guns'] breach of this Agreement," "the cost of finished Parts not yet shipped[,]" and Little Mountain's "reasonable legal and litigation expenses." DR Guns has not provided any reason as to why Little Mountain would not be entitled to recover these costs in the event that Little Mountain establishes its breach of contract claim against DR Guns. Nor has DR Guns provided any explanation as to why Little Mountain would not be entitled to recover lost profits in the event it can establish its breach of contract claim.

39

The Court is left then with Little Mountain's expert's calculation of its lost profit. DR Guns did not proffer its own expert opinion, or any other calculation, that challenges this amount. Comparing the expert's calculation of $8,861,613 in lost profits to the $8,968,090 calculated liquidated damages amount, this Court finds the liquidated damages amount is not so disproportionate to Little Mountain's actual damages that it cannot be said to express the true intention of the parties.

Additionally, this Court cannot say that Little Mountain's actual damages were not uncertain as to amount or difficult of proof. The Agreements were to continue for several years. In calculating Little Mountain's lost profits, its expert had to make a number of assumptions including concerning the present value and the incremental value of several items whose future value would be difficult to know at the time the Agreements were executed (*e.g.*, labor and steel).

DR Guns does not refute (through its own expert or otherwise) that Little Mountain's expert had to make these assumptions. Rather, DR Guns argues, without citing any legal authority, that Little Mountain's retention of an expert who was able to provide a calculation of lost profits somehow demonstrates that Little Mountain's damages are easy to ascertain. Case law suggests otherwise. *See, e.g.*, *Hemlock Semiconductor Operations, LLC v. SolarWind Indust. Sachsen GmbH*, 867 F.3d 692, 707–08 (6th Cir. 2017) ("The 41-page [expert] report indicates that calculating lost profits—even with the information available at the time of breach—is no easy task. Factors in the lost-profits calculation included, among other things, [plaintiff's] costs of raw materials, utilities, and labor, as well as an analysis of the 'discount rate' (an estimate of the conversion of a monetary sum from a future time period into a present value). Estimating the value

40

of many of these factors requires that a number of assumptions be made.") (applying Michigan law, which, like Ohio law, considers whether damages are uncertain and difficult to ascertain).

Further, the Agreement explicitly states that DR Guns "acknowledges that the actual damages sustained by [Little Mountain] resulting from [DR Guns'] breach of the Agreement are not readily calculable and that this liquidated damages amount is fair and reasonable[.]" While not conclusive, the stated intent of two sophisticated contracting parties is a factor that courts have considered when analyzing liquidated damages under Ohio law. *See Easton Telecom Servs., LLC*, 216 F. Supp. 2d at 699. To be sure, DR Guns was aware of the liquidated damages provision and signed the Agreements—even against the advice of its attorney.

For all the aforementioned reasons, Little Mountain's motion for summary judgment is granted to the extent it asks this Court to hold that Little Mountain can recover liquidated damages under the Agreements' damages provision if it establishes its breach of contract claim, but denied to the extent it alternatively moves for this Court to award it a sum certain amount of damages.[32] DR Guns' motion for summary judgment is denied to the extent it asks this Court to hold that the Agreements' liquidated damages are an unenforceable penalty.

---

[32] This Court cannot say at this juncture that Little Mountain is entitled to any damages because there remain genuine issues of material fact as to Little Mountain's breach of contract claims for the Gas Key and Carrier Agreement and DR Guns' counterclaims as to the Carrier Agreement, Upper & Lower Agreement, and Grinding Agreement.

41

6.      **Whether DR Guns Can Maintain Its Fraudulent Inducement and Illegality Affirmative Defenses[33]**

DR Guns contends that it was fraudulently induced into executing the Agreements with Little Mountain because John Habe, IV failed to disclose his prior felony conviction during negotiations over the Agreements. The undisputed record evidence establishes that John Habe, IV was substantially involved in the negotiations over the Agreements. He was the first person who David Rybacki interacted with on behalf of Little Mountain, and he was the main point of contact for DR Guns during the negotiations.

Despite John Habe, IV's significant involvement in the negotiations process, he did not sign any of the Agreements. Rather, on the day the Agreements were executed, John Habe, IV's brother Doug Habe showed up to sign the Agreements for Little Mountain. Doug Habe is one of Little Mountain's owners. John Habe, IV is not. David Rybacki testified that he asked John Habe, IV why he was not signing the Agreements. In response, John Habe, IV told him it was because of the way the family business was structured to equalize ownership interests across the family's companies.

The first agreement that John Habe, IV and David Rybacki negotiated was the Upper & Lower Agreement. The lower receivers manufactured under that Agreement are serialized gun parts that require a federal firearm license ("FFL") to manufacture. Both Little Mountain and DR Guns possess FFLs. To obtain an FFL, federal law requires applicants to report all "Responsible Persons" for the applicant. A responsible person is defined as "[a]n individual who has the power to direct the management and policies of the applicant pertaining to explosive materials. Generally, the term

_____

[33] DR Guns indicates in its response that is has withdrawn its previously plead illegality defense. (Doc. 152, at 5 n.1.) For that reason, Little Mountain's motion for summary judgment on DR Guns' illegality defense is denied as moot.

42

includes partners, sole proprietors, site managers, corporate officers and directors, and majority shareholders." 27 CFR § 555.11. Reported Responsible Persons are subject to background vetting because federal regulations restrict persons with felony convictions from serving as Responsible Persons for an FFL holder. *See* 18 U.S.C. § 843(b) ("[T]he Attorney General shall issue to such applicant the appropriate license or permit if (1) the applicant (or, if the applicant is a corporation, partnership, or association, each responsible person with respect to the applicant) is not a person described in section 842(i).").

It is undisputed that John Habe, IV has a felony conviction. Little Mountain maintains, however, that John Habe, IV is not a Responsible Person for Little Mountain and, further, that he is not an owner of Little Mountain because of decisions made to equalize ownership in the family companies between the Habe brothers. DR Guns believes that the real reason John Habe, IV does not possess any ownership interest in Little Mountain is because of his felony conviction. DR Guns contends that John Habe, IV's role in the negotiations created the false impression that he was a Responsible Person at Little Mountain with a clean criminal record. DR Guns maintains that it would not have contracted with Little Mountain had it known about John Habe, IV's felony conviction.

Ohio law recognizes fraudulent inducement as an affirmative defense to a breach of contract claim. To establish a fraudulent inducement defense under Ohio law, DR Guns must show: (1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to

43

mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately

caused by the reliance. *Bender v. Logan*, 76 N.E.3d 336, 352 (Ohio Ct. App. 2016).

DR Guns does not contend that John Habe, IV made any affirmative false representation or

had an outright duty to disclose his felony conviction to it. Rather, DR Guns contends that John

Habe, IV "failed to disclose his felony, a disclosure that was necessary to dispel the distinct and

reasonable impression that he was able to act as a Responsible Person for Little Mountain and could

otherwise make decisions regarding serialized parts." (Doc. No. 152, at 15–16.) *See Escue v.*

*Sequent, Inc.*, 2010 WL 3365933, at *7 (S.D. Ohio Aug. 24, 2010) ("[F]ull disclosure may be

required of a party to a business transaction where such disclosure is necessary to dispel misleading

impressions that are or might have been created by partial revelation of the facts." (citing *Blon v.*

*Bank, One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1988))).

Federal regulations restrict felons from serving as Responsible Persons for FFL holders. *See*

18 U.S.C. § 843(b). Failure to report a Responsible Person on its application can result in the denial

or revocation of an applicant's FFL. *See, e.g.*, *Mew Sporting Goods, LLC v. Johansen*, 992 F. Supp.

2d 665, 679–80 (N.D.W. Va. 2014) (upholding the decision by the Bureau of Alcohol, Tobacco,

Firearms and Explosives ("ATF") revoking an FFL where the applicant failed to list as a

Responsible Person his wife, who, among things placed the orders for inventory with wholesalers,

helped tag and log the firearms, showed guns to customers, called in sales to the FBI, filled out the

firearm transaction forms, and had authority to draw on the business's checking account). DR Guns

does not contend it had any obligation to report John Habe, IV as a Responsible Person on its own

application by virtue of the Agreements. Instead, DR Guns contends that "[r]eputable holders of a[n

FFL] do not knowingly do business with felons because of the potential risk of loss of the firearms

44

license or ITAR certification, another federal requirement to manufacture regulated firearms," that doing business with a felon would "violate prevailing FFL regulations," and that "Habe's failure to disclose his felony put [DR Guns'] own FFL at risk by actively doing business with an individual who is prohibited by law from making decisions for an FFL-holding company." (Doc. 152, at 11, 12, 15.)

Fatally, however, DR Guns does not point to any actual federal law or regulation that penalizes or otherwise restricts DR Guns' ability to negotiate or collaborate with counterparties who have felony convictions. Likewise, DR Guns does not point to any evidence that suggests the real reason John Habe, IV was not an owner of Little Mountain was because of his felony, rather than a decision based on structuring a family business to equalize ownership interests. DR Guns cannot create a genuine issue of material fact resting on its own unsupported contentions and speculations. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing the motion [for summary judgment] then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." (quoting *Street*, 886 F.2d at 1479)); *Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013) (citing *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

This Court's review is limited to whether John Habe, IV so clearly acted as a Responsible Person for Little Mountain that he had a duty to disclose his felony to correct an improper impression that his record was clean. Nothing in the record suggests that John Habe, IV was in fact a Responsible Person at Little Mountain. John Habe, IV was not a partner, sole proprietor,

corporate officer director, or majority shareholder at Little Mountain. He was not even an employee of Little Mountain. Further, DR Guns knew this to be the case before the Agreements were executed because, as David Rybacki testified, John Habe, IV did not sign the Agreements—rather, his brother Doug Habe signed the Agreements. If John Habe, IV had any ownership interest in Little Mountain, he could have signed the Agreements.

DR Guns has likewise failed to point to any evidence that John Habe, IV was, or acted as, a site manager at Little Mountain. DR Guns has not pointed to any evidence that John Habe, IV had authority to control any aspect of Little Mountain's operations or that any Little Mountain employees were required to answer to his direction. Nor has DR Guns pointed to any evidence that John Habe, IV possessed any control over the premises where Little Mountain operated or that he handled any firearms. *Cf. Gossard v. Fronczak*, 206 F. Supp. 3d 1053, 1063–64 (D. Md. 2016) (upholding ATF's determination that FFL applicant's landlord was a Responsible Person where the landlord "effectively had financial control" and "controlled the premises" where the FFL applicant operated).

DR Guns' contentions rest on John Habe, IV's role in negotiating the terms of the Agreements, but not every person who acts on behalf of an FFL holder is a Responsible Person under federal regulations. *See, e.g*., *United States v. 1,922 Assorted Firearms & 229,553 Rounds of Assorted Ammunition*, 330 F. Supp. 635, 638 (E.D. Mo. 1971) (finding that a store clerk (a felon) who had a key to the store premises, was in charge of the store in the owner's absence and was authorized to sell firearms was not a responsible person as defined in the license application). DR Guns has not pointed to any authority that suggests someone acting in John Habe, IV's role is clearly a Responsible Person under federal regulations. As such, DR Guns has failed to point to

46

sufficient evidence that suggests John Habe, IV was, or acted as, a Responsible Person at Little Mountain and, in turn, failed to establish that there is a genuine issue of material fact as to whether John Habe, IV had a duty to disclose his felony conviction to dispel some impression that he was a Responsible Person with a clean record.

Further, because no evidence suggests that John Habe, IV was clearly a Responsible Person at Little Mountain, or holding himself out as one, there is insufficient evidence to create a genuine issue of material fact as to whether John Habe, IV intended to mislead Defendants by not disclosing his felony conviction. *See Wells v. James*, 2015 WL 5164971, at *4 (S.D. Tex. Sept. 2, 2015) ("Even if this Court were to assume that Johnson were a responsible person, moreover, there would still be a material dispute regarding Wells's willfulness in violating the [Gun Control Act]. The record simply does not establish that Wells had knowledge of what the law required and that she acted intentionally or recklessly in violating those requirements when she filled out her FFL application.").

For all the aforementioned reasons, Little Mountain's supplemental motion for summary judgment on DR Guns' fraudulent inducement defense is granted.

## **CONCLUSION**

For the foregoing reasons, Little Mountain Precision, LLC's Motion for Partial Summary Judgment (Docs. 111 & 112) is GRANTED IN PART and DENIED IN PART; Defendants Rybacki Management Inc., SRW Industries, LLC, 500 Capital Drive LLC, SLD Real Estate Holdings LLC, Equipmunk Leasing LLC, 551 Telser Road LLC, and Hobbit Holdings Inc.'s Motion for Summary Judgment (Docs. 115 & 116) is GRANTED IN PART and DENIED IN PART; Defendant DR Guns, LLC's Motion for Summary Judgment (Doc. 117) is GRANTED IN

PART and DENIED IN PART; and Little Mountain Precision, LLC's Supplemental Motion for Summary Judgment on DR Guns, LLC's Fraudulent Inducement and Illegality Defenses (Doc. 143) is GRANTED.

Defendants RMI, SRW, 500 Cap, 551 Telser, SLD, Hobbit, and Equipmunk are entitled to judgment entered in their favor as to all of Little Mountain's claims against them.

This case will proceed with the following claims and parties: (1) Little Mountain's claim that DR Guns breached the Gas Key Agreement and the Carrier Agreement, (2) DR Guns' counterclaims that Little Mountain breached the Carrier Agreement, Upper & Lower Agreement, and Grinding Agreement.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated:  3/25/24